Brad P. Miller, ISB No. 3630
bmiller@hawleytroxell.com
Andrea J. Rosholt, ISB No. 8895
arosholt@hawleytroxell.com
**Hawley Troxell Ennis & Hawley LLP**
877 Main Street, Suite 1000
Boise, ID  83702
Telephone:  +1 208 388 4832
Facsimile:  +1 208 954 5240

James P. Baker (to be admitted *Pro Hac Vice*)
james.baker@bakermckenzie.com
California State Bar No. 96302
**Baker & McKenzie LLP**
Two Embarcadero Center, 11th Floor
San Francisco, CA  94111-3802
Telephone:  +1 415 576 3000
Facsimile:  +1 415 576 3099

Attorneys for Plaintiff
DONNIE ELY, a Participant in the PACE Industry
Union-Management Pension Fund

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF IDAHO

| | |
|---|---|
| DONNIE ELY, a Participant in the PACE Industry Union-Management Pension Fund, <br><br>        Plaintiff, <br><br>   v. <br><br> BOARD OF TRUSTEES OF THE PACE INDUSTRY UNION-MANAGEMENT PENSION FUND, <br><br>        Defendants. | **Case No.**   3:18-CV-315 <br><br> **COMPLAINT (ERISA)** |

Plaintiff DONNIE ELY, a Participant in the PACE INDUSTRY UNION-MANAGEMENT PENSION FUND ("PIUMPF"), through his undersigned attorneys, as and for his Complaint, alleges as follows:

## PRELIMINARY STATEMENT

1.     Defendants' breaches of fiduciary duty and violations of the requirements of the ERISA statute arise from their disloyal and imprudent mismanagement of the PACE Industry Union-Management Pension Fund (hereinafter also referred to as the "Plan" or "Fund").

2.     In 2013, the PIUMPF Trustees adopted an amendment to the Rehabilitation Plan requiring withdrawing employers to pay an additional exit fee based on the Fund's  accumulated funding deficiency (the "AFD Exit Fee").  Federal law requires pension plans in critical status to adopt a rehabilitation plan aimed at restoring the financial health of the Fund.  As a result of this amendment to its Rehabilitation Plan, any employer who completely withdraws from PIUMPF must pay both its statutorily required withdrawal liability assessment, as well as the separate AFD Exit Fee.  The withdrawal liability assessment, as well as the AFD Exit Fee, are computed by ascertaining the Employer's proportionate share of the Plan's underfunding.

3.     The plan-wide AFD Exit Fee is undermining PIUMPF's solvency.  The amount of the AFD Exit Fee is increasing geometrically.  In just five years, the plan-wide AFD Exit Fee amount has grown by a factor of 36.  The AFD Exit Fee plan-wide amount was $13.2 million at the end of calendar year 2013.  It is projected by the plan actuary to grow to $481 million at the end of calendar year 2018.   By the end of 2027, PIUMPF's actuary projects the plan-wide AFD Exit Fee amount will be in excess of $1.6 billion.  Because the AFD Exit Fee has no financial limitations (as does statutory withdrawal liability), an employer who continues to participate has seen its own AFD Exit Fee liability explode in size within just a few years.  In effect, the employers most loyal to PIUMPF are exposed to the greatest AFD Exit Fee assessment amounts.

4.      The Trustees' imposition of the AFD Exit Fee has generated perverse and unintended consequences.   It has rewarded employers who withdraw and has punished employers who remain.  A contributing employer's withdrawal liability assessment is limited in amount due to a 20-year payment cap under the ERISA statute.      ERISA section 4219(c)(1)(A)(ii)(B),  29 U.S.C.§ 1399(c)(1)(A)(ii)(B).   The AFD Exit Fee, however, has no similar mechanism.   Employers who pay less than their full amount of withdrawal liability due to the 20-year payment cap or due to their own insolvency, transfer all of those unpaid liabilities to the remaining contributing employers under the AFD Exit Fee.   In effect, employers who have abandoned PIUMPF are being subsidized by PIUMPF's loyal and remaining employers.

5.      In response to the fact that potential AFD Exit Fee increases significantly each year, many contributing employers have quit PIUMPF.  Since 2013, five out of PIUMPF's six largest contributing employers have completely withdrawn.  During this same short time period, the number of PIUMPF's contributing employers has plummeted from 135 to 75 – an over 44% decline.  The ratio of Active PIUMPF Participants to Inactives has similarly deteriorated.  At the end of Plan Year 2012, there were 3.2 Inactive PIUMPF Participants for every Active Participant.   On January 1, 2017, there were 10.1 Inactive PIUMPF Participants for every Active Participant.  The prospect of facing withdrawal liability, potentially reduced pensions for retirees  and a large lump sum AFD Exit Fee since 2013 has dissuaded new employers from joining PIUMPF.   The facts show the AFD Exit Fee has not "restored the financial health of the Fund."  Instead, the AFD Exit Fee is making the Fund's descent into insolvency inevitable.

