UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DONNIE ELY,

                Plaintiff,

v.

BOARD OF TRUSTEES OF THE
PACE INDUSTRY UNION-
MANAGEMENT PENSION FUND,

            Defendant.

Case No. 3:18-cv-00315-CWD

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

Plaintiff Donnie Ely, a participant in the Pace Industry Union Management
Pension Fund (PIUMPF or the Fund), challenges an action taken by the PIUMPF Board
of Trustees in 2013, whereby the Board amended its Rehabilitation Plan to require
withdrawing employers to pay an additional exit fee based on the Fund's accumulated
funding deficiency (the "AFD Exit Fee"). Ely alleges that the AFD Exit Fee is
undermining PIUMPF's solvency, and that the actions taken by the Board of Trustees
violate the Employee Retirement Income Security Act of 1974 (ERISA).

Before the Court is the Board of Trustees' motion to dismiss, and its motion to stay discovery.[1] (Dkt. 16, 17.) The Court conducted a hearing on the motions on November 13, 2018. After carefully considering the parties' arguments, their written memoranda, and relevant authority, the Court will grant in part and deny in part the Board of Trustees' motion to dismiss, and deny the motion to stay discovery.

## BACKGROUND

PIUMPF is an employee pension benefit plan as defined by 29 U.S.C. § 1002(3)(2)(A) and a multiemployer pension plan within the meaning of 29 U.S.C. § 1002(37). PIUMPF is governed by its Trust Agreement, restated as of April 2, 2000, and as amended thereafter. One-half of the members of the Board of Trustees are appointed by participating employers, and the other one-half are appointed by the sponsoring labor union. Trust Agreement, Ex. 1 (Dkt. 1-1); 29 U.S.C. § 186(c)(5)(B) (stating that employers must be "equally represented in the administration" of a pension fund). The Board of Trustees is the Fund's sponsor, meaning it is tasked with administering the Fund. Trust Agreement, Ex. 1 (Dkt. 1-1); 29 U.S.C. § 1002(16)(B) (defining plan sponsor). In addition, the Board of Trustees is designated as the named fiduciary of the Trust and Plan. Trust Agreement Ex. 1 (Dkt. 1-1.)

Ely is a participant in the Fund. The Fund currently is in critical status (and has been since 2010), which means that it is in dire financial condition. *See* 29 U.S.C.

---

[1] The Court in the interim ordered that discovery was stayed until the Court adopted a scheduling order. (Dkt. 29.)

§ 1085(b)(2), ERISA § 305(b)(2) (defining critical status). Because of its critical status, specific funding rules required the Board of Trustees to adopt a rehabilitation plan for the Fund. *See* 29 U.S.C. § 1085(a)(2) (requiring the plan sponsor of a plan in critical status to adopt and implement a rehabilitation plan in accordance with 29 U.S.C. § 1085(e), ERISA § 305(e)). A rehabilitation plan consists of actions, such as reductions in future benefit accruals, reductions in plan expenditures, or increases in contributions, designed to improve the Fund's financial outlook and enable it to either "cease to be in critical status by the end of the [ten-year] rehabilitation period," or "emerge from critical status at a later time or to forestall possible insolvency." 29 U.S.C. § 1085(e)(3)(A), ERISA § 305(e)(3)(A). [2]

On April 30, 2010, the Board of Trustees published a Notice of Critical Status Certification for the Fund, explaining to the Plan's participants:

> **Critical status**
> The Fund is considered to be in critical status because it has funding or liquidity problems, or both. More specifically, the Fund's actuary determined that the Fund is projected to have an accumulated funding deficiency within three (3) years after the current Plan Year. The projected year of the deficiency is 2013.
>
> **Rehabilitation Plan and Possibility of Reduction in Benefits**
> Federal law requires pension plans in critical status to adopt a rehabilitation plan aimed at restoring the financial health of the Fund ....

---

[2] The Pension Protection Act of 2006 ("PPA") was enacted to address problems associated with underfunded pension plans and introduced "a number of mechanisms aimed at stabilizing pension plans and ensuring they remain solvent." *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 130 (2nd Cir. 2012). Among the PPA's provisions are "measures designed to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future." *Id.* Funds designated as being in "critical status" require the fund sponsor to adopt a rehabilitation plan. 29 U.S.C. § 1085(e)(1), ERISA § 305(e)(1).

Thereafter, the Board of Trustees determined that the contribution rate increase schedules provided under the initial rehabilitation plan were not reasonable and would cause employers to withdraw from the Fund, thereby expediting rather than forestalling insolvency. Thus, by Resolution dated April 10, 2013, the Trustees retroactively adopted, as of November 15, 2012, the 2012 Amended and Updated Rehabilitation Plan ("Amended and Updated Rehabilitation Plan"). Compl. Ex. 4. The Amended and Updated Rehabilitation Plan had contribution rate schedules requiring lower annual increases to the contribution rate.[3]

In addition to the revised schedules, the Amended and Updated Rehabilitation Plan added a paragraph that included the AFD Exit Fee. This paragraph states in pertinent part:

> In addition, in the event an Employer withdraws during a Plan Year when the Fund has an accumulated funding deficiency,[4] as determined under Section 304 of ERISA, the Employer shall be responsible for its pro rata share of such deficiency in addition to any withdrawal liability determined under Section 4211 of ERISA.

Ely seeks a declaration that the AFD Exit Fee implemented via the Amended and Updated Rehabilitation Plan is unenforceable, and that the Board of Trustees should be

---

[3] Ely is challenging the 2012 Amended and Updated Rehabilitation Plan, not the original rehabilitation plan adopted in 2010.

[4] Under 29 U.S.C. § 1084(a), ERISA § 304(a), a fund's accumulated funding deficiency is the amount by which the accumulated charges to the plan's "funding standard account" exceed the accumulated credits to that account at the end of a plan year.

enjoined from further enforcement or implementation of the AFD Exit Fee on behalf of the PIUMPF. The Complaint asserts three counts for violations of ERISA.

In Count I, Ely alleges 29 U.S.C. § 1451(a)(1), ERISA § 4301(a)(1), permits him to bring an action for appropriate legal or equitable relief as a participant "adversely affected by an act or omission of a party under ERISA Title IV, Subtitle E." He asserts that, by implementing the AFD Exit Fee, the Board of Trustees violated 29 U.S.C. § 1391, ERISA § 4211, and 29 C.F.R. § 4211.21(c), which "prohibits any withdrawal liability allocation method that results in a systematic and substantial over-allocation of the plan's unfunded vested benefits (assessing employers amounts greater than the amount of vested liabilities less the plan's assets)." Compl. ¶ 25. Ely alleges also in Count I that the AFD Exit Fee violates 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii), because it is not a "reasonable measure to emerge from critical status at a later time or to forestall possible insolvency." 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii). Ely contends that, rather than a reasonable measure, the AFD Exit Fee has caused PIUMPF's decline in value, such that the Plan is projected to be unable to pay benefits to its participants in 2031.

