UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNIE ELY, a Participant in the PACE Industry Union-Management Pension Fund,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE PACE INDUSTRY UNION-MANAGEMENT PENSION FUND,<br><br>Defendant. | Case No. 3:18-cv-00315-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Plaintiff Donnie Ely's motion to compel production of documents, filed on October 21, 2019. (Dkt. 68.) Ely seeks to compel responses to Request Nos. 13, 14, and 15, which documents the Board of Trustees has withheld based on a claim of attorney-client privilege. Ely argues assertion of the attorney-client privilege is not appropriate, and also that the privilege log is inadequate because the descriptions of the documents withheld and explanations for redactions[1] do not provide

---

[1] The Board of Trustees produced redacted documents that are not listed on the privilege log.

**MEMORANDUM DECISION AND ORDER - 1**

sufficient information to enable him to evaluate whether a privilege or protection from disclosure exists. Ely requests relief in the alternative, asking the Court to either: (1) order the Board of Trustees to produce documents responsive to the requests; (2) order the Board of Trustees to amend its privilege log; or (3) order the Board of Trustees to submit all materials to which a privilege is claimed to the Court for an in camera inspection.

The Court has carefully considered the parties' arguments and cited authorities, and will grant the motion in part, as explained below.[2]

## BACKGROUND

Ely seeks to compel responses to Document Request Nos. 13, 14, and 15, which ask for the following documents:

- Document Request No. 13: ALL COMMUNICATIONS OR DOCUMENTS between the TRUSTEES AND its attorneys CONCERNING the REHABILITATION PLAN OR the AMENDED REHABILITATION PLAN.
- Document Request No. 14: To the extent not already produced in response to other requests, all COMMUNICATIONS OR DOCUMENTS received by the TRUSTEES CONCERNING the REHABILITATION PLAN OR the AMENDED REHABILITATION PLAN.
- Document Request No. 15: All COMMUNICATIONS OR DOCUMENTS between the TRUSTEES AND the FUND actuary CONCERNING the REHABILITATION PLAN OR the AMENDED REHABILITATION PLAN.

The Board of Trustees contends that communications involving Fund counsel regarding adoption of and amendment to the Rehabilitation Plan are protected from

---

[2] The Court finds the decisional process would not be significantly aided by oral argument. Accordingly, the motion will be decided on the record before the Court. D. Idaho L. Rule 7.1(d).

**MEMORANDUM DECISION AND ORDER - 2**

disclosure by the attorney-client privilege, because the Board of Trustees was performing a settlor function when it initially adopted and later amended the Rehabilitation Plan. Ely argues the communications are not protected from disclosure, because the advice was prepared for the benefit of the Plan's beneficiaries, not for the trustees exclusively, and therefore the fiduciary exception to the attorney-client privilege applies.

## ANALYSIS

1.  **Reasonableness Standard**

The Pension Protection Act of 2006 ("PPA") was enacted to address problems associated with underfunded pension plans and introduced "a number of mechanisms aimed at stabilizing pension plans and ensuring they remain solvent." *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 130 (2nd Cir. 2012). Among the PPA's provisions are "measures designed to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future." *Id*. Funds designated as being in "critical status" require the plan sponsor to adopt a rehabilitation plan. 29 U.S.C. § 1085(e)(1), ERISA § 305(e)(1).

In the case of a plan in critical status, *see* 29 U.S.C. § 1085(b)(2), ERISA § 305(b)(2),[3] the Plan Sponsor must adopt a rehabilitation plan which imposes revised

---

[3] Here, the Board of Trustees published on April 30, 2010, a Notice of Critical Status Certification for the Fund, explaining to the Plan's participants that the Fund was considered to be in critical status "because it has funding or liquidity problems, or both. More specifically, the Fund's actuary determined that the Fund is projected to have an accumulated funding deficiency within three (3) years after the current Plan Year." *See* 29 U.S.C. § 1085(b)(2)(B)(ii), ERISA § 305(b)(2)(B)(ii).

