Kathleen M. Keller (admitted pro hac vice)
Robert Alexander (admitted pro hac vice)
Elisabeth Oppenheimer (admitted pro hac vice)
BREDHOFF & KAISER, PLLC
805 15th Street, NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
Email: kkeller@bredhoff.com
Email: ralexander@bredhoff.com
Email: eoppenheimer@bredhoff.com

James M. Piotrowski, ISB# 5911
Marty Durand, ISB# 5111
PIOTROWSKI DURAND, PLLC
P.O. Box 2864
1020 Main Street, Suite 440
Boise, Idaho 83701
Telephone: (208) 331-9200
Facsimile: (208) 331-9201
Email: james@idunionlaw.com
Email: marty@idunionlaw.com

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNIE ELY, a Participant in the PACE Industry Union-Management Pension Fund, <br><br> Plaintiff, <br><br> v. <br><br> BOARD OF TRUSTEES OF THE PACE INDUSTRY UNION-MANAGEMENT PENSION FUND, <br><br> Defendant. | **Case No. 3:18-cv-00315-CWD** <br><br> **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................................ 1

Summary of Material Facts ................................................................................................ 3

   A.   The Fund ................................................................................................................. 3

   B.   The Rehabilitation Plan .......................................................................................... 4

   C.   The Amendment of the Rehabilitation Plan to Include the Exit Fee ..................... 5

   D.   Plaintiff Donnie Ely .............................................................................................. 8

Standard of Review ............................................................................................................ 9

   I.   The Fund Is Entitled to Judgment Because the Plaintiff Has Neither Shown Any
      Injury, Nor That the Relief Sought Would Remedy Any Alleged Injury ..................... 10

     A.  Plaintiff Has No Standing Under the Constitution to Challenge the Exit Fee,
       Because He Has Not Shown that It Caused Him "Injury in Fact". ..................... 10

     B.  Plaintiff Has Neither Standing Nor a Claim for "Appropriate Equitable Relief"
       Under ERISA Because the Relief Plaintiff Seeks Would Not Redress Any
       Claimed Injury .................................................................................................. 12

   II.  Plaintiff Has Not Created a Genuine Dispute of Material Fact that Would Allow A
      Fact-finder To Reject the Trustees' Determination that the Exit Fee Is a Reasonable
      Measure to Forestall Insolvency. .................................................................................. 14

     A.  The AFD Exit Fee Is a Reasonable Measure to Increase Revenue to the Plan
       Without Increasing Liabilities, Which Forestalls the Insolvency of the Fund. ............ 14

     B.  The Record Contains No Facts Permitting the Factfinder to Find That the Exit Fee
       Hastened Insolvency ......................................................................................... 17

     C.  The Process Followed by the Trustees in Adopting the Exit Fee Is Not Relevant to
       Plaintiff's Claim, But If It Were, the Facts Still Do Not Establish that the Fee Was
       Not a Reasonable Measure to Forestall Insolvency. ....................................... 21

       1.  The Statute Does Not Require a Plan Sponsor To Follow Any Particular Process
         in Evaluating Potential Measures to Forestall Insolvency ........................ 21

       2.  The Undisputed Facts Establish that the Trustees Were Advised by Professionals,
         and Considered the Relevant Facts Prior to Adopting the Fee. ................ 23

       3.  Plaintiff's Claim that the Trustees Did Not Exhaust All Reasonable Measures
         Prior to Adopting the Exit Fee, or Pursue Other Options, Is Legally Irrelevant
         and Unsupported by Any Facts .................................................................. 27

       4.  Plaintiff's Claim that the Exit Fee Favored Current Retirees at the Expense of
         Future Retirees Is Legally Irrelevant. ....................................................... 27

III.   Plaintiff Has Not Created a Material Dispute of Fact Sufficient to Show that the
        Board Has Failed in its Duty to Update or Monitor the Rehabilitation Plan. ................ 28

IV.   Plaintiff's Remaining Claims Are Barred By This Court's Previous Orders ................ 31

Conclusion ........................................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Artistic Carton Co. v. Paper Indus. Union-Mgt. Pension Fund*,
   971 F.2d 1346 (7th Cir. 1992) .................................................................22

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*,
   888 F.3d 696 (4th Cir. 2018) ..................................................................15

*Bd. Of Trustees v. Four-C-Aire, Inc.*,
   929 F.3d 135 (4th Cir. 2019) ..................................................................22

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)................................................................................12

*Cramer v. John Alden Life Ins. Co.*,
   763 F. Supp. 2d 1196 (D. Mont. 2011)...................................................11

*Cryer v. Franklin Res., Inc.*,
   No. 16-CV-04265-CW, 2018 WL 6267856 (N.D. Cal. Nov. 16, 2018)................................23

*Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v.
   Dorado Beach Hotel Corp.*,
   617 F.3d 54 (1st Cir. 2010)......................................................................7

*Glanton v. AdvancePCS*,
   465 F.3d 1123 (9th Cir. 2006) ................................................................13

*Great West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002)................................................................................12

*Hall v. Lhaco, Inc.*,
   140 F.3d 1190 (8th Cir. 1998) ................................................................14

*Hill v. Vanderbilt Capital Advisors, LLC*,
   834 F. Supp. 2d 1228 (D.N.M. 2011) .....................................................14

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)..........................................................................10, 12

*Mass. Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985)................................................................................21

*Paulsen v. CNF Inc.*,
    559 F.3d 1061 (9th Cir. 2009) ...................................................................................14

*Shuffle Master, Inc. v. MP Games LLC*,
    553 F. Supp. 2d 1202 (D. Nev. 2008) ......................................................................17

*Sierra Med. Servs. All. v. Kent*,
    883 F.3d 1216 (9th Cir. 2018) .............................................................................9, 10

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016), *as revised* (May 24, 2016).................................................11

*WestRock RKT Co. v. Pace Indus. Union-Mgt. Pension Fund*,
    856 F.3d 1320 ...........................................................................................................11

*Wright v. Oregon Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) .................................................................................10

**Statutes**

29 U.S.C. § 186 ..................................................................................................................3

29 U.S.C. § 1002 ................................................................................................................3

29 U.S.C. § 1082 ................................................................................................................7

29 U.S.C. § 1084 .............................................................................................................6, 7

29 U.S.C. § 1085 .......................................................................................1, 14, 22, 27, 28

29 U.S.C. § 1132 .................................................................................................1, 12, 14

29 U.S.C. § 1399 .........................................................................................................18, 19

29 U.S.C. § 1426 ..............................................................................................................15

Internal Revenue Code § 4971.............................................................................................7

**Rules**

Fed. R. Civ. Pro. 56............................................................................................................9

## Introduction

This case was brought by Plaintiff under ERISA § 502(a)(3), which permits an ERISA plan participant to sue for "appropriate equitable relief" to redress a violation of ERISA or to enforce an ERISA provision.  Ely challenges a provision in the Fund's Rehabilitation Plan, which he refers to as the "Exit Fee,"[1] added to the Rehabilitation Plan in 2013 to require an additional payment from contributing employers who choose to withdraw from the Fund.  More specifically, Plaintiff contends that the Exit Fee violates ERISA's requirement that rehabilitation plans consist of "reasonable measures to emerge from critical status [after the 10 year rehabilitation period] or to forestall possible insolvency," 29 U.S.C. 1085(e)(3)(ii), because he claims the Exit Fee has accelerated the Fund's insolvency.  As relief under section 502(a)(3), Plaintiff seeks to enjoin the Fund from continuing to apply the Exit Fee to employers who choose to withdraw from the Fund in the future.  Plaintiff claims that this Exit Fee has injured him because, to the extent the Exit Fee will accelerate the Fund's insolvency, it may interfere with the pension benefits he will be entitled to receive upon reaching retirement age in 2025.