6.      If PIUMPF becomes insolvent, it will be forced to sharply reduce pension benefits.  This will have a significant and financially debilitating impact on Plaintiff and all other Plan participants.   Plaintiff therefore seeks a Declaration that the AFD Exit Fee is imprudent and an injunction preventing the Fund from further enforcing the AFD Exit Fee.  It is

COMPLAINT (ERISA)
55982.0001.11219627.1

only under those circumstances that the Fund's headlong descent into insolvency can be arrested.

## JURISDICTION AND VENUE

7.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, *et seq.*  It is brought by a PIUMPF Plan participant to obtain injunctive relief and declaratory relief under sections 409(a) and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(2), so as to redress violations and enforce the provisions of Title I of ERISA.  This Court is authorized to award "such other equitable or remedial relief as the court may deem appropriate" under 29 U.S.C. § 1109(a).  In the alternative, Plaintiff seeks to obtain injunctive or other appropriate equitable relief under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3).  Plaintiff also seeks to enjoin the Trustees from taking further adverse actions in violation of Title IV of ERISA pursuant to 29 U.S.C. § 1451(a)(1).  This Court is authorized to enter declaratory relief under 28 U.S.C. § 2201.

8.      This Court has subject matter jurisdiction over this action pursuant to ERISA section 502(e)(1), 29 U.S.C. § 1132(e)(1), and ERISA section 4301(c), 29 U.S.C. § 1451(c).

9.      Venue with respect to this action lies in the Northern Division of Idaho, pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2) as this is the district where the breach took place and it is where a defendant resides or may be found.  Venue is also proper in this district because it is where a defendant resides or may be found.  ERISA section 4301(d), 29 U.S.C. § 1451(d).

## PARTIES

10.     Plaintiff DONNIE ELY is a PIUMPF participant within the meaning of ERISA section 3(7), 29 U.S.C. § 1002(7).  Pursuant to ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2) and under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff has the legal right to sue to enforce the provisions of Title I of ERISA by, among other things, the filing and prosecution

of fiduciary breach claims against the PIUMPF Plan Trustees who have violated ERISA. Pursuant to ERISA section 4301(a), 29 U.S.C. § 1451(a), Donnie Ely has the right to bring a claim against the PIUMPF Trustees whose actions in implementing the AFD Exit Fee have placed the receipt of his pension in jeopardy.

11.     Plaintiff DONNIE ELY is a resident of Lewiston, Idaho.  He is a vested participant in PIUMPF.  As a vested participant, he is entitled to receive a monthly PIUMPF pension benefit upon retirement.

12.     PIUMPF is an employee pension benefit plan as defined by ERISA section 3(2)(A), 29 U.S.C. § 1002(3)(2)(A) and is a multiemployer pension plan within the meaning of ERISA section  3(37), 29 U.S.C. §1002(37).  It is subject to ERISA regulation pursuant to ERISA section 4(a)(1), 29 U.S.C. § 1003(a)(1).

13.     PIUMPF is governed by its Trust Agreement, restated as of April 2, 2000, and as amended thereafter (the "Trust Agreement"), attached as **Exhibit 1**.  Under its express terms, the Trust Agreement is regulated by ERISA.

14.     Defendant PIUMPF's Board of Trustees ("Trustees") members are listed on the PACE Industry Union-Management Pension Fund Summary Plan Description dated December 2017 (at PDF pages 34 and 35), which is **Exhibit 2** attached hereto and which is made a part hereof ("PIUMPF Defendants").  Each PIUMPF Trustee is a functional fiduciary within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A) and acts as a named fiduciary within the meaning of ERISA section 402(a), 29 U.S.C. § 1102(a).  The PIUMPF Board of Trustees is the "named fiduciary" of the Plan and Trust.  PIUMPF Trust Agreement at Article I, section 11.  At least one of the PIUMPF Trustee Defendants resides and maintains his principal business office in Lewiston, Idaho, in the District of Idaho.