In Count II, Ely alleges the Board of Trustees breached its fiduciary duty of prudence. Ely contends the AFD Exit Fee is imprudent because it is a second, and impermissible, way to collect unfunded vested benefits, and because it delays, rather than prevents, insolvency. In Count III, he alleges a breach of co-fiduciary duty against the individual Trustees, for failure to act prudently and failure to discharge their duties with respect to the Plan solely in the interest of plan participants and beneficiaries.

The Board of Trustees argues that Count I must be dismissed, because 29 U.S.C. § 1451(a)(1), ERISA § 4301(a)(1), does not provide a cause of action to challenge a rehabilitation plan adopted pursuant to 29 U.S.C. § 1085(e), ERISA § 305(e). As for Counts II and III, the Board of Trustees argues dismissal is proper because the Board was not acting in a fiduciary capacity, but rather in its capacity as a settlor of the plan, when it adopted the Amended and Updated Rehabilitation Plan.

In his response to the Board of Trustees' motion to dismiss, Ely raised additional arguments addressed by the Board of Trustees in its reply. He alleges the AFD Exit Fee violates ERISA's "anti-cutback provision, 29 U.S.C. § 1054(g)(1), ERISA § 204(g)(1); that proper notice of amendment to the rehabilitation plan was not given to plan participants, in violation of 29 U.S.C. § 1054(h), ERISA § 204(h); and that the Board of Trustees' actions in delaying, but not preventing, insolvency of the Plan by implementing the AFD Exit Fee violates 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii). The Board of Trustees notes none of these theories of recovery were mentioned in the Complaint. Nonetheless, the Board of Trustees argues amendment would be futile because ERISA § 204(g)(1) and (h) do not apply to plan amendments adopted pursuant to ERISA § 305(e), and Ely's interpretation of ERISA § 305(e)(3)(A)(ii) is not supported by the plain language of the statue.

## STANDARD OF REVIEW

A motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a party's claim for relief. When considering such a motion, the Court's inquiry is whether the allegations in a pleading are sufficient under applicable

pleading standards. Federal Rule of Civil Procedure 8(a) sets forth minimum pleading rules, requiring only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A motion to dismiss will be granted only if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). Although "we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. at 1949-50; *see also Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Therefore, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Caviness v. Horizon Comm. Learning Cent., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (citation omitted).

## DISCUSSION

By way of background, a multiemployer pension plan is one in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers. *See Trustees of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 129 (2d Cir. 2012). The court in *Honerkamp* explained that plans of this sort

offer important advantages to employers and employees alike. For example, employers in certain unionized industries likely would not create their own pension plans because the frequency of companies going into and out of business, and of employees transferring among employers, make single-employer plans unfeasible. Multiemployer plans allow companies to offer pension benefits to their employees notwithstanding these practicalities, and at the same time to share the financial costs and risks associated with the administration of pension plans.

*Id.* (citing *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust Fund for S. Cal.*, 508 U.S. 602, 605–07 (1993)).

However,

[a] key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Id.* (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n.2 (1984), in turn quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind)) (internal quotation marks omitted).

The Pension Protection Act of 2006 (PPA) was enacted in response to the actual or forecasted termination of various large pension plans and is aimed at stabilizing pension plans to ensure they remain solvent. *Id.* at 130. In essence, here Ely argues the Amended and Updated Rehabilitation Plan, and specifically the AFD Exit Fee, is by design encouraging employers to leave the Plan and forcing the remaining participating

employers to shoulder the ever-increasing financial burden, thereby threatening his (and other participants) vested future benefits. Each of Ely's theories of recovery, set forth above, will be discussed in turn.

1.    **Count I - 29 U.S.C. § 1451(a), ERISA § 4301(a)(1)**

ERISA specifically sets forth the parties who can bring certain civil actions under the Act, and the type of actions each of those parties may pursue. *Cyr v. Reliance Std. Life Ins. Co.*, 642 F.3d 1202, 1205 (9th Cir. 2011). Accordingly, civil actions under ERISA are "limited only to those parties and actions Congress specifically enumerated in [29 U.S.C. §] 1132." *Gulf Life Ins. Co. v. Arnold*, 809 F.2d 1520, 1524 (11th Cir. 1987). Ely contends in Count I that he has a valid cause of action pursuant to 29 U.S.C. § 1451(a)(1), ERISA § 4301(a)(1). This provision of ERISA authorizes a plan participant, beneficiary, employer, or plan fiduciary to bring an action when he or she is "adversely affected by the act or omission of any party under this subtitle." 29 U.S.C. § 1451(a)(1). Ely asserts that the imposition of the AFD Exit Fee violates 29 U.S.C. § 1391, ERISA § 4211, because it results in an over-allocation of the plan's unfunded vested benefits, and violates 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii), because its purpose is to delay, but not prevent, insolvency of the Plan.

The Board of Trustees argues that the Court of Appeals for the Eleventh Circuit addressed the issue before the Court in *WestRock RKT Co. v. Pace Industry Union-Management Pension Fund*, 856 F.3d 1320, 1325 (11th Cir. 2017), and that the court's holding forecloses Ely's cause of action under 29 U.S.C. § 1451(a). Because of the plan's critical status, special funding rules required the board of trustees for the pension plan to

adopt a rehabilitation plan for its fund. The rehabilitation plan adopted by the board of trustees included a provision requiring a withdrawing employer to pay a portion of the fund's accumulated funding deficiency. WestRock, an employer contributing to the Pace Industry Union-Management Pension Fund, challenged the board of trustees' amendment to the fund's rehabilitation plan under 29 U.S.C. § 1451(a), as Ely does here. [5]

Section 1451 is part of Subtitle E of ERISA, which contains special provisions for multiemployer plans and has six parts, one of which governs employer withdrawals.[6] 856 F.3d at 1325. Part one governing employer withdrawals sets forth how to calculate "withdrawal liability", which is the amount a withdrawing employer is charged for its share of the unfunded vested benefits. *Id.* (citing 29 U.S.C. §§ 1381-1405 (governing the calculations for withdrawal liability)). WestRock argued that, because Subtitle E of ERISA governs withdrawal liability, it therefore encompassed the exit fee imposed upon employers upon withdrawal. WestRock asserted that the exit fee was an improper additional liability not permitted by any section within Subtitle E of ERISA.

The court held that Section 1451(a) does not support the employer's reading, because the employer was not challenging an act or omission under Subtitle E of ERISA. *Id.* at 1326. The board had adopted the amendment to the rehabilitation plan

---

[5] WestRock also challenged the AFD exit fee under 29 U.S.C. § 1132(a)(10), ERISA § 502(a)(10), which permits an employer to bring an action against the plan sponsor for specific violations of 29 U.S.C. § 1085, ERISA § 305. However, the court held that WestRock had not properly alleged the plan amendment imposing an AFD exit fee violated 29 U.S.C. § 1085 in a manner sufficient to support a cause of action under Subsection B of 29 U.S.C. § 1132(a)(10). *WestRock*, 856 F.3d at 1324.