**MEMORANDUM DECISION AND ORDER - 3**

benefit structures, revised contribution structures, or both which "may reasonably be expected" to enable the plan to emerge from critical status in accordance with the rehabilitation plan. 29 U.S.C. § 1085(e)(1)(B)(i), ERISA § 305(e)(1)(B)(i). If the Plan Sponsor determines that, "based on reasonable actuarial assumptions and upon exhaustion of all reasonable measures, the plan cannot reasonably be expected to emerge from critical status" by the end of the ten-year rehabilitation period, the Plan Sponsor must adopt "reasonable measures" that would allow the plan "to emerge from critical status at a later time or to forestall possible insolvency…." 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii). Stated differently, the Plan Sponsor is required to act reasonably, and choose from various options those that will either restore the plan's financial health within a specified period of time, or delay eventual insolvency.

The PPA was designed to: (1) impose tougher funding rules upon employers to ensure the money workers earned for retirement would be there, as promised by their employer; (2) prevent plan terminations and bankruptcies; and (3) shore up the finances of the Pension Benefit Guarantee Corporation so as to avoid a taxpayer bailout of the agency. 152 Cong. Rec. S8747-01, 152 Cong. Rec. S8747-01, S8747, 2006 WL 2224796. The overriding purpose of the PPA was to ensure "promises made to workers for their retirement will be promises kept by assuring the money needed is in the fund and by appropriately limiting when benefits may be increased, freezing future accruals, and restricting the rapid out-flow of lump sums and shutdown benefits when the plan gets into serious trouble." 152 Cong. Rec. S8747-01, 152 Cong. Rec. S8747-01, S8747, 2006 WL 2224796.

However, the PPA's drafters recognized that some multiemployer plans will not avoid collapse but, at the very least, the statutory changes effected by the PPA "will postpone" the possible collapse of some of those plans. 152 Cong. Rec. S8747-01, 152 Cong. Rec. S8747-01, S8749, 2006 WL 2224796; *see also* 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii) (defining a rehabilitation plan as one that consists of "reasonable measures to emerge from critical status at a later time or to forestall possible insolvency (within the meaning of section 4245)."). The PPA was enacted for the benefit of workers, to "strengthen the financial health of pension plans by doing as much as we can to guarantee that funds will be there to pay for employees hard-earned retirement benefits." 152 Cong. Rec. S8747-01, 152 Cong. Rec. S8747-01, S8754, 2006 WL 2224796. The PPA imposed upon the Plan Sponsor a requirement that measures taken to either allow the plan to emerge from critical status, or to forestall insolvency, be "reasonable" as that term is used throughout ERISA § 305.

As explained in its February 4, 2019 Memorandum Decision and Order, the Court found that Ely's complaint plausibly sets forth allegations sufficient to state a claim for relief under 29 U.S.C. § 1132(a)(3), ERISA § 502(a)(3), and presents a substantive challenge to the reasonable measures under which the amendment to the 2012 Updated and Amended Rehabilitation Plan (Rehabilitation Plan) was adopted pursuant to 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii). The Court found also that the Board of Trustees was not acting in a fiduciary capacity "within the meaning of ERISA" when it adopted the amended Rehabilitation Plan that imposed an additional employer contribution upon withdrawing employers in the form of the AFD Exit Fee. This is not to

**MEMORANDUM DECISION AND ORDER - 5**

say, however, that the Board of Trustees, as the Plan Sponsor, is unconstrained simply because the Board was not performing a fiduciary function as defined in 29 U.S.C. §§ 1002(21), 1104(a), ERISA §§ 3(21), 404(a).

In this case, the Board of Trustees is the Plan Sponsor as defined by 29 U.S.C. § 1002(16)(B), ERISA § 3(16)(B). It is therefore held to the "reasonableness" standard mentioned throughout ERISA § 305(e), even though ERISA, in other circumstances, gives the Board of Trustees wide latitude to design or amend a plan as it sees fit. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-41 (1999) (recognizing that ERISA provides an employer with broad authority to amend a plan, and that ERISA's fiduciary provisions are inapplicable to amendments to the plan); *Lockheed Corp. v. Spink*, 571 U.S. 882, 885-890 (1996) (holding that an employer's decision to design or amend a plan does not implicate the employer's fiduciary duties, which under ERISA consist of administration of the plan's assets).