There are, we submit, insurmountable deficiencies in the substance of Plaintiff's claim that the Exit Fee is not a "reasonable measure" under the Pension Protection Act ("PPA") to forestall the Fund's insolvency. But before reaching the merits of Plaintiff's statutory position, the Court must consider whether Plaintiff's claimed injury and the relief he seeks to redress his putative injury meet his burden to prove that he has the constitutional standing to bring this claim and obtain this relief. Below, we show that Plaintiff has produced no admissible evidence to create a material fact showing that the Exit Fee has caused him any injury, nor has he produced

---

[1] "Exit Fee" is not a term that the Fund or most witnesses in this case use to describe the challenged provision, who instead typically refer to as the "AFD Allocation" or the "AFD Rule." Nonetheless, for ease of the Court, we will use the term "Exit Fee" in this brief, as that is how the Court has previously described it.

1

any evidence at all to show that the relief he seeks—enjoining the Fund from imposing the Exit Fee on employers that withdraw in the future—will redress the injury. And, even though it is Plaintiff's burden to make that showing, the Fund has put forth substantial undisputed evidence that the Exit Fee's current and future effects on the Fund serve only to forestall insolvency, and therefore Plaintiff's desired relief benefits only contributing employers such as Plaintiff's former employer Clearwater Paper Corporation (which the facts now show prompted the filing of this suit, after being advised it could not itself challenge the Exit Fee).

If the Court were to reach the merits of Plaintiff's claim, Defendant would be entitled to judgment.  The undisputed facts show that the Exit Fee is, and has been, a reasonable measure to forestall the Fund's insolvency because it has the predictable and actual effect of increasing revenue into the Fund from employers that withdraw from the Fund. Because Plaintiff cannot seriously argue with the effects of the measure, he instead focuses on the process by which it was adopted, applying the fiduciary duty of prudence caselaw that this Court previously held does not apply here, and insisting that the plan sponsor was required to consider specific types of projections or studies before adopting the Exit Fee.  This approach is a misguided application of the standard set forth by this Court.  But even if it were not, the undisputed facts show that the Trustees used appropriate diligence in adopting and amending the Rehabilitation Plan provisions; evaluating alternative options; and adopting this particular measure based on professional guidance and their own knowledge of the realities of the industry, the pattern of prior employer withdrawals from the Fund, the attrition of the funding standard account, and the effects of other measures (such as contribution increases and benefit cuts) upon the Fund's insolvency date.  The

Exit Fee is, in every way, a "reasonable measure" to forestall the Fund's projected insolvency.[2]

## Summary of Material Facts

### A.  The Fund

PIUMPF is a multiemployer defined benefit pension plan that was established in 1963 to provide retirement benefits to workers who were represented by what was then the United Paperworkers International Union, which later became part of the United Steelworkers of America ("USW").  Defendant's Statement of Undisputed Material Facts ("DSMF") ¶¶ 1-3.  As required by the Taft-Hartley Act, *see* 29 U.S.C. § 186(c)(5)(B), the Fund is governed by a trust agreement and is administered by a Board of Trustees that consists of equal representation by employer and union representatives.  DSMF ¶ 1. The Board of Trustees is defined by statute as the "sponsor" of the Fund.  29 U.S.C. § 1002(16)(B)(ii).

Over PIUMPF's history, more than 700 employer groups have paid contributions into the Fund.  DSMF ¶ 4.  Employers participate in the Fund through agreement with the USW and also sign a standard participation agreement with the Fund in which they agree, *inter alia*, to be bound by the Fund's Trust Agreement, "irrevocably to designate as its representative on the Board of Trustees of the Fund such Trustees as are named . . . as Employer Trustees . . . " and, in more recent years, to be bound by terms of the Fund's Rehabilitation Plan.  DSMF 5 & Att. 1.

Due to the age of the Fund and decreasing employment in the industry covered by the Fund, since at least 1995 the number of inactive vested participants and beneficiaries have exceeded the number of actively employed participants.  DSMF ¶ 10.  By 2000, the annual benefit payments were almost double what the Fund was receiving in employer contributions,

---

[2] Much of the same evidence and the legal propositions that underpin the basis for granting Defendant summary judgment also undermine Plaintiff's motion for summary judgment.  For sake of economy and to avoid repetition, this submission addresses Plaintiff's summary judgment arguments within those explaining the reasons why Defendant is entitled to judgment.

and by 2007, annual benefit payments were more than triple the total employer contributions. DSMF ¶ 11. Due to these Fund demographics, for many years, the Fund has been relying on its assets and investment returns to meet benefit obligations, which has made it increasingly vulnerable to investment losses. *Id.*

In the 2001-02 time frame, the Fund suffered significant investment losses due to the market impact of the September 11, 2001 attack and the collapse of the "tech bubble." DSMF ¶ 12. Due to these investment losses, as well as the Trustees' concerns about the Fund's ability to recoup these losses through future investments or participant growth, the Fund's Board of Trustees voted in 2005 to give participating employers the choice of increasing contribution rates by 10% (with no accompanying benefit improvements), or cutting future benefit accruals for their employees by 25%. DSMF ¶ 13. In the wake of that action, approximately 20% of the Fund's participating employers withdrew from the Fund. DSMF ¶ 14. This came at a time when the paper industry continued to see sharp declines in U.S. employment, and employers were increasingly reluctant to shoulder the risk of a defined benefit pension plan, and particularly a multiemployer plan in which they shared the risk with other employers. DSMF ¶¶ 15, 17.

**B.** **The Rehabilitation Plan**

The 2008-09 market crash hit the already-fragile Fund hard, leading to asset losses of more than $500 million. DSMF ¶ 16. On March 31, 2009, the Fund's enrolled actuary certified that the Fund was in "critical" (aka "red zone") status for its 2009 plan year under the definition established in the Pension Protection Act of 2006 ("PPA"). DSMF ¶ 20. As plan sponsor, the Board of Trustees exercised its option under PPA to "freeze" the Fund's status as a "green zone" plan for 2009 to give itself more time to consider its options, and began working with its actuary and legal counsel to consider elements of a rehabilitation plan. DSMF ¶¶ 19-24. On March 31,

2010, the Fund's enrolled actuary certified that the Fund was in "red zone" status for 2010. DSMF ¶ 25. The Board accordingly adopted a Rehabilitation Plan for the 2010 plan year. DSMF ¶¶ 27-28 & Att. 42. Because the Board determined that "the plan [could] not reasonably be expected to emerge from critical status by the end of the rehabilitation period," the Plan included "reasonable measures to emerge from critical status at a later date or to forestall possible insolvency" pursuant to ERISA § 305(e)(3)(A)(ii). DSMF ¶¶ 27-28 & Knight Decl. Att. 42.

In designing the Rehabilitation Plan, the Trustees made several major decisions. First, the Trustees decided that participating employers were unlikely to agree to extremely large increases in the contribution rates. DSMF ¶¶ 21-27. This was based on their own experience in the industry, a lengthy report commissioned from an independent outside economics consultant, and the Fund's experience with the withdrawals that followed the 2006 contribution increase. *Id.* In addition, the Fund's actuary explained that massive increases in contributions for active employers (20% increases a year for ten years, plus 50% cuts to future benefit accruals) would be required to avert the projected insolvency. DSMF ¶ 22 & Knight Decl. Att. 42 at 2049. The adopted Rehabilitation Plan increased contribution rates by 10% following expiration of an employer's collective bargaining agreement, and by an additional 5% effective January 1, 2016, while also radically cutting adjustable benefits (those benefits which the PPA allows critical status plans to reduce, as an exception to ERISA's "anti-cutback" rule). DSMF ¶ 28 & Knight Decl. Att. 42 at 2052-58 (listing cuts to benefits).

### C.  The Amendment of the Rehabilitation Plan to Include the Exit Fee

At the Board's May 2012 meeting, the Trustees had the actuaries perform further live modeling, based on updated data, to consider "various alternative scenarios such as increased

[investment] returns over time, additional employer contributions and a cessation of future benefit accruals." DSMF ¶ 42. These projections showed that, to avoid insolvency, the Fund would need to double contribution rates by 2018 and also either maintain current participation rates or replace more than half of contributions with withdrawal payments. *Id.*

At the following meeting, in November 2012, the actuary presented the annual valuation of the Fund, which contained detailed information regarding the Fund demographics and funding issues. In presenting the valuation, the actuary reported that, in the first ten months of 2012, active participation had dropped by more than 15%. The Trustees "discussed the potential withdrawals of several large contributing employers" and the fact that, "depending on how the employers pay their withdrawal liability," such withdrawals "could have either a positive or negative effect on the Fund's long term solvency." They also discussed the projected insolvency in 2028 and the dwindling size of the funding standard account, predicted to be depleted by 2013. DSMF ¶ 43.