## THE ADOPTION OF THE AFD EXIT FEE

15.     Under ERISA, a pension fund is considered to be in "critical" status under Section 305 of ERISA (29 U.S.C. § 1085) if the funded percentage (that is the value of its assets divided by its accrued liabilities) is less than 65% (other factors may apply).  In 2010, the Fund entered critical status.  In response, the Trustees adopted a rehabilitation plan, as required by ERISA section 305(e), 29 U.S.C. § 1085(e).  This plan contained a combination of contribution increases and benefits reductions designed to either enable the Fund to eventually emerge from critical status or, if such changes would be impractical, to forestall insolvency.  In the case of the Fund, its Trustees determined that the changes necessary to enable the Plan to emerge from critical status would be unreasonable; consequently, the ultimate goal of the rehabilitation plan was simply to forestall insolvency.  A copy of the Fund's rehabilitation plan that was adopted in 2010, and that was circulated to contributing employers at that time, is attached hereto as **Exhibit 3**.

16.     On April 30, 2010, the Trustees published a Notice of Critical Status Certification for the PACE Industry Union-Management Pension Fund, explaining to the Plan's participants:

> **Critical status**
>
> The Fund is considered to be in critical status because it has funding or liquidity problems, or both.  More specifically, the Fund's actuary determined that the Fund is projected to have an accumulated funding deficiency within three (3) years after the current Plan Year.  The projected year of the deficiency is 2013.
>
> **Rehabilitation Plan and Possibility of Reduction in Benefits**
>
> Federal law requires pension plans in critical status to adopt a rehabilitation plan **aimed at restoring the financial health of the Fund** …[1]

---

[1] Emphasis supplied unless otherwise indicated.

17.     Subsequently, the Defendant Trustees determined that even the contribution rate increase schedules provided under the initial rehabilitation plan were not reasonable and would cause employers to withdraw from the Fund, thereby expediting rather than forestalling insolvency.  Thus, by Resolution dated April 10, 2013, the Trustees retroactively adopted, as of November 15, 2012, the 2012 Amended and Updated Rehabilitation Plan ("Amended and Updated Rehabilitation Plan"), attached as **Exhibit 4.**   This Amended and Updated Rehabilitation Plan had contribution rate schedules requiring lower annual increases to the contribution rate.

18.     But in addition to the revised schedules, the Amended and Updated Rehabilitation Plan added a paragraph that included the AFD Exit Fee.  This paragraph states in pertinent part:

> In addition, in the event an Employer withdraws during a Plan Year when the Fund has an accumulated funding deficiency, as determined under Section 304 of ERISA, the Employer shall be responsible for its pro rata share of such deficiency in addition to any withdrawal liability determined under Section 4211 of ERISA.

### THE AFD EXIT FEE VIOLATES THE
### ERISA STATUTE AND WILL CAUSE THE DEMISE OF THE FUND

19.     Under the Multiemployer Pension Plan Amendments Act of ERISA (the "MPPAA"), ERISA section 4211, *et seq*., 29 U.S.C. section 1391, *et seq*., when an employer ceases to have an obligation to contribute to a multiemployer pension plan, it must pay its share of the pension plan's unfunded vested benefits ("UVBs"). ERISA § 4211, 29 U.S.C. § 1391. This liability is commonly referred to as "withdrawal liability."  An employer's withdrawal liability, as defined under ERISA section 4201, 29 U.S.C. § 1381, is that employer's proportional share of the multiemployer pension plan's unfunded vested benefits—the plan's vested liabilities less its assets—after the application of certain statutory reductions.

20.     Separate and apart from the withdrawal liability is an obligation to pay an annual accumulated funding deficiency.  An accumulated funding deficiency is the amount, determined at the end of the plan year that equals the excess, if any, of the total charges to the plan's funding standard account for all plan years, over the total credits to the funding standard account for those years.  *See*, IRC § 431(a) and ERISA section 304(a), 29 U.S.C. § 1084(a).

21.     Under ERISA section 302(a), 29 U.S.C. § 1082(a), any accumulated funding deficiency is eliminated each year for multiemployer plans not in critical status by mandatory additional employer contributions.   In other words, the contributing employers to a multiemployer defined benefit pension plan are required to make annual contributions, on a pro rata basis, that in the aggregate are sufficient to ensure that the multiemployer pension plan does not have an annual accumulated funding deficiency.  *See* ERISA § 304, 29 U.S.C. § 1084.

22.     However, under ERISA section 302(b)(3), 29 U.S.C. § 1082(b)(3), when a multiemployer pension plan, like PIUMPF, is in critical status and is following the terms of its rehabilitation plan, the accumulated funding deficiency contribution obligation under ERISA section 302(b)(1), 29 U.S.C. § 1082(b)(1) does not apply.   In other words, under those circumstances, employers are not obligated to make payments to make up the annual accumulated funding deficiency deficit.