[6] The other five parts govern merger or transfer of plan assets or liabilities, insolvent plans, financial assistance, benefits after termination, and enforcement.

implementing the exit fee under its authority in 29 U.S.C. § 1085(a)(3)(A)(ii), ERISA

§ 305(a)(3)(A)(ii), which section is under Subtitle B of ERISA, not under Subtitle E. *Id.*

In other words, the court explained, because the employer was not challenging an act or

omission under Subtitle E, the employer could not maintain a cause of action under

Section 1451(a). *Id.*

The court noted that, under ERISA, its approach to statutory interpretation is

"measured and restrained." *Id.* (citing *Gulf Life*, 809 F.2d at 1524 ("[C]ivil actions under

ERISA are limited only to those parties and actions Congress specifically

enumerated….")). Because there is nothing in the text of ERISA indicating that Congress

intended a remedy not specifically enumerated, the court refused to recognize one by

implication. *Id.* Accordingly, the appellate court upheld the district court's order granting

the fund's motion to dismiss, finding that ERISA does not provide a cause of action

under 29 U.S.C. § 1451(a) to an employer to challenge an action taken by the board

under 29 U.S.C. § 1085(a)(3)(A)(ii). *Id.*

Absent controlling authority from the Court of Appeals for the Ninth Circuit, the

Court here finds the reasoning in *WestRock* persuasive.[7] The Board of Trustees

implemented the AFD Exit Fee pursuant to 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA

§ 305(e)(3)(A)(ii), the provision authorizing and mandating rehabilitation plans, which is

part of Subtitle B of ERISA. Accordingly, the adoption or amendment of the

rehabilitation plan is not an act or omission of a party under Subtitle E, and cannot give

---

[7] Although the Board of Trustees relied upon *WestRock,* Ely notably did not address its holding in his response brief.

rise to a cause of action under 29 U.S.C. § 1451(a). The Court finds no distinction

between the fact that a participant is suing here instead of an employer, given that Section

1451(a) includes both employers and participants.

Nor does Ely's argument that the AFD Exit Fee and the imposition of statutorily

required withdrawal liability are "intertwined," and therefore the imposition of the exit

fee should be viewed as an act or omission under Subtitle E of 29 U.S.C. § 1451(a)(1),

have merit. WestRock attempted a similar argument, asserting that any liability imposed

upon withdrawing employers was encompassed by 29 U.S.C. §§ 1381-1405. The

*WestRock* court explained that the concept of withdrawal liability, and its method of

calculation set forth in 29 U.S.C. § 1391, ERISA § 4211, is different than an accumulated

funding deficiency, which is defined in 29 U.S.C. § 1084(a), ERISA § 304(a). *WestRock*

856 F.3d at 1325, and n.6. Further, the court held that the exit fee was implemented

pursuant to the board of trustees' authority in 29 U.S.C. § 1085(e)(3)(A)(ii), which is

under subtitle B of ERISA. *Id.* at 1326.

Accordingly, Ely's attempt to distinguish *WestRock*, which considered the exit fee

imposed upon employers withdrawing from the Pace Industry Union-Management

Pension Fund,[8] is not one that matters for purposes of Ely's claim under 29 U.S.C.

§ 1451(a), ERISA § 4301(a)(1). The court in *WestRock* determined that the structure of

ERISA, and its plain meaning, is such that there simply is no cause of action under 29

U.S.C. § 1451(a) to challenge an act taken pursuant to 29 U.S.C. § 1085(e)(3)(A)(ii).

---

[8] The Court notes also that *WestRock* is a contributing employer in the Pace Industry Union-Management Pension Fund, the same fund in which Ely is a participant.

Count I is therefore subject to dismissal.

**2.     Counts II and III – Breach of Fiduciary Duties**

Ely alleges that the Board of Trustees, and each Fund Trustee, is a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A), and they breached their fiduciary responsibilities by amending the rehabilitation plan to include the AFD Exit Fee. In Count II, Ely alleges that the implementation of the AFD Exit Fee was imprudent, and violates 29 U.S.C. § 1104(a), ERISA § 404(a), because it is: (1) a second, and therefore unlawful, way to collect Unfunded Vested Benefits, contrary to 29 U.S.C. § 1391, ERISA § 4211; (2) a violation of 29 U.S.C. § 1085, ERISA § 305, because it does not prevent insolvency; and (3) there were other, more prudent actions the Board of Trustees could have taken to improve the Fund's financial health.

In Count III, brought against the individual trustees as co-fiduciaries, Ely alleges that, through implementation of the AFD Exit Fee, the Trustees: (1) failed to act prudently; (2) failed to discharge their duties with respect to the Plan solely in the interest of plan participants and beneficiaries; and, (3) failed to act in accordance with the documents and instruments governing the Plan.

Ely alleges also that the Board of Trustees has made misleading statements to the participants about the rehabilitation plan. Specifically, Ely contends the notices mislead participants into believing the rehabilitation plan is aimed at restoring the financial health of the Plan, when in reality the Plan is on a path to insolvency.

In response, the Board of Trustees argues that the plan amendments adopted in the Amended and Updated Rehabilitation Plan were not adopted by the Trustees while acting

in a fiduciary capacity, but instead were adopted when carrying out their settlor function. The Board of Trustees argues also that the notices complied with applicable ERISA requirements for such amendments.

## A.    *Count II*

"To establish an action for equitable relief under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), [for breach of fiduciary duty], the defendant must be an ERISA fiduciary acting in its fiduciary capacity, and must violate [ ] ERISA–imposed fiduciary obligations." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1178 (9th Cir. 2004) (internal citation omitted). ERISA requires that a "fiduciary shall discharge his duties ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B), ERISA § 404(a)(1)(B).

ERISA § 406(a)(1) regulates the conduct of plan fiduciaries, placing certain transactions outside the scope of their lawful authority. 29 U.S.C. § 1106, ERISA § 406 (defining prohibited transactions in violation of a fiduciary's duties). A plaintiff must first show, however, that the individual or other entity was acting as a fiduciary—in other words, the Court must first determine whether fiduciary status existed before it proceeds to determining whether a violation of ERISA § 406 has occurred. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996).

In enacting the amended rehabilitation plan, the Board of Trustees was acting as a plan sponsor engaged in plan design. 29 U.S.C. § 1085(e)(1)(A) clearly provides the plan

sponsor, in accordance with "this subsection— (A) shall adopt a rehabilitation plan."

And, it is for the plan sponsor to determine whether the plan cannot reasonably be

expected to emerge from critical status by the end of the ten-year rehabilitation period. 29

U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii). Last, the plan sponsor is required

to annually update the rehabilitation plan. 29 U.S.C. § 1085(e)(3)(B)(i).