Having so concluded, the Court recognizes that the Board of Trustee's adoption of the amended Rehabilitation Plan, which imposed the AFD Exit Fee at issue in this case, fell within the Board's authority (and responsibility) as Plan Sponsor and not as a fiduciary as that term is defined in ERISA. However, as the Court has previously articulated, this does not mean that that the Board can escape the provisions of the PPA that add a level of accountability to the authority the Board must exercise under the PPA when a plan is deemed to be in critical status simply by invoking legal principles applicable to plan sponsor actions undertaken pursuant to other provisions of ERISA.

Rather, the Board of Trustees was required by statute to abide by the "reasonableness" standard for adopting a rehabilitation plan, which standard was imposed for the benefit of workers entitled to rely upon their employer's promise of retirement benefits.[4] Thus, although not technically fiduciaries as defined by ERISA, the PPA imposes a standard upon Plan Sponsors that the Court has determined creates the cause of action in this matter. Accordingly, Ely should be allowed to obtain information necessary to determine whether the Board of Trustees met the reasonableness standard, which was statutorily imposed for the benefit of the Plan's participants and beneficiaries.

It is against this backdrop that the Court considers the parties' arguments for and against the fiduciary exception to the attorney-client privilege in connection with the discovery dispute at issue.

**2. The Fiduciary Exception to the Attorney-Client Privilege**

The attorney-client privilege is intended to encourage full and frank communication between attorneys and their clients. *United States v. Mett*, 178 F.3d 1058, 1062–63 (9th Cir. 1999). In the words of the Supreme Court of the United States, "[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

---

[4] The PPA does, however, allow for certain reductions of benefits for underfunded multi-employer pension plans. "[W]hile ERISA's anti-cutback rule would typically preclude many benefit changes, the Pension Protection Act of 2006 provides an exception that permits reductions of adjustable benefits when a fund is in critical status." Mem. Dec. and Ord. at 24 - 25 (citations omitted).

**MEMORANDUM DECISION AND ORDER - 7**

The Court of Appeals for the Ninth Circuit, however, recognizes a "fiduciary exception" to the attorney-client privilege. *Id.* As applied in the ERISA context, the fiduciary exception provides that "an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration." *Id.* at 1063 (quoting *Becher v. Long Is. Lighting Co.* (*In re Long Is. Lighting Co.*), 129 F.3d 268, 272 (2d Cir. 1997)).

The fiduciary exception exists along a spectrum. "On the one hand, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries. On the other hand, where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact." *Mett*, 178 F.3d at 1064. As the party seeking the information, Ely bears the burden of showing the exception exists. *Id.* at 1065.[5]

The Board of Trustees argues that the label attached to its actions—in this case, plan sponsor—forecloses the fiduciary exception in its entirety. However, application of the fiduciary exception is not dependent upon labels, but rather upon "the nature of the particular attorney-client communication." *Id.* at 1065. Courts interpreting *Mett* focus on the "intended recipient of the advice and the purpose for which it is sought." *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 609 (N.D. Cal. 2000). In other words, the "use

---

[5] Notably, the Board of Trustees did not discuss the implication of *Mett* in its response brief. Ely, however, discussed *Mett* in his reply brief.

**MEMORANDUM DECISION AND ORDER - 8**

of a fiduciary-nonfiduciary activity distinction as the touchstone for a privilege inquiry in discovery is awkward at best," and courts should instead focus on whether the advice was sought for the benefit of the beneficiaries, as opposed to whether the advice is sought for the trustee's own protection. *Fischel*, 191 F.R.D. at 609. And, "hard cases should be resolved in favor of the privilege." *Mett*, 178 F.3d at 1065.