At that same meeting, the actuary, together with legal counsel, presented "a proposal to modify the Rehabilitation Plan to reflect an employer assessment of a pro rata share of any accumulated funding deficiency in the event an employer withdraws from the Fund." DSMF ¶¶ 44, 46. The actuary had heard such a rule discussed at a meeting of actuaries and had discussed it with legal counsel before the Board meeting, believing it a good fit for the Fund's issues, given the pattern of withdrawals, the inadvisability of raising contribution rates drastically, and the need to increase revenue over the decade to come. DSMF ¶ 45.

The term "accumulated funding deficiency" long pre-dates the PPA. ERISA has always required multiemployer pension plans to "establish and maintain a funding standard account," to which specified credits and charges are to be made for each plan year. 29 U.S.C. § 1084(b). Any

excess of charges over credits in that account carries over to following years and is referred to as the "accumulated funding deficiency." 29 U.S.C. § 1084(a); *Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp.*, 617 F.3d 54, 64 (1st Cir. 2010). Ordinarily, participating employers are required to make annual contributions in an amount necessary to avoid an accumulated funding deficiency ("AFD"). 29 U.S.C. § 1082(a)(2)(C). If they fail to do so, they are subject to an excise tax for each year in which there is an AFD. Internal Revenue Code § 4971(a). But under the PPA, if the plan sponsor of a critical status plan adopts and complies with a rehabilitation plan, the plan may maintain an AFD without employers having to pay additional contributions or an excise tax.  29 U.S.C. § 1082(b)(3); Internal Revenue Code § 4971(g).

The Trustees knew that an AFD was looming; the projected deficiency in 2013 was the basis for the Fund's 2009 "red zone" certification.  DSMF ¶¶ 24-25. Moreover, the actuary annually presented to the Board projections, based on reasonable actuarial assumptions, estimating the funding standard account for seven years into the future. DSMF ¶ 31. After consideration and discussion, the Board directed its actuary and counsel to "restate the Rehabilitation Plan to incorporate all amendments to date and to reflect the update as well as proposed language regarding assessment of a pro rata share of any accumulated funding deficiency" and authorized the Board's Chairman and Secretary to approve the amended plan between meetings. DSMF ¶ 48.  The amendment added the following language to the Rehabilitation Plan's "Schedule of Reasonable Measures to Emerge From Critical Status . . . Or Forestall the Date of Insolvency":

> In addition, in the event an Employer withdraws during a Plan Year when the Fund has an accumulated funding deficiency, as determined under Section 304 of ERISA, the Employer shall be responsible for its pro rata share of such deficiency in addition to any withdrawal liability determined under Section 4211 of ERISA.

DSMF ¶ 49.  This referenced "pro rata share" is what Plaintiff refers to as the "Exit Fee."

As projected, PIUMPF had a deficiency in its funding standard account at the end of 2013.  DSMF ¶ 52.  As a result, the Exit Fee rule first applied to employers that withdrew in 2014.  Since that time, the Fund has been issuing demands for payment of the Exit Fee to withdrawn employers, and has obtained or negotiated for payments from the majority of the withdrawn employers.  DSMF ¶¶ 55-56.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████  DSMF ¶ 56.  The Fund office and Fund counsel report on the allocations and payments of this Exit Fee at each Board meeting to allow the Trustees to monitor the effect of the rule.  DSMF ¶ 55 & Knight Decl. Att. 47 (sample report to Board).

PIUMPF remains in critical status (since 2015, "critical and declining" status under the statutory definitions revised by the Multiemployer Pension Reform Act of 2014), and continues to comply with its adopted rehabilitation plan.  DSMF ¶ 58.  From 2013 to 2018, the projected insolvency date has moved out two years, from 2028 to 2030, indicating a likelihood of two additional years of benefit payments to participants.  DSMF ¶ 59 (2013 & 2018 certifications).  In addition, the Fund's funding standard account has performed better than projected: in 2013, the funding deficiency was projected to be $772,342,809 as of January 1, 2019, but by January 1, 2019 the actual deficit was $574,948,216, an improvement of nearly $200 million over the projection.  DSMF ¶¶ 50, 57.  Withdrawals from the Fund have also slowed substantially, with only three small employers withdrawing in 2019.  DSMF ¶ 60.

**D.  Plaintiff Donnie Ely**

Ely was, until last year, Plant Manager of Clearwater Paper Corporation's Idaho plant. DSMF ¶ 7. He earned vested pension credit while employed in a union position and is entitled to a benefit from the Fund upon reaching 65. *Id.* His PIUMPF benefit is, however, merely theoretical to him, as he is entitled to a much larger pension from Clearwater's salaried pension plan and the Clearwater plan provides a full "offset" for his PIUMPF benefit, meaning that Clearwater's plan will reduce the amount it pays him by the pension amount the Fund pays. DSMF ¶ 9. Ely decided to bring this lawsuit after Clearwater's General Counsel told him that the withdrawal of companies from the Fund was hurting the plan and suggested Ely contact Clearwater's outside ERISA lawyer (who now represents Plaintiff in this suit) for information. DSMF ¶ 8.  Clearwater's General Counsel did so after that same Clearwater outside counsel advised Clearwater that it likely could not challenge the Exit Fee under ERISA.  DSMF ¶ 8. The only equitable relief Ely seeks is an order prohibiting enforcement of the Exit Fee against currently participating employers, of which Clearwater is by far the largest.  DSMF ¶ 7.

## **Standard of Review**

A party is entitled to summary judgment under Rule 56 where there is no "genuine dispute as to any material fact" and the party is "entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56.  "A genuine dispute of material fact exists 'if the evidence is such that [the factfinder] could return a verdict for the nonmoving party.'" *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Where, as here, the party moving for summary judgment is not the party that bears the burden of proof at trial, it may secure summary judgment by . . . pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  It is, accordingly, the Plaintiff's burden in opposing summary judgment "to make a showing sufficient to establish existence of [the]

element[s] to that party's case." *Id.* at 1226.

In order to defeat the Trustees' Motion, the Plaintiff bears the burden of showing that there is a triable issue of disputed fact that would establish his standing, and that the Exit Fee was not a reasonable measure to forestall insolvency. To prevail on his own Motion for Summary Judgment, he must meet the higher standard of showing that the *undisputed* material facts prove as a matter of law that the Fee is not a reasonable measure to forestall insolvency.[3]

## I.   The Fund Is Entitled to Judgment Because the Plaintiff Has Neither Shown Any Injury, Nor That the Relief Sought Would Remedy Any Alleged Injury.

At summary judgment, a plaintiff bears the burden to show, by affidavit or other evidence, "specific facts" sufficient to prove the three elements that together compose the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). These three elements are: (1) "a 'injury in fact'… which is .. concrete and particularized…[and] "actual or imminent, not 'conjectural' or 'hypothetical,'"; (2) "a causal connection between the injury and the conduct complained of" and (3) it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* Plaintiff fails to meet his constitutional standing burden under *Lujan.* And, for largely the same reasons that his standing fails, he also has no claim under ERISA § 502(a)(3), because the relief he seeks is not "appropriate equitable relief."

### A.   Plaintiff Has No Standing Under the Constitution to Challenge the Exit Fee, Because He Has Not Shown that It Caused Him "Injury in Fact".

---

[3] Plaintiff's argument that the Defendant bears the burden of proof, *see* Dkt. 84-1 at 22-24, is not consistent with the caselaw. Plaintiff's cited cases do not stand for the proposition that the burden of proof rests on the Defendant, but for a rather different proposition: that if an ERISA plaintiff *proves* a breach of fiduciary duty in investing assets *and* that the plan suffered a loss, the burden shifts to the fiduciary to prove that the investment loss would have occurred absent the breach. *Id.* That line of cases is irrelevant, but in any event the Ninth Circuit has rejected that approach, instead holding that the Plaintiff continues to bear the burden of proving the causal link even in those circumstances. *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1099 (9th Cir. 2004).