23.     ERISA does not include, as part of an employer's withdrawal liability, a pro rata payment of the plan's accumulated funding deficiency. Instead, an employer's allocable share of the multiemployer pension plan's unfunded vested benefits must be calculated under one of the statutory methods prescribed under ERISA section 4211, 29 U.S.C. § 1391.  An employer's allocable share of unfunded vested benefits is determined by either (i) attributing a proportionate share of the plan's total unfunded vested benefits based on the employer's share of contributions in prior years; or (ii) directly attributing to an employer the unfunded vested benefits relating to pension credit earned through service with that employer.

24.     Under any of the statutory calculation methods, a withdrawn employer's share of the multiemployer pension plan's total unfunded vested liability is based on the plan's total vested and unfunded liabilities that exist on the last day of the plan year prior to the year of the employer's withdrawal. ERISA § 4211, 29 U.S.C. § 1391.

25.     Pension Benefit Guaranty Corporation ("PBGC") regulation, 29 C.F.R. § 4211.21(c), prohibit any allocation method that results in a systematic and substantial over-allocation of the plan's unfunded vested benefits (assessing employers amounts greater than the amount of vested liabilities less the plan's assets).

26.     Under PIUMPF's AFD Exit Fee, an employer is assessed twice for the same liability.  First, in accordance with ERISA, an employer who withdraws from PIUMPF will be assessed statutory withdrawal liability.  Under ERISA, the unfunded vested benefits for the Plan as a whole are allocated among all the participating employers.  ERISA § 4211, 29 U.S.C. § 1391.  Second, under PIUMPF's AFD Exit Fee, the employer will also be charged its proportionate share of PIUMPF's AFD Exit Fee (which includes the Plan's accumulated Funding Standard Account net charges for each Plan Year's UVBs).  As the years pass and more employers withdraw, the AFD Exit Fee accumulates all plan contributions and withdrawal liability non-payments or underpayments (whether due to employer bankruptcies, the 20-year cap on withdrawal liability payments, or any other source) and allocates all UVB underpayments for a second time to the remaining contributing employers.

27.     The calculation of a plan's unfunded vested benefits and the calculation of a plan's AFD Exit Fee encompass, in large part, the same unfunded liability.  If every employer withdrew in the same year, 100% of the plan's unfunded vested benefits would already be allocated among all the participating employers.  Charging these same employers a second time for a share of the plan's "accumulated funding deficiency" results in the plan seeking to recover more than 100% of the Plan's unfunded liabilities.  PIUMPF's assessment of both withdrawal

liability and an AFD Exit Fee against an employer results in a "systematic and substantial over-allocation of the plan's unfunded vested benefits" in violation of 29 C.F.R. § 4211.21(c).

28.    PIUMPF's AFD Exit Fee assessment is also improper because it permits PIUMPF to collect more than the employer's proportionate share of PIUMPF's underfunding. ERISA sections 304(b)(3) and 304(b)(7), 29 U.S.C. §§ 1084(b)(3) and 1084(b)(7), state a pension fund's AFD Exit Fee is cured through an infusion of funds into the plan, regardless of the obligation under which they are contributed. Withdrawal liability payments are aimed at curing PIUMPF's AFD Exit Fee. ERISA § 304(b)(7), 29 U.S.C. § 1084 (b)(7).

29.    The nature of the AFD Exit Fee virtually assures that all of PIUMPF's contributing employers will have to withdraw from the Fund because the alternative will cause their liability to increase many times over. An employer who now makes 10% of PIUMPF's total contributions, and who withdraws in 2018, would owe in addition to its statutory withdrawal liability assessment, an AFD Exit Fee of approximately $48 million for its share of PIUMPF's AFD Exit Fee. If this same employer remained in PIUMPF until 2027, then its share of the AFD Exit Fee would grow to at least $160 million. In addition, while an employer's statutory withdrawal liability is paid in installments over 20 years, the AFD Exit Fee is required to be paid in a single lump sum. The fear of being the "last man standing" subject to a mushrooming AFD Exit Fee is a real and compelling concern. It has motivated many employers to withdraw from PIUMPF. See paragraph 35 below.