Based upon the plain text of 29 U.S.C. § 1085(e), ERISA § 305(e), the Board of

Trustees did not breach fiduciary duties when it adopted the Updated and Amended

Rehabilitation Plan, which included the imposition of the ADF Exit Fee. "Plan sponsors

who alter the terms of a plan do not fall into the category of fiduciaries." *Lockheed Corp.*,

517 U.S. at 890. The United States Supreme Court explained, in *Curtiss–Wright Corp. v.

Schoonejongen*, 514 U.S. 73, 78 (1995), that "[e]mployers or other plan sponsors are

generally free under ERISA, for any reason at any time, to adopt, modify, or terminate

welfare plans." When employers or, in this case the Board of Trustees, undertake those

actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.

*Lockheed Corp.*, 517 U.S. 890 (citing *Curtiss-Wright Corp.*, 514 U.S. at 78, *Johnson v.

Georgia–Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir 1994)). *See also Hartline v. Sheet

Metal Workers' Nat'l Pension Fund*, 286 F.3d 598, 599 (D.C. Cir. 2002) (The Supreme

Court made it clear that "employers and plan sponsors do not act in a fiduciary capacity

when they modify, adopt or amend plans. Nothing in the Supreme Court's decision or

ERISA itself creates an exemption for multiemployer pension plans.").

Although the Board of Trustees wears two hats, (both as plan sponsor and as

fiduciary), when it amended the Plan by adopting the Amended and Updated

Rehabilitation Plan, the Board of Trustees did not act in a fiduciary capacity as defined

by ERISA. Fiduciary responsibilities are defined in terms of the exercise of discretionary

control over the management or administration of the plan or its assets. 29 U.S.C.

§ 1102(21)(A), ERISA § 3(21)(A). To qualify as a fiduciary, a plan administrator must

have the discretion to interpret provisions of the plan document and to make final

decisions, even in the face of dispute, as to eligibility and benefits. *Chaganti v. Ceridian

Benefits Services, Inc.*, 208 Fed .Appx. 541, 547 (9th Cir. 2006) (citing *IT Corp. v.

General American Life Ins.*, 107 F.3d 1415 (9th Cir.1997)).

When it adopted the Amended and Updated Rehabilitation Plan, the Board of

Trustees was not engaged in interpreting plan documents, administering benefits,

administering assets, or decisions regarding eligibility and benefits. *See Lockheed Corp.*,

517 U.S. at 890 (explaining that only when a person fulfills certain defined functions

does a person become a fiduciary under ERISA § 3(21)(A), and that amending a plan is

not an act of plan management or administration.). Rather, the Board of Trustees engaged

in plan design, and did so pursuant to the authority in 29 U.S.C. § 1085(e), ERISA

§ 305(e).

Second, even assuming the Board of Trustees was acting in a fiduciary capacity,

neither Ely's allegation that the AFD Exit Fee constituted an unlawful collection of

UVBs nor his allegation that the AFD Exit Fee was unreasonable because it contributed

to the decline of the Fund fall within the scope of the duty of prudence. This conclusion

follows from the explicit language of 29 U.S.C. § 1104(a)(1)(B), ERISA § 404(a)(1)(B),

which "imposes a 'prudent person' standard by which to measure fiduciaries' investment

decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467, 189 L. Ed. 2d 457 (2014) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143, n.10, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). In turn, Section 1104(a)(1)(C) requires ERISA fiduciaries to diversify plan assets. 29 U.S.C. § 1104(a)(1)(C), ERISA § 404(a)(1)(C). The Court's task in evaluating a fiduciary's compliance with these standards is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983).

As the Board of Trustees points out, the AFD Exit Fee is an employer contribution. It is not an investment decision or financial transaction that would fall within the scope of the duty of prudence. Therefore, Count II is subject to dismissal.

### B.   *Count III – Breach of Co-Fiduciary Duty*

Ely alleges in Count III that, as co-fiduciaries, the individual PIUMPF Trustees violated ERISA's fiduciary obligation to act prudently, and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A), ERISA § 404(a)(1)(A). *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099–100 (9th Cir. 2004). He alleges also that the individual trustees failed to act in accordance with the documents and instruments governing the plan, in violation of 29 U.S.C. § 1104(a)(1)(D), ERISA

§ 404(a)(1)(D). Again, his allegations are based upon the implementation of the AFD Exit Fee by the adoption of the Amended and Updated Rehabilitation Plan.

To bring a claim for breach of co-fiduciary duty, Ely must show that the Board of Trustees was performing a fiduciary function when it adopted the Amended and Updated Rehabilitation Plan. In other words, if the Board of Trustees was not performing a fiduciary act, Ely cannot bring a claim for breach of co-fiduciary duty against the individual Trustees. *Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1097 (D. Nev. 2011) ("A claim under 29 U.S.C. § 1105(a)(2) requires a plaintiff to prove that the fiduciary 'failed to comply with its duties under ERISA, and thereby enabled a co-fiduciary to commit a breach.'"). Because Ely's claims are derivative of his prudence claim, they fail for the reasons set forth above.

### C. *Notice*

Ely argues that the Board of Trustees breached its fiduciary duty by sending a misleading notice regarding the health of the fund. "[A]n ERISA fiduciary has a duty under [29 U.S.C. §] section 1104(a) to convey complete and accurate information when it speaks to participants and beneficiaries regarding plan benefits." *In re Xerox Corp. ERISA Litig.*, 483 F.Supp.2d 206 (2007) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 441 (3d Cir.1996)). *See also Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1095 (D. Nev. 2011).

However, ERISA contains detailed requirements governing plan notification to participants when a plan is in critical status. This notice must include the limitation on benefit payments. 29 U.S.C. § 1085(b)(3)(D), ERISA § 305(b)(3)(D). The notice Ely was

entitled to receive required also that the plan sponsor notify Ely of the projected date of insolvency; provide a clear statement that insolvency may result in benefit reductions; and provide a statement describing whether the plan sponsor has taken legally permitted actions to prevent insolvency. 29 C.F.R. § 2520.101-5(b)(6)(iii). *See generally,* 29 C.F.R. § 2520.101-5.[9] Ely has acknowledged that such notice was provided to him. Compl. ¶¶ 31, 34.

Ely does not specifically allege in the Complaint how the notice he received violated the provisions of 29 C.F.R. § 2520 or the language of the model notice.[10] Rather,

---

[9] 29 C.F.R. 2502.101-5(b)(6) refers to multiemployer plans in either critical, or critical and declining status. It provides as follows:

> (6) Endangered, critical, or critical and declining status. In the case of a multiemployer plan, a statement whether the plan was in endangered, critical, or critical and declining status under section 305 of the Act for the notice year and, if so—
> (i) A statement describing how a person may obtain a copy of the plan's funding improvement plan or rehabilitation plan, as appropriate, adopted under section 305 of the Act and the actuarial and financial data that demonstrate any action taken by the plan toward fiscal improvement;
> (ii) A summary of the plan's funding improvement plan or rehabilitation plan, including any update or modification of such funding improvement or rehabilitation plan adopted under section 305 of the Act during the notice year; and
> (iii) In the case of a multiemployer plan in critical and declining status:
> (A) The projected date of insolvency;
> (B) A clear statement that such insolvency may result in benefit reductions; and
> (C) A statement describing whether the plan sponsor has taken legally permitted actions to prevent insolvency.