Thus, if the documents comprise advice from counsel that relates to the legal implications and potential liability of the Trustees in their personal capacity, the attorney-client privilege protects the documents from disclosure. But, if the documents comprise advice concerning the structure and design of the rehabilitation plan vis-à-vis the PPA's "reasonableness" requirements; the intended purpose of the advice is to benefit the plan beneficiaries; and it is clear that there is no concern or advice relating to the trustees' personal liability, the documents should be produced. *See Fischel*, 191 F.R.D. at 609-12. *See also Searls v. Sandia Corp.*, No. 1:14-cv-578, 2015 WL 1321517 (E.D. Va. Mar. 2015) (explaining that the fiduciary exception focuses on the intended recipient of the advice and the purpose for which it is sought); *A.F. v. Providence Health Plan*, 173 F.Supp.3d 1061, 1075-76 (D. Or. 2016) (explaining that a communication-by-communication analysis is required to determine where discovery falls on the spectrum).

The Court has distinguished the actions of the Board of Trustees in its role as Plan Sponsor exercising its authority pursuant to the PPA, which requires the Board of Trustees to act reasonably as that term is utilized in ERISA § 305 in evaluating and choosing measures designed to restore the financial health of the plan, from mere plan design decisions, which concern the benefit structure of the plan itself. *See, e.g., Hughes*

**MEMORANDUM DECISION AND ORDER - 9**

*Aircraft Co.*, 525 U.S. at 443 (explaining the acts that comprise plan design). The former activity, exercised under the PPA, involves the exercise of discretionary authority or control over the plan itself, because the acts taken are meant to improve the plan's funding percentage for the benefit of the plan participants and beneficiaries. 29 U.S.C. § 1085, ERISA § 305. Thus, the Court rejects the Board of Trustee's argument that it can shield documents from disclosure by asserting that its decisions made pursuant to the PPA constituted "pure plan design decision[s]."

The Court's conclusion includes within its ambit the Board of Trustee's decisions concerning implementation and monitoring of the AFD Exit Fee's impact upon the funding percentage of the plan, which in turn impact the plan's ability to emerge from critical status at a later time or to forestall insolvency. Contrary to the Board of Trustee's assertion, Ely's complaint contains, as an aspect of his claim under ERISA § 305, the claim that the Board of Trustees failed to appropriately monitor the effect of the AFD Exit Fee and its impact upon the funding percentage of the plan. ERISA § 305(e)(3) imposes a duty upon the Plan Sponsor to annually update (1) the rehabilitation plan; and (2) the schedule of contribution rates provided under Section 305 to reflect the experience of the plan. 29 U.S.C. § 1085(e)(3)(B), ERISA § 305(e)(3)(B). Further, Section 305(e)(8) allows the Plan Sponsor flexibility with regard to adjusting certain benefits enumerated therein "which the plan sponsor deems appropriate" based on the plan's "then current overall funding status."

The Board of Trustees, as the Plan Sponsor, was required to abide by the reasonableness standard when adopting the Rehabilitation Plan and monitoring its overall

effectiveness in light of the objectives of the PPA applicable to plans in critical status. Accordingly, requests for production which encompass this aspect of Ely's claim must be reevaluated by the Board of Trustees, and the approach outlined above must be applied to determine whether the advice of counsel was obtained and provided for the benefit of the plan and its beneficiaries.

3.  **Timeliness, Relevance, and Adequacy of the Privilege Log**

    *Timeliness*

    The Board of Trustees criticizes Ely for not raising the adequacy of its privilege log earlier, arguing the motion was untimely filed and should be denied, citing *Progressive Specialty Ins. Co. v. Tiffin Motor Homes, Inc.*, No. 3:17-CV-00405-BLW, 2019 WL 956794, at *2 (D. Idaho Feb. 27, 2019). However, when presented with a timeliness challenge, the Court must consider five factors: (1) the length of time since expiration of the deadline; (2) the length of time the moving party has known about the discovery; (3) whether the discovery deadline has been previously extended; (4) the explanation for the tardiness or delay; (5) whether dispositive motions have been scheduled or filed; (6) the age of the case; (7) any prejudice to the party from whom the discovery is sought; and (8) disruption of the court's schedule. *Progressive Specialty Ins. Co.*, 2019 WL 956794 at *2.