Injury-in-fact is a constitutional requirement for standing, and "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016), *as revised* (May 24, 2016). Accordingly, "an ERISA plaintiff must not only have statutory standing under the civil enforcement provisions of § 1132(a), but must also satisfy the separate, minimum requirements of constitutional standing," including injury-in-fact. *Cramer v. John Alden Life Ins. Co*., 763 F. Supp. 2d 1196, 1205–06 (D. Mont. 2011).

Plaintiff alleged in his Amended Complaint that, "[i]f the Exit Fee is left in place, it is all but certain to result in the Fund becoming insolvent, thereby causing irreparable harm to Plaintiff . . . who will be denied most, if not all, of his pension benefits." *See, e.g.*, Dkt 44, ¶ 149. The facts developed during discovery, however, have shown that Ely will suffer no financial injury from the Fund's insolvency. This is because he is entitled to a much larger monthly pension payment from Clearwater's salaried pension plan and that plan's terms prevent Ely from double-dipping by drawing his PIUMPF benefit on top of his Clearwater benefit; the Clearwater plan offsets the amount of PIUMPF benefit from the payment due under the Clearwater plan. DSMF ¶ 9.  In other words, if Ely's PIUMPF benefit is reduced or eliminated, his Clearwater benefit will correspondingly be increased dollar for dollar. Ely will not be injured at all by the Fund's eventual insolvency—only Clearwater, which funds the salaried plan, stands to lose.[4]

---

[4] After discovery, it is plain that Plaintiff is before this Court as a proxy for Clearwater, which itself has no statutory standing to sue.  *See* DSMF ¶ 8 (Clearwater testifying that it had a discussion with counsel regarding "alternative strategies" relating to PIUMPF and learning that it could not bring a claim itself to contest the Exit Fee); *WestRock RKT Co. v. Pace Indus. Union-Mgt. Pension Fund*, 856 F.3d 1320, 1322-24 (11th Cir. 2017 (employer has no cause of action under ERISA to challenge provision of Rehabilitation Plan). This scenario—a plaintiff with no real stake in the outcome, who is merely acting as a proxy for another party that would have no claim under the statute—is a perfect example of what the constitutional standing requirement seeks to preclude.

Simply put, because any decrease in his PIUMPF pension will be made up by the Clearwater pension plan, Ely himself is at no "imminent" risk of any concrete harm even were the Exit Fee on withdrawing employers to accelerate the Fund's insolvency.[5]

### B. Plaintiff Has Neither Standing Nor a Claim for "Appropriate Equitable Relief" Under ERISA Because the Relief Plaintiff Seeks Would Not Redress Any Claimed Injury.

Beyond failing to show any concrete injury in the first place, Plaintiff presents no evidence that the relief he seeks—"an injunction prohibiting the Trustees from continuing to make Exit Fee assessments," Dkt. 44 at ¶ 153—would redress the claimed acceleration of the insolvency date which he claims is the source of his putative injury.  To the contrary, the undisputed evidence in this case makes clear that enjoining the Fee prospectively would accelerate, not forestall, the Fund's insolvency.  The legal impact of this fact is twofold.  First, even if Plaintiff did have an injury, which he did not, he would nonetheless lack standing to bring the claim because he cannot show that it is "likely" that "the injury will be 'redressed by a favorable decision'" from this Court, *Lujan*, 504 U.S. at 560.  Second, the relief he seeks is not "appropriate equitable relief," which is the only relief available under ERISA § 502(a)(3)(B). *Great West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 221 (2002) (holding that § 502(a)(3) authorizes only appropriate equitable relief and "is a catchall provision that authorizes all relief that is consistent with ERISA's purposes and is not explicitly provided elsewhere.")

Under § 502(a)(3), the only relief that this Court can provide is *equitable* relief—namely, an injunction ordering the Fund to stop requiring withdrawing employers to pay their allocated share of the AFD. This Court has no authority to turn back time to 2013 and force those

---

[5] The Supreme Court has stressed that "imminence," for these purposes, means that the injury "must be certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

employers that have withdrawn back into the Fund. And the relief Plaintiff seeks—eliminating the Exit Fee liability of employers that still participate but are considering leaving the Fund— would put the Fund in a worse financial situation than it would be in if those employers were required to pay a portion of the Fund's AFD when they withdraw. DSMF ¶¶ 62, 64.

Moreover, there is absolutely no evidence that: (1) the Exit Fee, at this point, incentivizes the remaining employers to leave; or that (2) enjoining the Exit Fee would cause any employer currently participating to stay in the Fund. To the contrary, Ely's expert readily conceded that once the AFD is large enough, the Exit Fee creates an incentive for employers **not** to leave the Fund, and that he was in no way opining on the Exit Fee's effects on the Fund at the present, or going forward from this point in time. DSMF ¶¶ 61, 63. Indeed, the whole thrust of Ely's expert's testimony in this respect is that, "because the Exit Fee escalates so dramatically over time, it … encourage[s employers] to leave *before* the costs of leaving increase." Dkt. 85, Ex. 4 at ¶ 39 (emphasis added). Once the "costs of leaving" *have* increased, that claimed incentive is gone—and Ely has presented no evidence regarding the present-day incentives on currently participating employers. The Fund's experience suggests that, even if there were such an incentive in the past, such alleged incentive is now gone, as the Fund is experiencing a marked decrease in withdrawals, with only three small employers withdrawing in 2019.  DSMF ¶ 60.

The caselaw is clear, both within and outside the ERISA context, that, where the Court's injunctive power likely would not remedy his injury, the plaintiff has no constitutional standing to maintain the suit.  For example, in *Glanton v. AdvancePCS*, 465 F.3d 1123, 1125 (9th Cir. 2006), the Court found that a plan participant had no standing to bring a fiduciary breach claim alleging that the fiduciary charged the plan too much for prescription drugs, because the Court had no authority to order the plan sponsor to pass along the savings to participants, and therefore

the Court's injunctive power would not remedy the claimed harm to the Plaintiff. *See also*

*Paulsen v. CNF Inc.*, 559 F.3d 1061, 1074 (9th Cir. 2009) (Plaintiffs had no standing to bring

claim that would benefit only the PBGC, but not Plaintiffs, as the Court has "no mechanism to

compel PBGC to pass along the recovery" and therefore Plaintiffs could not show it "likely …

that their injury will be redressed by a favorable decision"); *Hall v. Lhaco, Inc.*, 140 F.3d 1190,

1197 (8th Cir. 1998) ("claim was not 'redressable' [because] the district court correctly held that

no injunction against [Defendant] would have any effect whatsoever on" plaintiff); *Hill v.*

*Vanderbilt Capital Advisors, LLC*, 834 F. Supp. 2d 1228, 1254 (D.N.M. 2011) (no standing

"[b]ecause redressing the Plaintiffs' alleged injury … requires a third party's actions").

For these same reasons, the undisputed facts show that Plaintiff's claim is not one for

"appropriate equitable relief" under ERISA § 502(a)(3)(B). Because Plaintiff has presented no

evidence that the equitable relief available to Plaintiff (an order enjoining the Fund from

enforcing the Exit Fee against future withdrawals) would advance any ERISA statutory interest,

and where all evidence is that enjoining the rule's prospective application would, to the contrary,

harm the Fund's participants and—contrary to the ERISA statutory interests—not forestall

insolvency, the relief he seeks is neither "appropriate" nor "equitable."

## II.    Plaintiff Has Not Created a Genuine Dispute of Material Fact that Would Allow A Fact-finder To Reject the Trustees' Determination that the Exit Fee Is a Reasonable Measure to Forestall Insolvency.

### A.    The AFD Exit Fee Is a Reasonable Measure to Increase Revenue to the Plan Without Increasing Liabilities, Which Forestalls the Insolvency of the Fund.