<u>**THE AFD EXIT FEE IS CONTRARY TO THE<br>PURPOSE OF A REHABILITATION PLAN**</u>

30.    PIUMPF's December 31, 2017 Rehabilitation Plan explains:

> The Board of Trustees had determined that the alternatives available to attempt to emerge from Critical Status by the end of the Rehabilitation Period would rather likely result in a mass withdrawal under ERISA. Therefore, the Board determined that, based on reasonable actuarial assumptions, and upon exhaustion of all reasonable measures, the Fund cannot reasonably be expected to emerge from Critical Status by the end of the Rehabilitation

Period. **Therefore, the Trustees have adopted a Rehabilitation Plan described under Section 305(e)(3)(A)(ii) of ERISA that consists of reasonable measures to forestall the date of the Fund's possible insolvency.**

31.     Each year the Trustees provide Plan participants a notice describing the pension's funding status pursuant to 29 C.F.R. 2520, 105-5. Its 2018 Notice of Critical Status Certification states in pertinent part:

> **Critical and Declining Status**
>
> Also, as required by the Multiemployer Pension Reform Act of 2014, the Fund was certified as being in critical and declining status because the actuary determined that the Fund has an accumulated funding deficiency, the funded percentage was less than 65%, and the Fund is projected to become insolvent in the 2032 Plan Year.
>
> **Rehabilitation Plan**
>
> **Federal law requires pension plans in critical status to adopt a rehabilitation plan aimed at restoring the financial health of the Fund.**

32.     PIUMPF's AFD Exit Fee is directly contrary to the statutory purpose for a Rehabilitation Plan. ERISA requires a Rehabilitation Plan to consist of:

> **"reasonable measures to emerge from critical status at a later time or to forestall possible insolvency"** 29 U.S.C. § 1085(e)(3)(A)(ii)

33.     A "reasonable measure to emerge from critical status" is something that would help PIUMPF emerge from critical status by increasing the Plan's funding percentage above 65%. *See*, 29 U.S.C. § 1085(c)(3). But over the past five years, the AFD Exit Fee has had the opposite effect. It has caused the Plan's funding level to decline. More importantly, by forcing many employers to completely withdraw from PIUMPF, the AFD Exit Fee is, itself, a patently imprudent measure. The continuing loss of a material number of contributing employers has caused a corresponding loss in contributions for active employees. Since the adoption of the AFD Exit Fee, the ratio of active employees to inactive vested participants has gone from one

active to three inactives, to one active to ten inactives.  This dramatic erosion of the active employee contribution base is <u>not</u> restoring the financial health of the Fund.  Instead, the shrinking number of active employee participants makes it more and more likely PIUMPF will not emerge from critical status at a later time.

34.     PIUMPF's AFD Exit Fee is contrary to the purpose of its own Rehabilitation Plan.  Each year PIUMPF states in its 2018 Notice of Critical Status that its "**rehabilitation plan [is] aimed at restoring the financial health of the Fund**."  It then states in the text of its amended Rehabilitation Plan that its purpose is to "**forestall the date of the Fund's possible insolvency**."  But the ERISA statute does not say Rehabilitation Plans may be adopted to delay insolvency.  Instead, ERISA requires a Rehabilitation Plan to adopt "**reasonable measures to emerge from critical status or to forestall possible insolvency**."   29 U.S.C. § 1085(e)(3)(A)(ii).  The word "forestall" means "to prevent something from happening by acting first: doctors prescribe aspirin to forestall second heart attacks." dictionary.cambridge.org.  *See also*, oxforddictionaries.com.  "Forestall" does not mean delay.

## THE AFD EXIT FEE IS CAUSING PIUMPF'S RAPID DECLINE

35.     In fact, the  impact of the AFD Exit Fee on the Plan has been devastating. PIUMPF's 2017 Actuarial Valuation is based on demographic data as of December 31, 2016. In summary:

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Active Participants | 17,932 | 16,819 | 13,980 | 11,224 | 9,934 | 6,282 |
| Inactive Participants | 57,316 | 57,797 | 59,488 | 61,254 | 61,388 | 63,343 |
| Inactives / Actives | 3.2 | 3.4 | 4.3 | 5.5 | 6.2 | 10.1 |
| Contributing Employers | 135 | 119 | 101 | 89 | 75 | ? |

**Exhibit 5** at PDF p. 38.   PIUMPF's Form 5500 lists the Plan's contributing employer participation information on page 2, line 7.  Their 5500's are publicly available and can be

accessed          through          the          DOL's          website
https://www.efast.dol.gov/portal/app/login?execution=e1s1 (EIN 116166763) (last accessed
June 20, 2018).