[10] Ely did not provide the full text of the Notice of Critical Status he received. The sections quoted in the Complaint indicate only that the Board of Trustees "have adopted a Rehabilitation Plan described under Section 305(3)(3)(A)(ii) of ERISA that consists of reasonable measures to forestall the date of the Fund's possible insolvency," and that the notice stated, in part, that "Federal law requires pension plans in critical status to adopt a rehabilitation plan aimed at restoring the financial health of the Fund." Compl. ¶¶ 30, 31. Ely did not explain, however, how the notice deviated from the model notice.

he alleges in a circuitous fashion, and in reliance upon his argument that the Board of Trustees must prevent, not delay, insolvency, that the notice's statement that the rehabilitation plan is "aimed at restoring the financial health of the fund" misleads participants if the plan is likely to become insolvent at a later date. However, the model notice requires both that the notice inform participants of the projected date of insolvency, and the legally permitted actions taken to prevent insolvency. 29 C.F.R. § 2520.101-5(b)(6)(iii).

The 2012 Amended and Updated Rehabilitation Plan, attached as Exhibit 4 to the Complaint, appears to do just that. The Plan states that the Fund's Board of Trustees "has determined that based on reasonable actuarial assumptions, and upon exhaustion of all reasonable measures, the Fund cannot be reasonably expected to emerge from critical status by the end of the [ten-year] Rehabilitation Period. Therefore, the Board of Trustees adopted a Rehabilitation Plan described under ERISA Section 305(e)(3)(A)(ii) that consisted of reasonable measures to forestall the date of the Fund's possible insolvency." (Dkt. 1-4 at 4.) The Plan next describes, in detail, the options the Board of Trustees considered, the steps it planned to implement, and the reasons why it chose these options. (Dkt. 1-4 at 3-5.) Further, it notified participants that, based upon reasonable expectations under the assumptions made in the rehabilitation plan, the "Fund is projected to become insolvent in the year 2028," and forestalls the February 2023 insolvency date predicted under the described alternative assumptions. (Dkt. 1-4 at 6.)

The Court finds nothing inconsistent here with the requirements of the model notice imposed by statute.

### 3. 29 U.S.C. § 1132(a)(3), ERISA § 502(a)(3)

Ely argues in his response brief that he has multiple causes of action under 29 U.S.C. § 1132(a)(3), ERISA § 502(a)(3).[11] This section permits plan participants "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1132(a)(3).

Ely alleges he has the right to enjoin further imposition of the AFD Exit Fee for three reasons. First, Ely alleges the AFD Exit Fee violates ERISA's "anti-cutback" provision, which prohibits a plan sponsor from decreasing accrued benefits by plan amendment. 29 U.S.C. § 1054(g)(1), ERISA § 204(g)(1). Second, he alleges proper notice was not given to plan participants, in violation of 29 U.S.C. § 1054(h), ERISA § 204(h), which prohibits a plan amendment that significantly reduces the rate of future benefit accrual unless proper notice is given. And third, he alleges that, when a plan is in critical status and cannot be rehabilitated within the time set forth in the statute, ERISA requires that insolvency be "forestalled," which means prevented, rather than delayed.

The problem with all three of Ely's arguments is that ERISA specifically permits the actions taken by the Board of Trustees pursuant to 29 U.S.C. § 1085, ERISA § 305. This section sets forth specific rules for plans in critical or endangered status. It addresses the process for determining if the fund is in critical as opposed to endangered status, 29

---

[11] Although Ely did not include a specific count under ERISA § 502(a)(3) in his Complaint, Ely included a reference to ERISA § 502(a)(3) in paragraph 7 of the Complaint and in Counts II and III. The Board of Trustees noted the absence of a specific count under § 502(a)(3) including the following arguments, but addressed them in its reply brief.

U.S.C. § 1085(b); the process for adopting and updating a funding improvement plan for funds in endangered status, 29 U.S.C. § 1085(c); and, the process for adopting and updating a rehabilitation plan for funds in critical status, 29 U.S.C. § 1085(e). The acceptable tools for constructing a rehabilitation plan include reductions in plan expenditures, reductions in future benefit accruals, or increases in contributions. 29 U.S.C. § 1085(e)(3)(A)(i). Nonetheless, the Court will address Ely's specific arguments below.

### A.      Anti-Cutback Rule – 29 U.S.C. § 1054(g), ERISA § 204(g)

ERISA § 204(g) provides that the "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." 29 U.S.C. § 1054(g)(1), ERISA § 204(g)(1). The anti-cutback rule protects only accrued benefits from reduction or elimination by plan amendment. 29 U.S.C. § 1054(g)(1). In the case of a defined benefit plan, ERISA defines an "accrued benefit" as a participant's "accrued benefit determined under the plan and ... expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). Reduction or elimination of these accrued benefits through plan amendment gives rise to a claim for violation of ERISA § 204(g). 29 U.S.C. § 1054(g); I.R.C. § 411(d)(6).

Benefit accrual is "the rate at which an employee earns benefits to put in his pension account," while benefit vesting refers to the point at which a participant's pension rights become nonforfeitable "by virtue of his having fulfilled age and length of service requirements." *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749 (2004). Accrual provisions establish a formula or methodology for calculating the amount of the

normal retirement benefit that an employee has earned, whether vested or not. *Hoover v. Cumberland, Md. Area Teamsters*, 756 F.2d 977, 983–84 (3d Cir. 1985). A participant becomes fully vested once he has obtained a nonforfeitable right to the entirety of his accrued benefit. In other words, "benefit accrual affects the size of the pension, while benefit vesting determines whether a pension will be paid at all." *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 858 (11th Cir. 2007).

Ely asserts that the effect of the AFD Exit Fee will eventually cause the Fund to become insolvent, thereby reducing his accrued benefits, and hence violating the anti-cutback rule. However, his claim is not the type of benefit reduction that the anti-cutback rule protects. Rather, a "typical anti-cutback case is where an amendment changes the terms of a plan—for example, the method of calculating partial pension benefits, the rate at which a plaintiff's benefits accrue, or expanding a plan's definition of disqualifying employment for early retirement beneficiaries—to the detriment of the plaintiff." *Clark v. Feder, Semo & Bard, P.C.*, 808 F. Supp. 2d 219, 228 (D. D.C. 2011), *aff'd*, 739 F.3d 28 (D.C. Cir. 2014) (citing *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 746 (2004); *Hoover v. Cumberland, Md. Area Teamsters*, 756 F.2d 977, 983–84 (3d Cir. 1985)). Here, Ely has not pointed to terms of the Plan that were changed and which directly affected his accrued benefits because of the plan amendment implementing the AFD Exit Fee. Rather, the AFD Exit Fee is a plan amendment governing employer contributions upon withdrawal.