    In *Tiffin*, the motion to compel was filed five months after the close of discovery, a factor the Court found dispositive. Here, in contrast, after an extension to the original deadline, discovery was due to be completed by October 15, 2019, (Dkt. 60), and the

motion was filed on October 21, 2019.[6] Further, beginning in July, letters were exchanged between the parties prior to the filing of the motion (Dkt. 68-2), and the issue involves not a failure to produce in the first instance, but rather a substantive issue concerning the scope of the attorney-client privilege and the adequacy of the Board's privilege log. The Court therefore finds *Tiffin* distinguishable and concludes the motion is not untimely under the circumstances here.

### Relevance and Undue Burden

The Board of Trustees raises also claims of relevance and undue burden. The Board of Trustees explains that some attorney advice provided to it related to the defense of other lawsuits. Such documents likely would not be relevant in this case. As for other documents, the Board of Trustees explains that certain handwritten notes that later were used to prepare the meeting minutes either do not exist; would be difficult to locate; or would be of limited value given the Board's meeting minutes were created from these notes. The Court agrees that, to the extent any such documents do exist, their utility would be of limited value and disproportionate to the needs of the case. Fed. R. Civ. P. 26(b)(1).

### Adequacy of the Privilege Log

The Court is not inclined to reward the failure of the Board in the first instance to adequately provide a privilege log simply because Ely did not raise the issue with the Court sooner. *See, e.g., Sherwood v. BNSF Ry. Co.*, 325 F.R.D. 652, 663 (D. Idaho 2018)

---

[6] The parties called Chambers on October 15, prior to filing the motion on October 21, to discuss the nature of the discovery dispute and obtain permission to file the motion.

("The opportunity for mischief is obvious—a party could make the generalized claim without meeting Rule 26(b)'s requirement to 'describe the nature of the documents…,'" leaving the opposing party without enough information "to judge for itself whether the claim upon which the information being withheld is justified."). A review of the privilege log (Dkt. 68-2) reveals that the nature of the documents are described in the most general terms, such as "legal advice…[regarding] withdrawal liability issues," or "legal advice…[regarding] funding issues." In light of the Court's analysis, these broad descriptors are insufficient to allow either Ely or the Court to assess the claim of privilege.

With the guidance discussed above, the Court will order the Board of Trustees to supplement its privilege log. "The Federal Rules of Civil Procedure contemplate full and equal discovery so as to prevent surprise, prejudice and perjury during trial." *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008) (quotation marks omitted). A Rule 26(b)(5)(A)(ii) privilege log must "describe the nature of the documents ... not produced or disclosed ... in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Doing so is a predicate burden to asserting the privilege. *Sherwood*, 325 F.R.D. at 662.

# CONCLUSION

Based upon the foregoing, the Court will order that the Board of Trustees reevaluate the documents withheld or redacted on the basis of the attorney-client privilege, and produce those documents that fall within the scope of the fiduciary exception to the attorney-client privilege in light of the Court's analysis. For any documents the Board of Trustees considers remain protected from disclosure or appropriately redacted, the Board must prepare an amended privilege log sufficiently describing the documents withheld or redacted. If the parties are unable to reach agreement that the remaining documents are appropriately withheld or redacted based upon the amended privilege log, the Court will require the documents be submitted to the Court for in camera review.

The Court will allow the Board of Trustees up through January 27, 2020, within which to complete its review, supplement its production of documents, and amend the privilege log.

**ORDER**

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Motion to Compel (Dkt. 68) is **GRANTED IN PART**, consistent with the Court's Memorandum and Order.

2) Defendant shall have up to and including **January 27, 2020**, to complete its review of the documents currently withheld or redacted, and produce an amended privilege log to Plaintiff.

3) The Court will conduct a telephonic status conference with the parties on **February 10, 2020, at 2:30 p.m.** mountain time to discuss whether a dispute remains over any documents that the Board of Trustees continues to withhold from production, and therefore should be submitted for in camera review.

DATED: January 8, 2020

Honorable Candy W. Dale
United States Magistrate Judge