Section 305(e)(3)(A)(ii) of ERISA provides that a rehabilitation plan adopted by the

sponsor of a critical status plan may consist of "reasonable measures to emerge from critical

status [after the end of the rehabilitation period] or to forestall possible insolvency."  29 U.S.C. §

1085. "Insolvency" is when "the plan's available resources are not sufficient to pay benefits

under the plan when due for the plan year." 29 U.S.C. § 1426(b)(1). This Court's prior Order makes clear that a rehabilitation plan is not unreasonable merely because it does not "prevent insolvency." Dkt. 37 at 35.

In considering what is a "reasonable measure," this Court may be guided by long-standing caselaw recognizing that, when it comes to multiemployer pension funds, "judgment calls about future fund health" are "accord[ed]" a 'wide range of reasonableness.'" *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.,* 888 F.3d 696, 706 (4th Cir. 2018) (quoting *Artistic Carton Co. v. Paper Indus. Union-Mgt. Pension Fund*, 971 F.2d 1346, 1348 (7th Cir. 1992)) (rejecting challenge to Fund's critical status determination and resulting imposition of rehabilitation plan). "Put another way, the law recognizes that '[r]easonableness is a zone, not a point,' ... and projections of a pension fund's future health necessarily involves decisions others may have made differently." *Id.* (quoting *Coombs v. Classic Coal Corp.*, 931 F.2d 96, 99-100 (D.C. Cir. 1991)). And, in deciding whether a rehabilitation plan "measure" is within this zone of reasonableness as a way to forestall insolvency, it is important to recognize that, for plans in this situation—*i.e*., those plans with a projected insolvency that cannot be averted through any reasonable measures—plan sponsors have no easy or perfect solutions, and any measure chosen will disappoint some party.

In resolving Plaintiff's claim, the sole question to be considered under the standard set forth by this Court, is whether the Exit Fee is a "reasonable measure" to "forestall insolvency." Dkt. 37 at 35, 36; Dkt. 58 at 1-2.  How quickly—or slowly—a plan becomes insolvent depends entirely on the relationship between the influx of money to the plan (investment gains and money paid by active or withdrawn employers) and the outflow of money from the plan (benefit payments and administrative costs). *See* DSMF ¶ 64.  Any additional money the plan receives

prior to the insolvency date has the necessary effect of forestalling insolvency, provided that the additional money is not offset by a related cost. Here, the Exit Fee was designed to obtain additional revenue from those employers who decided to withdraw rather than continue participating in the Fund at the higher contribution rates required by the Rehabilitation Plan. See DSMF ¶¶ 46-47.  As the Exit Fee creates no benefit obligations, its only certain effect was to increase plan revenue.  It therefore on its face naturally forestalls insolvency.

This predictable and natural effect has been borne out by the seven years of Fund experience since the Board of Trustees adopted the Exit Fee. The Exit Fee was first applied to employers that withdrew in 2014 (the first year in which the Fund had an AFD).  Over that time, the Fund has collected ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████  DSMF ¶ 56. Every dollar so collected allows the Fund to forestall insolvency and pay additional benefits to beneficiaries.

Plaintiff cannot contradict these undisputed facts about the effects of the Exit Fee, although he brushes off the many millions received by the Fund as "de minimis" given the size of the unfunded liability.[6]  Dkt. 84-1 at 19-20.   Nothing in the statute, however, suggests that a measure is not a "reasonable measure … to forestall insolvency" because it provides only a partial solution, as this Court itself recognized that the statute does not require that a rehabilitation plan entirely prevent insolvency. See Dkt. 37 at 29-30.  ████████████████

---

[6] Plaintiff's brief states that AFD Rule collections totaled ███████████████████████
██████████████████████████████████████████████████████████████████████  The figures as of March 2020, see DSMF ¶ 56, show that the Fund's collections continue apace.

███████████████████████████████████████–every dollar received from these

withdrawing employers funds additional months of pension checks for retirees and thereby

forestalls insolvency a bit more.

### B. The Record Contains No Facts Permitting the Factfinder to Find That the Exit Fee Hastened Insolvency.

To get around the fundamental fact that the Exit Fee as designed increases revenue and

thereby forestalls insolvency, the Plaintiff argues that the Exit Fee caused additional employer

withdrawals which in turn caused lost revenues to the Fund.  There are two insurmountable flaws

with this argument.

First, the Plaintiff has presented not one whit of admissible evidence that the Exit Fee

caused *any* employer to withdraw from the Fund.  Rather, to support his assertion, Plaintiff relies

solely on a speculative academic exercise submitted by his designated expert James Naughton, a

business school professor who has never performed actuarial services for a multiemployer plan.[7]

Naughton's report attempts to impute a causal link between the Exit Fee and employer

withdrawals by arguing that (1) in general, employers want to avoid paying money, and (2) on

average, PIUMPF saw more declines in active participation after 2013 than other critical plans

did.[8]  Plaintiff has adduced no evidence from any withdrawn employer as to its motivation for

withdrawing, much less any testimony linking any employer's withdrawal to the adoption of the

---

[7] As noted in Defendant's objections to Plaintiff's separate Statement of Facts, the Court can disregard Professor Naughton's report altogether, given that an unsworn expert's report is inadmissible to support summary judgment.  *See, e.g., Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1210-11 (D. Nev. 2008).

[8] See Defendant's Motion to Exclude Naughton's Opinion, Dkt. 89-1, for more detail on the flaws in Naughton's analysis on this point, including that Naughton shockingly failed to acknowledge that the specifics of the particular industry in which a fund operates are highly relevant to the fund's ability to maintain or increase active participation rates.  *Id.* at 7-17; *cf.* DSMF ¶15, 17 (sworn statements of union officials relating to realities of bargaining within the industry and BLS data related to industry declines).

Exit Fee.  To the contrary, the union-appointed Trustee with responsibility over collective bargaining in the industry, who was well-situated to understand the reasons driving withdrawal from the Fund, believed that there was no connection between the Exit Fee and employer withdrawals.  DSMF ¶ 53.  Professor Naughton's simplistic syllogism—even if submitted as sworn testimony—is simply insufficient to create a material dispute of fact that the Exit Fee caused employers to leave. Indeed, Naughton himself conceded that the Exit Fee would not cause an employer that otherwise had no plans to withdraw to change course and withdraw, because "[i]f an employer had no plans to ever exit the plan, it doesn't have to take account of an exit fee." DSMF ¶ 61.

Second, even assuming that the Exit Fee did cause employers to leave, the Plaintiff adduces no evidence that any employer withdrawals hastened insolvency.  Because the sole question to be decided in this case is whether the Exit Fee was a reasonable measure to "forestall insolvency,"  the question of whether the rule by itself incentivized employers to withdraw is simply irrelevant, unless such withdrawals moved up the insolvency date.   Naughton's report— the sole material proffered by Plaintiff for this essential point on which the Plaintiff bears the burden of proof—creates no dispute of material fact because it fails to show that employer withdrawals (even if caused by the Exit Fee) actually had the effect of hastening insolvency.  It is inherent in the structure of ERISA's withdrawal liability provisions that a withdrawn employer's annual withdrawal liability payments will often exceed the employer's annual contributions as an active employer, because an employer's annual withdrawal payment is based on the employer's historical contribution rate.  *See* 29 U.S.C. § 1399(c)(1)(C)(i) (annual payment calculated from highest three-year contributions in ten-year period).  Naughton himself conceded that a withdrawn employer's annual withdrawal liability payments will often exceed what it

contributed annually as an active participating employer, especially where the employer has a declining base of covered employees.  DSMF ¶ 38.

As most of the large employers that have withdrawn since the Exit Fee was imposed had a declining contribution base, they were able to minimize their overall obligation to the Plan by *waiting* to withdraw until their highest contribution years were no longer part of their ten-year history (and therefore excluded in the calculation of their withdrawal liability), which presented a major concern for the Trustees. *See* DSMF ¶ 39; 29 USC § 1399(c)(1)(B). If the Exit Fee did encourage employers to withdraw earlier, rather than waiting until their withdrawal liability was smaller, the effect would be to *increase* revenue into the Fund, for a period beyond the Fund's original projected insolvency date. DSMF ¶¶ 37-38. The Board of Trustees were well-aware of these facts, and often discussed at their meetings the fact that employer withdrawals could have a negative or positive impact upon the insolvency date, depending on the particular circumstances of the employer. DSMF ¶ 43. Naughton's analysis ignored these facts, and also ignored the facts showing the Fund's total revenue increased due to these employers' withdrawing.