36.     The number of active participants has declined from 23,335 to 6,282 over the last
10 years, while the number of retirees has increased by 5,317 over that same period.  The active
employee population has decreased by 63% between January 1, 2013 and January 1, 2017.  In
just the 2016-2017 period, there was a 36.8% decrease.  PIUMPF's actuary states the number of
active participants will continue to decline.  In the January 1, 2017 Actuarial Valuation, the
actuary states "the active population is expected to decline 12% due to employers that withdrew
during or after 2016 to approximately 5,546 actives."  **Exhibit 5** at PDF p, 10.  This actuarial
valuation also reports there are 31,168 pensioners and 32,175 inactive vested participants.  *Id.* at
p. 38.  The ratio of non-actives to actives has increased to 10.1 from 6.2 in just the last year.  *Id.*
at p. 13.

37.     PIUMPF's actuary reports that as of January 1, 2017, "the Plan is projected to be
unable to pay benefits in 2031."  Id. at p. 11.

38.     The AFD Exit Fee has caused a large employer exodus.  Since its 2013 adoption,
more than 44% of PIUMPF's contributing employers (60 out of 135) have left PIUMPF.
Contributing employers have realized the AFD Exit Fee arithmetic is simple.  Each year, the
AFD Exit Fee amount grows significantly.  For a contributing employer, this means the sooner
you get out, the lower the AFD Exit Fee you will need to pay.  Because there are fewer
contributing employers, there are fewer PIUMPF contributions.  The continuing erosion of the
employer contribution base is not "restoring the financial health of the Fund."  It has had the
opposite effect.  It is making insolvency more inevitable.

39.     Significant employers known to have withdrawn include:

- AK Steel
- American Valve & Hydrant

- Appleton Papers
- Domtar, Inc. (6th largest contributor in 2012)
- Evergreen Packaging
- Graphic Packaging
- Mylan Pharmaceutical (3rd largest contributor in 2011)
- Sebring Container
- Georgia Pacific (largest contributor in 2014)
- Possibly Robert Wood Johnson Hospital (in litigation; 5th largest in 2015)
- WestRock in early 2018 (2nd largest contributor in 2017)

40.     For the January 1, 2017 Actuarial Valuation, PIUMPF reports benefit payments and expenses were 4.0 times contributions (including withdrawal liability and funding deficiency payments). *Id.* at 19. That is, for every dollar in employer contributions paid into PIUMPF, four dollars in plan benefit payments and expenses is paid out. This Plan, as currently administered, is falling headlong into insolvency.

41.     Since the adoption of the AFD Exit Fee in April 2013, PIUMPF's funding has steadily declined even though the U.S. stock market is up almost 85%.

42.     The AFD Exit Fee is putting PIUMPF's retiree pensions in increasing jeopardy. If PIUMPF is not able to pay full pension benefits when due in 2031 (as PIUMPF itself predicts), then assuming the PBGC, itself, is not insolvent, the ERISA statute will require PIUMPF to reduce retiree pension benefits. If the PBGC becomes insolvent in 2025 (as it predicts), the likely maximum annual benefit for a PIUMPF retiree will be $1,609. *See* **Exhibit 6**, "PBGC Multiemployer Pension Guarantees Are Lousy: Hearing Revelation." Thinkadvisor, May 18, 2018, https://www.thinkadvisor.com/2018/05/18/pbgc-multiemployer-pension-guarantees-are-lousy-he/.

43.     The rapidly shrinking number of employers who contribute to PIUMPF makes PIUMPF's decline into insolvency almost inevitable. When PIUMPF becomes insolvent, all retiree pension benefits will be drastically reduced. The prospect of facing both withdrawal liability and dwindling pension benefits, as well as the prospect of being assessed a large lump sum AFD Exit Fee has also dissuaded new employers from joining PIUMPF.

## COUNT I

## BREACH OF ERISA SECTION 4301

44.    Plaintiff repeats the allegations set forth in paragraphs 1 through 43 as though fully set forth at length herein.

45.    ERISA section 4301(a)(1), 29 U.S.C. § 1451(a)(1) permits a participant who is adversely affected by an act or omission of a party under ERISA Title IV, Subtitle E to bring an action for appropriate legal or equitable relief.

46.    By implementing the AFD Exit Fee, the Trustees violated ERISA section 4211, 29 U.S.C. § 1391.    The AFD Exit Fee also violates 29 C.F.R. section 4211.21(c), which prohibits any withdrawal liability allocation method that results in a systematic and substantial over-allocation of the plan's unfunded vested benefits (assessing employers amounts greater than the amount of vested liabilities less the plan's assets).