Even if the Plan is eventually unable to pay vested benefits, (a fact which is currently unknown), persuasive and analogous authorities hold that ERISA's anti-cutback

provision is not triggered upon plan termination and its resulting failure to pay benefits.

*See Hollowell v. Cincinnati Ventilating Co.*, 711 F.Supp.2d 751, 766 (E.D. Ky.2010)

("ERISA's anti-cutback provision is not triggered via termination of a prior plan and its

subsequent failure to pay vested benefits. To the extent Plaintiff seeks to state a claim

based on termination of the plan, rather than amendment, ERISA § 204(g) is not

implicated."); *Herman v. Cent. States Southeast & Sw. Areas Pension Fund*, 423 F.3d

684, 692 (7th Cir. 2005) (an amendment that does not render any person ineligible for

benefits for which he or she was previously eligible does not violate the anti-cutback

provision). In other words, if plan termination resulting in the failure to pay benefits does

not trigger the anti-cutback rule, neither should a plan amendment requiring additional

contributions from exiting employers which may result in reduction of benefits in the

future due to insolvency of the fund. Thus, while Ely's benefits ultimately may be

reduced because the Plan may lack sufficient assets to pay him his full benefits, it will not

be because an amendment "eliminat[ed] or reduc[ed] an early retirement benefit or

retirement-type subsidy," 29 U.S.C. § 1054(g)(2)(A), or "eliminat[ed] an optional form of

benefit," 29 U.S.C. § 1054(g)(2)(B).

Further, ERISA expressly provides for a reduction in benefit payments due to a

plan's insolvency and requires notice of that possibility to be given to plan participants.

While ERISA's anti-cutback rule would typically preclude many benefit changes, the

Pension Protection Act of 2006 provides an exception that permits reductions of

adjustable benefits when a fund is in critical status. *See* 29 U.S.C. § 1085(e)(8), ERISA

§ 305(e)(8); *Arendt v. Washington-Idaho-Montana Carpenters-Employers Ret. Tr. Fund*,

No. CV-11-5135-LRS, 2014 WL 1771701, at *3 (E.D. Wash. May 2, 2014), *aff'd*, 669 F. App'x 919 (9th Cir. 2016) ("The PPA's express authorization of the reduction or elimination of adjustable benefits (including early retirement benefits), through rehabilitation plans of those plans in critical status, is an exception to ERISA's general 'anti-cutback rule,'" citing ERISA § 204(g), 29 U.S.C. § 1054(g)).

Accordingly, Ely cannot state a claim under ERISA § 502(a)(3) for violation of the anti-cutback rule.

### B. Notice Provision – 29 U.S.C. § 1054(h), ERISA § 204(h)

The same problem with Ely's argument regarding the anti-cutback provision exists with respect to his argument that the Board of Trustees provided improper notice—the provisions cited do not apply here. 29 U.S.C. § 1054(h) prohibits an amendment which "provides for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the notice described in paragraph (2) to each applicable individual…." Paragraph 2 requires the notice to be written in a "manner calculated to be understood by the average plan participant and shall provide sufficient information…to allow applicable individuals to understand the effect of the plan amendment. The Secretary of the Treasury may provide a simplified form of notice" in certain circumstances. 29 U.S.C. § 1054(h), ERISA § 204(h).

First, the AFD Exit Fee is an employer contribution, and does not directly affect future benefit accrual, as explained in the preceding section. Therefore, the notice provisions of Section 1054(h), which apply when the rate of future benefit accrual will be significantly reduced, do not apply.

Second, if a rehabilitation plan proposes a reduction in future benefit accruals, *see* 29 U.S.C. § 1085(e)(3)(A)(i) (which permits reductions in future benefit accruals as a possible component of the rehabilitation plan), then 29 U.S.C. § 1085(e)(8)(C), ERISA § 305(e)(8)(C), mandates a specific notice under such circumstances. Section 1085(e)(8)(C) further requires the Secretary of the Treasury to establish a model notice that a plan sponsor may use to meet the notice requirements. In other words, the specific notice provisions of Section 1085 apply if a rehabilitation plan proposes a reduction in future benefit accruals, not the notice provisions of Section 1054. *See, e.g.*, *Reyes v. Bakery and Confectionery Union and Industry Internat'l Pension Fund*, 170 F.Supp.3d 1239, 1244-45 (N.D. Cal. Mar. 22, 2016) (finding notice provided by employer regarding fund in critical status did not meet statutory requirements of 29 U.S.C. § 1085(e)(8)(C)(i) because it did not meet the 30-day notice requirement imposed by that section). Ely has not alleged that the notice provisions of Section 1085 were violated. *See, e.g., Schwarz v. UFCW-N. California Employers Joint Pension Plan*, No. C13-00977 LB, 2014 WL 186647, at *10 (N.D. Cal. Jan. 16, 2014) (refusing to impose notice that goes beyond what the PPA explicitly requires and noting that the statutory notice requirements applicable under the PPA are explicitly set forth in 29 U.S.C. § 1085).

Third, Section 1085(b)(3)(D) prescribes a general notice that must be given to plan participants informing them that a plan is or will be in endangered or critical status for a plan year, which notice must also be given to the bargaining parties, the Pension Benefit Guaranty Corporation, and the Secretary of the Treasury. For plans in critical status, the plan sponsor must also include notice of the possibility that adjustable benefits may be

reduced, and that "such reductions may apply to participants and beneficiaries whose benefit commencement date is on or after the date such notice is provided for the first plan year in which the plan is in critical status." 29 U.S.C. § 1085(b)(3)(D)(ii). The Secretary of the Treasury has adopted a model notice to satisfy Section 1085(b)(3)(D)(ii). 29 U.S.C. § 1085(b)(3)(D)(iii).

Ely does not contend that the notice he received deviated from the model notice, or otherwise violated Section 1085(b)(3)(D), which applies here. Other than the general notice required under Section 1085(b)(3)(D)(ii) and the notice requirement of Section 1085(e)(8)(C), there is no specific notice requirement for rehabilitation plan provisions that seek to improve a plan's funding status by implementing reductions in plan expenditures or increases in employer contributions. Here, the AFD Exit Fee is an employer contribution, which would not require any specific notice to plan participants under Section 1085.

## C. Forestalling Insolvency

Ely's final argument is that the Board of Trustees was required to prevent, not delay, insolvency under 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii). Although asserted as a breach of fiduciary duty claim in Counts II and III, Ely presents the argument in a general sense as well, claiming that, because the AFD Exit Fee causes employers to withdraw, it thereby hastens the Fund's decline and spiral into insolvency. Ely's argument fails based upon a plain reading of the statute and its explicit reference to insolvent plans.

ERISA defines two types of rehabilitation plans in 29 U.S.C. § 1085(e)(3)(A).

*WestRock*, 856 F.3d at 1324. One enables the plan to cease to be in critical status by the

end of the [ten-year] rehabilitation period. 29 U.S.C. § 1085(e)(3)(A)(i); 29 U.S.C.