Defendant's designated expert, Joseph Hicks, issued an expert report that, unlike the Naughton report, considered the actual economic effect of employer withdrawals on the Fund, and concluded that the expected positive impact of the Exit Fee was borne out by the withdrawals.  Hicks measured this in two different ways.  First, he looked at the largest contributing employers at the time the rule was adopted and found that their annual withdrawal liability payments were about 148% of their contributions in the year immediately prior to their withdrawal (totaling $39.5 million rather than $26.7 million).  Hick Decl Att. 1 at 35-36.  And he observed that the majority of these employers had their withdrawal liability calculated "based on the earliest work history … allowable by law," indicating: (a) that their bargained contributions

were declining, and (b) withdrawal at a later date would have resulted in lower withdrawal liability revenue payments to the Fund. *Id.* Second, Hicks looked at the overall pattern of active contributions and withdrawal liability payments into the Fund over the period 1993 to 2018, finding that, "as the bargained contributions decline, they are more than replaced by withdrawal liability payments and [after 2015] the AFD Rule." *Id.* at 37.

Plaintiff can present no evidence to contradict the foregoing. Indeed, Plaintiff's expert did not even attempt to contradict these undisputed facts. Instead, he generated a speculative mathematic exercise, which posited that the Trustees first should have predicted the actual rate of employer withdrawal following 2012 and then, second, should have predicted—contrary to the facts just described—that withdrawal assessments would be no greater than previously paid contributions, *and*, third, assumed that withdrawing employers would pay only 37% of that assessed withdrawal liability and 0% of their AFD allocation. From these speculative, factually incorrect assumptions, Naughton opined that the Trustees should have predicted that the Exit Fee would hasten insolvency by two years. Naughton, however, concedes that he did no inquiry of his own to validate these assumptions. DSMF ¶ 65. He simply pulled them from modeling that the Fund's actuary had done for a discussion with the PBGC (not from documents certified by the actuary as representing their best estimates), without any inquiry by Plaintiff into whether that 37% collection rate was the actuary's best estimate based on plan experience. *Id.* As a result, his entire analysis rests on an assumption that is not valid for this purpose, and does not constitute any actuary's best estimate for withdrawal collections. *Id.*

As the only material presented by Plaintiff to support its position that employer withdrawals hastened insolvency is a speculative mathematical exercise based on unsupported assumptions, no factfinder could find that the Exit Fee hastened the Fund's insolvency date,

regardless of whether it hastened employer withdrawals.[9]

**C.  The Process Followed by the Trustees in Adopting the Exit Fee Is Not Relevant to Plaintiff's Claim, But If It Were, the Facts Still Do Not Establish that the Fee Was Not a Reasonable Measure to Forestall Insolvency.**

The majority of Plaintiff's argument in support of summary judgment goes to the process employed by the Board in deciding to adopt the rule, rather than the reasonableness of the rule itself.  *See* Dkt. 84-1 at 4-6, 10-12, 15-21.  Ely argues that what he depicts as deficiencies in the process by which the Exit Fee was adopted renders the Exit Fee itself unreasonable and entitles him to summary judgment.  As we show herein, Ely's argument is misdirected, as the statute imposes no process requirements on plan sponsors, but rather says only that the plan must "consist of" "reasonable measures" to forestall insolvency.  However, even were the process by which the Exit Fee was adopted germane to his claim, the record establishes that the Trustees in fact did follow an appropriate and reasonable process in adopting the Exit Fee.  Not only is Ely not entitled to summary judgment, the evidence on this point provides one more reason summary judgment is due to be granted to the Board of Trustees.

*1.  The Statute Does Not Require a Plan Sponsor To Follow Any Particular Process in Evaluating Potential Measures to Forestall Insolvency*

The PPA does not require that a plan sponsor engage in any particular process in order to show that a rehabilitation plan provision is a reasonable measure to forestall insolvency. ERISA is a "comprehensive and reticulated statute" and courts should not create additional obligations beyond those specified in the statute. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-47

---

[9] As explained in Defendant's motion to exclude the testimony of Plaintiff's expert, Plaintiff's evidence that the AFD Rule caused employer withdrawals is so fundamentally flawed as to be unreliable as expert opinion testimony.  Dkt. 89-1 at 12-15.  And, as explained above, even if that evidence were found to create a dispute of fact as to whether the AFD Rule caused employer withdrawals, the dispute would not be *material* where there is no evidence sufficient to create a dispute of fact as to whether the withdrawals hastened insolvency.

(1985). And, while the PPA established many new procedural requirements for plans with respect to specific actuarial calculations to be performed at specific times, the section addressing rehabilitation plans, § 305(e)(3), mandates no procedures that plan sponsors must follow, except for providing that, before a plan sponsor adopts a "forestall…insolvency" plan, it must first make a determination that "based upon reasonable actuarial assumptions and upon exhaustion of all reasonable measures," the plan could not be expected to emerge from critical status by the end of the rehabilitation period. This is the only procedural requirement that the statute imposes upon the plan sponsor in adopting a rehabilitation plan—one that Defendant indisputably met.

This Court has already held that "[i]n enacting the amended rehabilitation plan, the Board of Trustees was acting as a plan sponsor engaged in plan design," not a fiduciary governed by the fiduciary standard. *See* Dkt. 37 at 14.[10] As such, the Board of Trustees' action in adopting the Exit Fee does not even "fall within the scope of the duty of prudence" set forth in ERISA Section 404. Dkt. 37 at 16; *see also id.* at 8. This is not to say that the Board was acting imprudently in carrying out its plan sponsor function.  But when a plan sponsor is acting as a plan sponsor engaged in plan design (rather than as an administrator engaged in plan administration), the fiduciary prudence test is, at best, ill-fitting. A plan sponsor is, by definition, engaged in determining what plan to offer and how to fund it; in so doing, the plan sponsor may decide to

---

[10] As shown in Defendant's Motion to Dismiss, Dkt. 16-1 at 16-17, plan sponsor decisions regarding how to fund a plan fall squarely within plan design, not plan administration.  And, even outside the rehabilitation plan context, it has long been the rule that it is permissible for a plan sponsor, as part of its funding design, to allocate additional costs to withdrawing employers. *See, e.g., Bd. Of Trustees v. Four-C-Aire, Inc*., 929 F.3d 135, 145 (4th Cir. 2019) (fund's rule requiring withdrawing employers not subject to withdrawal liability to pay an "exit contribution" was an enforceable plan rule); *Artistic Carton Co. v. Paper Indus. Union-Management Pension Fund*, 971 F.2d 1346 (7th Cir. 1992) (enforcing plan rule requiring withdrawing employers to pay for liabilities accrued during employees' work with previous employers, noting that the Fund's Trust and participation agreement is a contractual agreement and the law permits agreements between funds and employers to pay more than statutorily required).

offer a plan that differs from the plan that an individual participant may prefer. For instance, a participant may prefer a plan that offers richer benefits to fewer people, but a plan sponsor may decide to offer a plan that offers a smaller benefit to more people. Such decisions will not be in the equal interest of every plan participant, but they are nonetheless permissible plan design.

However, even if one were to accept the Plaintiff's suggestion that the caselaw governing the fiduciary duty of prudence should apply (contrary to this Court's prior ruling that it does not, Dkt. 37 at 16-17), the Plaintiff has not presented any facts sufficient to create a triable issue that such a duty was breached.  Although Plaintiff's brief attempts to argue various alternatives that he believes could have led to a better result, he provides absolutely no evidence—not even in the form of expert opinion testimony—that there was a single alternative that was both feasible and that a reasonable Board would have concluded would lead to a better outcome with respect to the insolvency date.  This deficiency is fatal to his claim that the Trustees acted imprudently.

### 2.  The Undisputed Facts Establish that the Trustees Were Advised by Professionals, and Considered the Relevant Facts Prior to Adopting the Fee.