47.    The AFD Exit Fee was also adopted in violation of ERISA section 305(e)(3)(A)(ii), 29 U.S.C. § 1085(e)(3)(A)(ii).    A Rehabilitation Plan is required to consist of: "reasonable measures to emerge from critical status at a later time or to forestall possible insolvency."  ERISA § 305(e)(3)(A)(ii), 29 U.S.C. § 1085(e)(3)(A)(ii).

48.    A "reasonable measure to emerge from critical status" is something that would help PIUMPF emerge from critical status by increasing the Plan's funding percentage above 65%.  *See,* 29 U.S.C. § 1085(c)(3).  But over the past five years, the AFD Exit Fee has had the opposite effect.  It has caused the Plan's funding level to decline.

49.    Recognizing this fact, the Trustees do not even claim that the Fund's Rehabilitation Plan will cause the Plan to emerge from critical status.  PIUMPF's December 31, 2017 Rehabilitation Plan explains:

> The Board of Trustees had determined that the alternatives available to attempt to emerge from Critical Status by the end of the Rehabilitation Period would rather likely result in a mass withdrawal under ERISA.  Therefore, the Board determined that, based on reasonable actuarial assumptions, and upon exhaustion of

> all reasonable measures, the Fund cannot reasonably be expected to emerge from Critical Status by the end of the Rehabilitation Period.  Therefore, the Trustees have adopted a Rehabilitation Plan described under Section 305(e)(3)(A)(ii) of ERISA that consists of reasonable measures **to forestall the date of the Fund's possible insolvency**. [emphasis added]

50.     "Forestall" means "prevent;" it does not mean delay.   By adopting a Rehabilitation Plan seeking to delay the date of insolvency, instead of preventing insolvency, the Trustees are in violation of 29 U.S.C. § 1085(e)(3)(A)(ii).

51.     For the reasons set forth above, and, pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff seeks a declaration that, by implementing the AFD Exit Fee, the Trustees violated the ERISA statute and, therefore, the AFD Exit Fee should be annulled forthwith.

52.     Because the AFD Exit Fee violates ERISA sections 305 and 4211, Plaintiff seeks injunctive relief, pursuant to 29 U.S.C. § 1451(a)(1) and 29 U.S.C. § 1132(a)(3).

### COUNT II

### BREACH OF THE DUTY TO ACT PRUDENTLY

53.     Plaintiff repeats the allegations set forth in paragraphs 1 through 52 as though fully set forth at length herein.

54.     ERISA imposes the "prudent man standard of care" on PIUMPF's Trustees.  This standard requires the Trustees to discharge their duties:

> with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

Imposition of the AFD Exit Fee was an imprudent practice which significantly weakened the Fund's financial status as described above (see, for example, paragraph 31).

55.     ERISA section 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

15

56.     ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409(a), 29 U.S.C. § 1109(a).

57.     ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

58.     The Trustees' implementation of the AFD Exit Fee is imprudent because the adoption of the AFD Exit Fee is contrary to the mandates of ERISA.  The AFD Exit Fee is a second way of collecting UVBs.  As such, it is contrary to the requirements of ERISA section 4211, 29 U.S.C. § 1391 and 29 C.F.R. § 4211.21(c).

59.     ERISA section 4211(a) states: "The amount of the unfunded vested benefits allocable to the employer that withdraws from a plan **shall be determined** in accordance with subparagraphs (b), (c), or (d) of this section."  29 U.S.C. § 1391(a).  Section 4211(c)(5)(A) then states the PBGC may "prescribe by regulation" alternative methods.  No PBGC regulation allows a second UVB assessment through the use of an AFD Exit Fee assessment.

60.     When the Trustees amended the Rehabilitation Plan, they stated its purpose was to "forestall the date of insolvency."  ERISA section 305 requires a Rehabilitation Plan to increase a pension's funding above 65% or to take actions to prevent insolvency.  Adopting the AFD Exit Fee to delay the date of insolvency was imprudent, because it violates the mandates of ERISA section 305, 29 U.S.C. § 1085.

61.     The Trustees also acted imprudently by failing to take other more prudent actions in the face of the AFD Exit Fee's adverse consequences to the Fund's financial health.

62.     Other more prudent options were available.  For example, under the Multiemployer Pension Reform Act of 2014 ("MPRA"), the PBGC can facilitate mergers between two or more plans, including providing financial assistance.