§ 1085(e)(4). Alternatively, Section 1085(e)(3)(A)(ii) provides that a rehabilitation plan

can consist of "reasonable measures to emerge from critical status at a later time or to

forestall possible insolvency (within the meaning of [ERISA] section 4245)." In turn, 29

U.S.C. § 1426, ERISA § 4245, specifically addresses insolvent plans. A multiemployer

plan is considered insolvent if "the plan's available resources are not sufficient to pay

benefits under the plan when due for the plan year, or if the plan is determined to be

insolvent under subsection (d)." 29 U.S.C. § 1426(b)(1), ERISA § 4245(b)(1). This

section requires a plan sponsor of a "plan in reorganization" to notify the Secretary of the

Treasury, plan participants and beneficiaries, and the Pension Benefit Guaranty

Corporation (PBGC).[12] And finally, 29 C.F.R. 2520.101-5(b)(6)(iii)(A) requires

multiemployer plans in critical status to notify participants of the projected date of

insolvency.

Similarly, 29 U.S.C. § 1085(e)(3)(A)(ii) consists of two alternative options—a

plan to emerge from critical status at some later time beyond the statutory ten-year

rehabilitation period, or a plan "to forestall possible insolvency." The conjunction "or"

connects the two alternative options, meaning that there are two distinct possibilities

under the statute. *See WestRock*, 856 F.3d at 1324 (noting the separation of (i) and (ii) in

---

[12] Congress established the PBGC to provide insolvent plans with financial assistance. 29 U.S.C. § 1431, ERISA § 4261.

28 U.S.C. § 1085(e)(3)(A) with an "or.") One option is to emerge from critical status at some later time beyond the statutory ten-year rehabilitation period, while the other is to "forestall possible insolvency," meaning there is a possibility that the plan will not emerge from critical status, but only delay the date of insolvency.

With the explicit reference to 29 U.S.C. § 1426, which section sets forth what happens to an insolvent plan, and the safety net provisions applicable in such circumstances, the plain meaning of the statute indicates that option two of subsection (ii) is the antithesis of emergence from critical status at a later date. Simply put, the statute recognizes a plan may become insolvent and not emerge from critical status. Such a possibility was recognized in *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co., Inc.*, in which the court stated that "implementation of a rehabilitation plan under the PPA may not restore a pension plan's solvency…the Trustees here determined that the Fund was unlikely to emerge from critical status, and therefore designed the non-default schedules not to prevent but only to delay the point of insolvency." 669 F.3d at 135-36. *See also* 29 U.S.C. § 1085(e)(3)(A) (noting if clause (ii) applies, the rehabilitation plan must explain "why the plan is not reasonably expected to emerge from critical status by the end of the rehabilitation period, *and specify when, if ever*, the plan is expected to emerge from critical status in accordance with the rehabilitation plan.") (emphasis added).

Although ERISA was enacted to ensure that employees and their beneficiaries will not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans, *see Pension Ben. Guar. Corp.*

*v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984), Congress also contemplated plans may fail due to insolvency, and provided a safety net in such cases. If the Court accepts Ely's argument, the alternative provisions of the statute would be rendered meaningless. There would be no need for the second clause referring to possible insolvency, as opposed to emergence from critical status at some time beyond the ten-year rehabilitation period, in 29 U.S.C. § 1085(e)(3)(A)(ii); no need for 29 U.S.C. § 1085(3)(3)(A)(ii)'s reference to 29 U.S.C. § 1426, which sets forth provisions applicable to insolvent plans if such plans fail to emerge from critical status; and no need for the plan to notify participants of the projected date of insolvency.[13]

Ely's argument that a rehabilitation plan must prevent entirely, and not simply delay, insolvency fails to state a claim under 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii).

**4.     Reasonableness of the Measures Taken by the Board of Trustees**

Ely's remaining argument contends that the measures taken by the Board of Trustees were simply not "reasonable," referring to 29 U.S.C. § 1085(e)(3)(A)(ii)'s description that a rehabilitation plan is a plan which consists of "reasonable measures" to forestall possible insolvency. The plan sponsor must also determine that, "based on

---

[13] The Court finds it unnecessary to address Ely's alternative argument that the Kline-Miller Multiemployer Pension Reform Act of 2014 (MPRA) informs the Court regarding the meaning of "forestall" set forth in 29 U.S.C. § 1085(e)(3)(A)(ii), or that the Board of Trustees should have enacted measures pursuant to the MPRA. The provisions of the PPA of 2006 set forth in 29 U.S.C. § 1085, ERISA § 305, are distinct from those set forth by the MPRA, which established two alternative options (benefit suspension and partition) that plan trustees can utilize to restore the financial health of a pension plan. However, nothing within the text of ERISA indicates that the MPRA negates the options set forth in 29 U.S.C. § 1085(e)(3)(A).

reasonable actuarial assumptions and upon exhaustion of all reasonable measures, the plan can not reasonably be expected to emerge from critical status by the end of the [ten-year] rehabilitation period….” *Id.* Ely argues the AFD Exit Fee has caused a drop in active employer participation, to the detriment of the remaining employers and plan participants. Ely asserts also that the AFD Exit Fee is contrary to the mandates of ERISA, because it is a second way of collecting Unfunded Vested Benefits (UVBs), which are already collected via the statutorily required assessment of withdrawal liability upon withdrawing employers. Ely contends that there were and are other options that the Board of Trustees could have considered to forestall insolvency.

The Board of Trustees argues that the reasonableness of the measures it implemented to forestall possible insolvency is not subject to judicial review, because the determination of plan amendments is purely a settlor function; therefore, the Board of Trustees argues it was not acting in a fiduciary capacity when it considered and adopted the amendments to the Plan, and specifically the AFD Exit Fee. The Board of Trustees notes that, as the plan sponsor, it is composed of members representing the employer and employees such that there is equal representation, and therefore no reason to believe that

the substance of the amendments was determined by anything other than board member consensus. *See* 29 U.S.C. § 186(c)(5)(B).[14]

However, while the allegations in the complaint supporting Ely's claims of breach of fiduciary duty do not state a cause of action under the provisions of ERISA discussed above, *WestRock* does not appear to foreclose recognition of a cause of action asserted generally under 29 U.S.C. § 1132(a)(3), ERISA § 502(a)(3), for a substantive challenge to plan amendments enacted under 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA 305(e)(3)(A)(ii). First, *WestRock* did not decide the question before the Court, which is a "substantive challenge of the 'reasonable measures' under which the amendment was adopted" pursuant to 29 U.S.C. § 1085(e)(3)(A)(ii). *See* Michael Berthiaume, FIRST ROCK TO THE WEST, STRAIGHT ON 'TIL MORNING: WESTROCK DRAWS POTENTIAL ROADMAP TO SUBSTANTIVE CHALLENGES OF ERISA REHABILITATION PLANS UNDER SECTION 1132, 69 Mercer L. Rev. 1267, 1280 (Summer 2018) (recognizing *WestRock* did not foreclose a potential cause of action for an employer under 29 U.S.C. § 1132(a)(10) asserting a substantive violation of 29 U.S.C. § 1085(e)(3)(A)(ii)). And second, while scant, the Court has identified legal authority where challenges to the reasonableness of the measures taken to forestall possible insolvency was allowed.