Even if ERISA's fiduciary duty of prudence could be applied to a plan sponsor action in adopting a rehabilitation plan, the undisputed facts show that the Board followed prudent processes. "Whether a fiduciary acted prudently cannot be measured solely from the perspective of hindsight; rather, the question is whether the fiduciary conducted himself in the appropriate manner and considered the appropriate factors when making his decisions."  *Cryer v. Franklin Res., Inc*., No. 16-CV-04265-CW, 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018).

In support of Ely's claim that the Trustees acted unreasonably, he cites to a series of "facts" regarding what he views as deficiencies in the Trustees' process.  The purported facts on which he relies are conclusory, lack record citation, or are flatly contradicted by the record.  *See* Def. Opp. to Plf.'s SMF. 4-5, 8, 18, 20.  The Board disputes all of these facts, and therefore

summary judgment for Plaintiff would be inappropriate.  Moreover, given the deficits in Plaintiff's asserted facts, we submit that Plaintiff's evidence is so flawed that it can create no genuine dispute and the Board is entitled to summary judgment on this point.

The undisputed facts show that the Trustees considered the following before they amended the Rehabilitation Plan to include the Exit Fee:

- Advice from their retained independent actuarial firm, highly experienced in multi-employer plans and the development of rehabilitation plans, that the Exit Fee was a viable possible measure to forestall insolvency, and consensus from Fund Counsel, DSMF ¶¶ 44-46;

- Actuarial modeling showing that, given the size of the retired and terminated vested population compared to the remaining participant population, cuts to future benefit accruals would have minimal impact on insolvency, and therefore the primary mechanism for forestalling insolvency was to collect additional funds from employers, DSMF ¶¶ 21-22, 42;

- Models presented by the Fund's actuaries, including at the Trustees' meeting immediately prior to the meeting at which they voted on the Exit Fee, showing that the Fund would need four years of 20% contribution increases (which compounded would double contribution rates) to avoid insolvency, DSMF ¶ 42;

- Approximately 20% of contributing employers had withdrawn from the Fund after the Fund raised contributions by 10% in 2006, DSMF ¶ 14;

- Union-side Trustees were experiencing increased resistance to participation in the Fund by employers, and declining interest among represented employees in participation in a critical status Fund with a projected insolvency, leading them to conclude that it was not realistic to attempt to attract new employers to the Fund, DSMF ¶ 35;

- Prior notice or inquiry from large employers regarding withdrawal, including the largest

employer (Georgia-Pacific) which had initiated negotiations about its withdrawal and which the Board discussed at the meeting in which it decided on the Exit Fee, DSMF ¶¶ 36, 43;

- Repeated discussions among the Trustees and the actuary (including at the Board meeting in November 2012 at which the Trustees decided to adopt the Exit Fee) that withdrawal of employers could have a positive effect on the Fund's insolvency date, where the employer paid more after withdrawal than it did as a contributing employer, DSMF ¶¶ 43, 53.

- Decreasing contribution rates by many employers, particularly large employers such as Georgia-Pacific and others that had closed facilities or retracted operations, indicating that some employers that had not yet withdrawn were likely timing their withdrawal to minimize their ultimate liability to the Fund by taking advantage of the twenty-year cap, DSMF ¶ 38.

Plaintiff's complaint that the process was "unreasonable" reduces to the contention that the Trustees did not do a specific analysis making explicit projections of receipts under the Exit Fee.  Dkt. 84-1 at 4, 12.  However, because any such receipts would help forestall the insolvency date, it was not essential that the Trustees project the *magnitude* of the period by which it would be forestalled—particularly where any such quantified projections would be highly speculative, due to the difficulty of predicting which employers might withdraw and in what year.

A close reading of Plaintiff's argument in his summary judgment brief reveals the true gravamen of his suit, which is not that the Trustees failed to analyze the possibilities, but that he *disagrees with their conclusion*, as he believes that the options rejected by the Trustees, such as 20% annual contribution increases,  were "reasonable choices" because, in his view, "it should not have been difficult for the Trustees to convince all of the largest contributing employers that four years of 20% increase was palatable."  Dkt. 84-1 at 4-5.  Plaintiff, however, presents nothing in support of that assertion—even his own hired expert disclaimed any opinion about

what magnitude of contribution increases would be reasonable, Von Thielen Decl. Att. 5

(Naughton Dep.) 214:14-215:21. 217:16-218:2.  And, moreover, the statute is quite clear that it

is for the plan sponsor (composed of business and labor leaders from the affected industry) to

determine whether such steps would be "reasonable" in the context of the plan and industry.

Plaintiff, with his uninformed view that "it should not have been difficult" to convince

contributing employers to agree to massive contribution increases, has no basis to second-guess

the plan sponsor's decision, which was informed by the Trustees' many years of experience in

the industry (and is sensibly one reason Congress would have delegated these decisions to the

plan sponsors).

Lacking any specific evidence that the Trustees here failed to act prudently, Ely attempts

to impugn the general knowledge or capacity of the Trustees. In support of this, he cites only to

two pieces of evidence. First, he quotes retired management Trustee Dale Olson's refusal to

agree that, as a general rule, "to be healthy, a defined benefit plan **needs** to have more active

employees than retirees," *see* Dkt. 84-1 at 11 (emphasis added)—an eminently reasonable view,

one with which even Plaintiff's own expert agreed, *see* von Thielen Decl. Att. 5 (Naughton Dep.)

at 35 ("Q: A high dependency ratio in and of itself doesn't mean that a plan can't pay the

benefits; right? A: That is correct.  The dependency ratio is important when you're looking at

plans that don't have all of the funding set-aside to cover promised benefits.").  Second, he

suggests that, because certain individual trustees could not recall specifics at their depositions,

which occurred seven years after the fact and after some had retired from the Board, they "were

unprepared to determine what constitutes a 'reasonable measure'" at the time they made the

decision.  Dkt. 84-1 at 10-11.  But their lack of specific memory many years later establishes

nothing, particularly where the documents contemporaneous with the decision clearly show the

prudent processes used to make the decision.

### 3. Plaintiff's Claim that the Trustees Did Not Exhaust All Reasonable Measures Prior to Adopting the Exit Fee, or Pursue Other Options, Is Legally Irrelevant and Unsupported by Any Facts

Plaintiff's contention  that "the Trustees had additional options," to forestall insolvency Dkt. 84-1 at 12-13, is both unsupported by the record evidence and irrelevant to any question to be determined in this case. First, the text of the statute is clear that a plan sponsor is not required to "exhaust all reasonable measures" to forestall insolvency.  Rather, the requirement is that the plan sponsor make a determination that, even if it did exhaust all reasonable measures to prevent or forestall insolvency, it would not emerge from critical status within the rehabilitation period. 29 U.S.C. § 1085(e)(3)(ii). Once that determination is made, the plan sponsor is then obligated to create a plan consisting of "reasonable measures" to forestall insolvency—but nothing obligates it to follow a kitchen-sink approach of including "all" measures that might be reasonable.

Plaintiff faults the Board for not taking a list of actions that Trustees of a multi-employer plan theoretically might take, but provides no evidence that such options were possible or desirable for this fund.  Dkt. 84-1 at 12-13.  For example, the first such action he posits the Trustees should have taken—"Implementing Amendment 8 to cap withdrawal liability payments"—was demonstrably not an option, as the undisputed facts show that the PBGC said this was inconsistent with ERISA. Def. Opp. Plf.'s SMF. ¶ 24.  As another example, benefit suspensions were not a possibility until 2015, post-MPRA, at which point the Fund's actuary determined that PIUMPF did not meet the statutory eligibility criteria. *Id.* In short, Plaintiff can submit no evidence at all that any of these options was realistic for this particular plan, and cannot use this argument either as a basis for granting him summary judgment, or to create a genuine dispute of material fact to defeat Defendant's motion for summary judgment.