63.     Another more prudent option that could help PIUMPF retain contributing employers is the "two-pool" method.   Under the two-pool method, the plan maintains two withdrawal liability pools for contributing employers: one new pool for new employers and current employers that elect to pay off their existing withdrawal liability and transition over; and a second old pool for existing employers who, for a variety of reasons, decide not to trigger a withdrawal and remain in the plan.   Numerous Funds have received PBGC approval to use the two-pool method.

64.     One final option, PIUMPF could have considered is the suspension/reduction of benefits being paid to retirees.   MPRA amended § 432(e)(9) of the Internal Revenue Code and section 305(e)(9) of ERISA to permit the sponsor of multiemployer defined benefit plan in critical and declining status to submit to the Secretary of the Treasury  an application to suspend (reduce the amount of retirement) benefits so as to prevent insolvency.

65.     For the reasons set forth above, and, pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff seeks a declaration that the AFD Exit Fee is imprudent and should be annulled forthwith.

66.     If the AFD Exit Fee is left in place, it is all but certain to result in the Fund becoming insolvent, thereby causing irreparable harm to Plaintiff, who will be denied most, if not all, of his pension benefits.

## COUNT III

## BREACH OF CO-FIDUCIARY DUTY

67.     Plaintiff repeats the allegations set forth in paragraphs 1 through 66 as though fully set forth at length herein.

68.     The PIUMPF Defendants, at the times of the transactions described above, were or presently are members of the Board of Trustees of PIUMPF.  PIUMPF's Board of Trustees is the named fiduciary of the Fund pursuant to ERISA section 402(a), 29 U.S.C. § 1102(a).  The

COMPLAINT (ERISA)
55982.0001.11219627.1

PIUMPF Defendants also act as functional fiduciaries with respect to PIUMPF within the meaning of ERISA section 3(21), 29 U.S.C. § 1002(21).

69.     The PIUMPF Trustees, acting in their capacities as co-fiduciaries, amended and updated the PIUMPF Rehabilitation Plan creating the AFD Exit Fee.  The Trustees have acted with the knowledge that making AFD Exit Fee assessments was unlawful and was not restoring PIUMPF's financial health.  In just five years, AFD Exit Fee assessments have caused PIUMPF to lose 60 out of 135 contributing employers.  During this same time period, the ratio of active employees to inactive employees has gone from one active to 3.2 inactives to one active to 10.1 inactives.  The AFD Exit Fee, instead of restoring the Fund's health, is making insolvency more certain.  By such conduct, the PIUMPF Defendants in their capacity as co-fiduciaries of PIUMPF:

        a.     failed to act in accordance with the "Prudent Man Standard of Care," in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

        b.     failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration, in violation of ERISA section 404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A);

        c.     failed to act in accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with ERISA, in violation of ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

70.     Pursuant to ERISA section 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3), PIUMPF Defendants are jointly liable for the breaches of their co-fiduciaries because, as described above, they knowingly participated in or concealed an act or omission, knowing that such act or omission is a breach; they enabled the other fiduciaries to commit a breach by breaching their own fiduciary duties under ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1); and they had

knowledge of a fiduciary breach and did not make reasonable efforts under the circumstances to remedy it.

71. For the reasons set forth above, and, pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff seeks a declaration that, by implementing the AFD Exit Fee, the Trustees breached their fiduciary duty and, therefore, the AFD Exit Fee should be annulled forthwith.

72. If the AFD Exit Fee is left in place, it is all but certain to result in the Fund becoming insolvent, thereby causing irreparable harm to Plaintiff, who will be denied most, if not all, of his pension benefits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DONNIE ELY, on his behalf and on the behalf of all PIUMPF participants, prays for relief against the PIUMPF Defendants as follows:

1. A declaration that the AFD Exit Fee is unenforceable and shall be annulled forthwith by the Board of Trustees;

2. Permanently enjoining the Board of Trustees, their agents, successors and all persons acting on their behalf, from enforcing or implementing the AFD Exit Fee on behalf of PIUMPF;

3. Awarding Plaintiff his attorneys' fees and the costs of this action; and

COMPLAINT (ERISA)
55982.0001.11219627.1

4.     Providing such other appropriate relief the Court deems necessary, just and proper.

Dated:  July 16, 2018                    Respectfully submitted,

                                         BAKER & McKENZIE LLP


                                         By:    _/s/ James P. Baker_____
                                                James P. Baker

                                         HAWLEY TROXELL


                                         By:    _/s/ Brad P. Miller_____
                                                Brad P. Miller

                                         Attorneys for Plaintiff DONNIE ELY

1388020-v5\NYCDMS