---

[14] In its brief, the Board of Trustees asserted that, as the plan sponsor, it included equal representation from employers and unions, and was therefore "best suited" to making difficult decisions for the purpose of implementing a rehabilitation plan. However, based upon the record before the Court, it is not clear what process the Board of Trustees may have utilized. Further, the distinction between 29 U.S.C. § 1085(e)(3)(A)(i) and (ii) suggests that the second version of the rehabilitation plan created by subsection (ii) allows the fund to enact "reasonable measures" to emerge from critical status without collective bargaining, which process appears limited to rehabilitation plans adopted pursuant to subsection (i). *See WestRock*, 856 F.3d at 1324 (noting that the "if agreed to by the bargaining parties" language is not included in 29 U.S.C. § 1085(e)(3)(A)(ii)).

In *Bakery and Confectionery Union and Industrial Internat'l Pension Fund v. Just Born II, Inc.*, No. DKC 16-0793, 2017 WL 511911 (D. Md. Feb. 8, 2017), the court denied the employer's cross motion on the pleadings, explaining that the defendant had not sufficiently plead its affirmative defense that the trustees of the pension fund fraudulently or intentionally misrepresented the fund's critical status and had departed from reasonable actuarial assumptions. 2017 WL 511911 at *9-10. However, the court permitted the employer to amend its affirmative defenses, explaining that the defendant must plead clearly "who allegedly knew what when making what assertions…[and] to state with more particularity the circumstances of the alleged misrepresentation." *Id.* at 10.

And, in *Reyes v. Bakery and Confectionery Union and Industry Internat'l Pension Fund*, 170 F.Supp.3d 1239 (N.D. Cal. 2016), on a motion for judgment on the pleadings, the court explained that actuarial certifications adopted as part of a rehabilitation plan "can be challenged as professional malpractice under state law." 170 F.Supp. 3d at 1247. The court explained the complaint lacked allegations, however, that the fund and its trustees (rather than the actuaries) had:

> violated any kind of duty or statutory requirement in the certification process. They do not, for example, allege facts that suggest Defendants acted unreasonably or in bad faith in providing certain information to the actuaries. Nor do they allege that the Defendants failed in some way or form to oversee the actuaries' work.

*Id.* The court therefore granted the pension fund's motion for judgment on the pleadings, which challenged the reasonableness of the certification of critical status under ERISA § 305.

Last, although not an action that challenged the reasonableness of measures taken to forestall insolvency, the court in *United Food and Commercial Workers Unions and Employers Pension Fund v. Mercer Human Resource Consulting, Inc.*, 1:06-cv-01149-WSD, 2008 WL 11406166 (N.D. Ga. Apr. 4, 2008), considered a challenge to the fund's plan amendment that resulted in contribution increases and benefit reductions. There, the pension fund claimed that, had the trustees known of the liabilities the actuary identified as mispriced or omitted, they would have enacted deeper benefit cuts than they did, and the fund would have been in better financial condition had the trustees done so. In other words, the fund challenged the reasonableness of the defendant's valuation assumptions which then informed the plaintiff's decision to amend the plan. The court concluded that questions of material fact existed, and denied summary judgment to the actuarial consulting company. 2008 WL 11406166 at *4.

Here, against the backdrop of the above authorities, the Court finds the Complaint adequately states a plausible claim for relief generally under ERISA § 503(a)(3), for violation of ERISA § 305(e)(3)(A)(ii). Although *WestRock* noted that no portion of ERISA "explicitly states that a plan sponsor cannot put in place a system for charging withdrawing employers for their share of the accumulated funding deficiency" for funds certified to be in critical status, 856 F.3d at 1325, 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii), explicitly states that any measures adopted must be "reasonable."

Similarly, 29 U.S.C. § 1085(e)(1)(B)(ii) reflects that the plan sponsor must determine that the measures described in the published schedules are "reasonably necessary." The word "reasonable" is used throughout Section 1085(e)(1) and (3).

It would contravene the express purpose of ERISA—protection of employee benefits—for the Court to ignore the purposeful inclusion of language directing that measures adopted pursuant to 29 U.S.C. § 1085(e)(3)(A)(ii) must be "reasonable." If the Court were to ignore the "reasonableness" requirement, it would eliminate any measure of oversight or substantive review, leaving employees (and employers) "without redress in the event of an unreasonable substantive term enacted completely out of [a plan sponsor's] authority." Berthiaume, 69 Mercer L. Rev. at 1281.

The Court will, therefore, allow Ely the opportunity to conduct limited discovery and to amend his Complaint to set forth with particularity the facts supporting the claim asserted under ERISA § 503(a)(3) for violation of ERISA § 305(e)(3)(A)(ii). He cannot, however, rely generally upon his assertion that the AFD Exit Fee was unreasonable because it did not prevent insolvency.[15]

---

[15] For instance, Ely commented at the hearing he had information from his own actuary, and raised the argument that plan trustees should understand what they are doing when considering plan amendments. *See, e.g., Bakery and Confectionery Union*, 2017 WL 511911 at *9-10; *Reyes*, 170 F.Supp.3d at 1247.

# CONCLUSION

Count I fails as a matter of law. Ely cannot state a cause of action under 29 U.S.C. § 1451, because the Updated and Amended Rehabilitation Plan was adopted pursuant to 29 U.S.C. § 1085(e). Nor can Ely state a cause of action under 29 U.S.C. § 1132(a)(3) for violation of the anti-cutback rule, which applies to changes to accrued benefits of participants, not to changes to employer contributions. The notice provisions of Section 1054(h) do not apply, and Ely has not plead facts establishing the Board of Trustees violated the specific notice requirements of 29 U.S.C. § 1085, ERISA § 305.

Counts II and III, for breach of fiduciary and co-fiduciary duties, fail also as a matter of law. The Board of Trustees was not acting in a fiduciary capacity within the meaning of ERISA when it adopted the Updated and Amended Rehabilitation Plan to provide for an additional employer contribution upon withdrawing employers in the form of the AFD Exit Fee.

Nonetheless, the Court finds that the complaint plausibly sets forth allegations sufficient to state a claim for relief under 29 U.S.C. § 1132(a)(3), ERISA § 503(a)(3), which presents a substantive challenge to the reasonable measures under which the amendment to the 2012 Updated and Amended Rehabilitation Plan was adopted pursuant to 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii).

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)     Defendant's Motion to Dismiss (Dkt. 16) is **GRANTED IN PART AND DENIED IN PART**.

2)     Defendant's Motion to Stay Discovery (Dkt. 17) is **DENIED**.

3)     The Court will issue a separate notice of hearing for the purpose of conducting a scheduling conference to discuss the scope of discovery and the date by which Plaintiff must file his amended complaint.

DATED: February 04, 2019

Candy W. Dale
U.S. Magistrate Judge