### 4. Plaintiff's Claim that the Exit Fee Favored Current Retirees at the Expense of

27

***Future Retirees Is Legally Irrelevant.***

Plaintiff's argument that he is entitled to summary judgment because the Exit Fee supposedly "favors retirees over all others because retirees continue to receive full benefits until insolvency," Dkt. 84-1 at 9, again misapprehends the requirements of the statute, which asks only that the rehabilitation plan consist of reasonable measures to forestall insolvency. *See generally* Dkt. 37 at 34-35.[11] Plaintiff's claim that all participant groups must be treated equally highlights the important distinction between plan sponsor design decisions and fiduciary administrative decisions, as it is beyond dispute that a plan sponsor may make decisions that advantage one group over another, such as deciding to freeze future benefit accruals, or provide COLAs to an existing retiree group. Moreover, Plaintiff's desired relief would not cure this claimed inequity as it would still result in current retirees receiving more years of benefit payments than an individual who is not eligible to retire for another five years. That is simply the nature of any rehabilitation plan to forestall insolvency.

III.   **Plaintiff Has Not Created a Material Dispute of Fact Sufficient to Show that the Board Has Failed in its Duty to Update or Monitor the Rehabilitation Plan.**

In its summary judgment motion, Plaintiff argues that the Board of Trustees breached its duty under ERISA 305(e)(3)(B) to "annually update the rehabilitation plan" because, on Plaintiff's theory, if the Board had monitored the effects of the Exit Fee on employer participation, it would have removed the Exit Fee from the Rehabilitation Plan.[12]  See Dkt. 84-1

---

[11] In contrast to the PPA, in MPRA, Congress did require that the suspensions of benefits allowed by that statute be "equitably distributed across the participant and beneficiary population." Even so, that law recognizes that the plan sponsor designing such suspensions may take into account eleven factors including the beneficiary's age, years until retirement and length of time in pay status. 29 U.S.C. §1085(e)(9)(D)(vi). As noted above, PIUMPF is not eligible for MPRA benefit suspensions, *see supra* in text, so this requirement has no relevance here.

[12] In making this argument, Plaintiff also inserts a separate argument, impugning the reasonableness of certain assumptions used for the Fund's actuarial valuations and certifications,

at 14-15.  The undisputed facts, however, are entirely to the contrary.

There is no caselaw establishing what a Plaintiff must show in order to establish a claim that a plan sponsor failed to annually "update" a rehabilitation plan in accordance with the statute. As the statute expressly assigns this role to the "plan sponsor," not the "plan fiduciary," it is clear that Congress did not intend to import the caselaw establishing a fiduciary "duty of prudence" in monitoring the implementation of plan terms. *See* Dkt. 37 at 14-17. It is, moreover, clear that the requirement to "update" does not require that the Board *amend* the Rehabilitation Plan.  Against this background, the undisputed facts establish that the Board fulfilled its statutory obligation.

First, it is undisputed that the Board performed an annual review of the Rehabilitation Plan to update it, and from time to time made certain amendments.  DSMF ¶¶ 32, 34.  Indeed, Plaintiff concedes that the Trustees did update the Plan annually, as required by statute, and the sole evidentiary support that Plaintiff cites in support of his claim that the Trustees' action was inadequate is that "almost identical boilerplate language was used throughout these 'annual updates'" Dkt. 84-1 at 18.[13]  Putting to the side Plaintiff's characterization of these reports, there is nothing wrong with annual updates that use similar language if they still accurately describe the underlying facts. Indeed, the incontrovertible evidence demonstrates that, at each meeting,

---

specifically the industry activity assumptions selected by the Trustees to project future participation and the assumed rate of investment return rate selected by the plan actuaries.  *See* Dkt. 84-1, at 15 & n.4.  But Plaintiff's Amended Complaint does not assert any challenge to the Fund's actuarial assumptions, the Plaintiff has cited no evidence to support a claim that these assumptions were unreasonable when made, and the time to assert any such allegations has long passed.  The Court should disregard these new allegations.

[13] The Plaintiff's further argument that the Fund failed to file the annual Rehabilitation Plan update in years 2017 and 2018 is puzzling, as the Form 5500s are posted publicly on the Fund's website, and clearly show that the update was included in both those years.  See Def. Opp. To Plf.'s SMF ¶ 33; C. Knight Decl. ¶ 8, Atts. 7-A, 7-B; DSMF ¶ 66.

the Board reviewed all the information necessary to determine the impact of the Exit Fee.  In particular:

- Although Plaintiff asserts, without support, that the Trustees "ignored" the large number of withdrawals from the Fund, Dkt. 84-1 at 15, the minutes show that in connection with each meeting the Fund office reported to the Board on employer withdrawals: the Fund office provided all withdrawal liability assessments and demands for payment of the AFD allocation to the Board's Audit Committee for review prior to issuance; assessments were reported to the full Board at the next Board meeting; and the Audit Committee and full Board were briefed at their meetings on payment and collection efforts with respect to the withdrawal liability. As a result, the Board was continually monitoring withdrawals, and the amount of revenue that the specific withdrawals generated, DSMF ¶¶ 40, 41, 52-53.

- The Board reviewed data regarding current contribution levels for the largest employers along with estimated withdrawal liability payments for those employers, and was aware of the potential financial impact of further withdrawals, including specifically the fact that many employers would pay after withdrawal than as active employers, DSMF ¶¶ 38, 43, 52-53.

- Once the Fund began issuing demands for payment under the Exit Fee, the Board was briefed at each of its meetings regarding the allocations to withdrawn employers, and the resulting collection efforts and payments made. DSMF ¶ 55.  In addition, the Audit Committee of the Board is involved throughout the year with the Fund office and Fund counsel in evaluating offers for settlement or requests for payment plans in connection with the Exit Fee allocations, and worked throughout to maximize these collections, DSMF ¶ 56.

- The Board was advised by its independent actuary at regular intervals throughout the year with updated projections of the Fund's insolvency date, and other details regarding the

Fund's funding. At each meeting, the Board discussed with its actuary and legal counsel the evolving status of the Fund and potential ways to address the situation. DSMF ¶ 41, 55. The undisputed evidence, therefore, is that the Board actively monitored the progress of the Rehabilitation Plan, including the effects of the Exit Fee, and determined that removing the rule would hasten the insolvency date of the Fund as it would allow employers to leave the Fund without paying anything beyond their statutory withdrawal liability. DSMF ¶¶ 62, 64.

### IV.    Plaintiff's Remaining Claims Are Barred By This Court's Previous Orders

Plaintiff's Amended Complaint sets forth a grab-bag of other claims, including that the Exit Fee violates the terms of the plan or the Trust Agreement and a claim for breach of co-fiduciary duty. *See* Dkt. 44-0 (Am. Compl,) Counts II, III, V, VI.   This Court's Order on the Defendant's Motion to Dismiss, *see* Dkt. 37, and subsequent Order on the Motion to Dismiss the Amended Complaint, Dkt. 58, previously disposed of these claims as a matter of law.  In any event, they have no legal basis. *See* Def. Mot. to Dismiss Am. Compl., Dkt. 52-1, at 8-9, 14-19.

### <u>Conclusion</u>

For the reasons set forth above, Defendant Board of Trustees respectfully request that the Court deny the Plaintiff's Motion for Summary Judgment and grant the Board judgment on all of Plaintiff's remaining claims.

Respectfully submitted,


*/s/ Kathleen Keller*
Kathleen M. Keller* Robert Alexander*
Elisabeth Oppenheimer*
**Bredhoff & Kaiser, P.L.L.C**.
805 15th St. N.W., Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
Email: kkeller@bredhoff.com
Email: ralexander@bredhoff.com
Email: eoppenheimer@bredhoff.com

James M. Piotrowski, ISB# 5911
Marty Durand, ISB# 5111
**PIOTROWSKI DURAND, PLLC**
P.O. Box 2864
1020 Main Street, Suite 440
Boise, Idaho 83701
Telephone: (208) 331-9200
Facsimile: (208) 331-9201
Email: James@idunionlaw.com
Email: Marty@idunionlaw.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of March, 2020, I filed the foregoing electronically through

the CM/ECF system, which caused the following parties of counsel to be served by electronic

means, as more fully reflected on the Notice of Electronic Filing.

/s/ Kathleen Keller

Kathleen Keller
