UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNIE ELY, a Participant in the PACE Industry Union-Management Pension Fund,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE PACE INDUSTRY UNION – MANAGEMENT PENSION FUND,<br><br>Defendant. | Case No. 3:18-cv-00315-CWD<br><br>**MEMORANDUM DECISION AND ORDER**<br>**RE: Dkt. 84, 89, 92, 105** |

## INTRODUCTION

Before the Court are the parties' motions for summary judgment and corresponding motions in limine to exclude the other's expert report and opinions. (Dkt. 84, 89, 92, 105.) The motions have been fully briefed and are ripe for the Court's consideration. The Court conducted a hearing by video on October 9, 2020. Thereafter, Plaintiff filed a motion to appoint a receiver, and Defendant filed a motion to strike Plaintiff's motion. (Dkt. 163, 165.)

**MEMORANDUM DECISION AND ORDER - 1**

After careful consideration of the parties' arguments, legal authorities, and the extensive record, the Court will deny the parties' respective motions in limine (Dkt. 89, 92), deny Plaintiff's motion for summary judgment (Dkt. 84), and grant Defendant's motion for summary judgment (Dkt. 105), for the reasons discussed below. Consequently, Plaintiff's motion to appoint receiver and Defendant's corresponding motion to strike will be deemed moot.

## BACKGROUND[1]

The Pace Industry Union-Management Pension Fund ("the Fund" or "PIUMPF") is an employee pension benefit plan as defined by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(3)(2)(A), ERISA § 3(3)(2)(A), and a multiemployer pension plan within the meaning of 29 U.S.C. § 1002(37), ERISA § 3(37). PIUMPF is governed by its Trust Agreement, restated as of April 2, 2000, and as amended thereafter. The Board of Trustees is both the Fund's sponsor, meaning it is tasked with administering the Fund, and designated as the named fiduciary of the Trust and Plan. Trust Agreement, Ex. 1 (Dkt. 1-1); 29 U.S.C. § 1002(16)(B), ERISA § 3(16)(B) (defining plan sponsor).

Donnie Ely is a participant in the Fund. The Fund currently is in critical status (and has been since 2010), which means that it is in dire financial condition. *See* 29 U.S.C. § 1085(b)(2), ERISA § 305(b)(2) (defining critical status). Because of its critical

---

[1] The background material is derived from the Complaint and is excerpted from the Court's earlier Memorandum Decision and Order granting in part and denying in part Defendant's motion to dismiss. (Dkt. 37.) This section is intended to provide context.

**MEMORANDUM DECISION AND ORDER - 2**

status, specific funding rules required the Board of Trustees to adopt a rehabilitation plan for the Fund. *See* 29 U.S.C. § 1085(a)(2), ERISA § 305(a) (requiring the plan sponsor of a plan in critical status to adopt and implement a rehabilitation plan in accordance with 29 U.S.C. § 1085(e), ERISA § 305(e)). A rehabilitation plan consists of actions, such as reductions in future benefit accruals, reductions in plan expenditures, or increases in contributions, designed to improve the Fund's financial outlook and enable it to either "cease to be in critical status by the end of the [ten-year] rehabilitation period," or "emerge from critical status at a later time or to forestall possible insolvency." 29 U.S.C. § 1085(e)(3)(A), ERISA § 305(e)(3)(A).[2]

The Board of Trustees adopted a rehabilitation plan, effective in 2010. By Resolution dated April 10, 2013, the Board of Trustees adopted retroactively, as of November 15, 2012, the 2012 Amended and Updated Rehabilitation Plan ("Amended Rehabilitation Plan"). Compl. Ex. 4. The Amended Rehabilitation Plan included a new provision imposing an additional fee upon employers withdrawing from PIUMPF, referred to as the AFD Exit Fee.

Although the Complaint and Amended Complaint assert several claims, the Court in its memorandum decision and order on Defendant's motion to dismiss, and again on reconsideration, determined the sole claim at issue is Ely's contention that the AFD Exit

---

[2] The Pension Protection Act of 2006 ("PPA") was enacted to address problems associated with underfunded pension plans and introduced "a number of mechanisms aimed at stabilizing pension plans and ensuring they remain solvent." *Board of Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co*., 692 F.3d 127, 130 (2nd Cir. 2012). Among the PPA's provisions are "measures designed to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future." *Id*. Funds designated as being in "critical status" require the fund sponsor to adopt a rehabilitation plan. 29 U.S.C. § 1085(e)(1), ERISA § 305(e)(1).

**MEMORANDUM DECISION AND ORDER - 3**

Fee is not a "reasonable measure to emerge from critical status at a later time or to forestall possible insolvency." 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii). Ely contends that, rather than a reasonable measure, the AFD Exit Fee has caused employers to leave the Fund and hasten PIUMPF's decline in value, such that the Fund is projected to be insolvent sooner than projected by the Board of Trustees. Ely seeks a declaration that the AFD Exit Fee is unenforceable, and an injunction preventing the Board of Trustees from further enforcement of the AFD Exit Fee.

### FACTS[3]

PIUMPF has been in existence since 1963 and was created to provide retirement annuities for workers in the paper industry represented by the PACE (Paper and Allied Craft Employees) Union.[4] The PACE union merged with the United Steelworkers of America (USWA) in approximately 2005; after that point, the union-side trustees on the Board for PIUMPF were appointed by the USWA rather than by PACE.

Over the course of its history, approximately 735 separate employer groups have participated in the Fund and approximately 436 of those have current or former employees who have a vested benefit in the Fund. Employers generally participate in the

---

[3] The Court has relied upon Defendant's Statement of Undisputed Material Facts (Dkt. 109) and Plaintiff's response thereto (Dkt. 135), as well as the citations to the record contained therein. For purposes of resolving the motions for summary judgment, the Court finds the following facts both relevant and material. To the extent Ely objected to certain facts, the Court finds Ely's objections do not create a dispute regarding the facts material for resolving the motions for summary judgment. *See* Dkt. 135-2. The Court resolves certain objections to the extent necessary.

[4] Ely clarifies that the PACE Union was not formed until 1999, when the United Paperworkers and the Oil Chemical and Atomic Workers International Union merged, and that these two unions later merged their pension plans in 2002.

**MEMORANDUM DECISION AND ORDER - 4**

Fund through agreement with the United Steelworkers (USW), which is now the sponsoring union for PIUMPF. This agreement is typically memorialized in the collective bargaining agreement between the participating employer and the USWA local union, and the employer signs a Standard Form of Agreement (SFA) with PIUMPF to participate in the Fund.[5]

Participating employers contribute to the Fund based upon hours worked by the covered employees. Employees earn pension credit by virtue of their employment with a participating employer, and the employer contributions are held in common trust with other contributions received by the Fund and used for payment of the Fund's expenses and benefits owed to plan beneficiaries.

Until the Spring of 2019, Donnie Ely was the Plant Manager for the Clearwater Paper plant in Lewiston, Idaho. Clearwater is currently PIUMPF's largest participating employer, supplying approximately 40% of its total contributions in 2018. Ely is fully vested in PIUMPF, and is entitled to a benefit of approximately $412 per month from PIUMPF when he reaches age sixty-five in May of 2026.

According to publicly filed documents accessible from the Department of Labor, by the year 2000, the number of inactive vested participants and beneficiaries exceeded the number of actively employed participants in the Fund, and annual benefit payments

---

[5] Ely contends also that employers engaging non-union or unrepresented employees can participate as contributing employers if they sign a participation agreement.

**MEMORANDUM DECISION AND ORDER - 5**

exceeded what the Fund was receiving in employer contributions.[6] These trends

continued, and the Fund's unfunded liability increased from $129 million as of January 1,

2000, to over $572 million as of January 1, 2004.

     Due to investment losses, as well as the Board of Trustees' concerns about the

Fund's ability to recoup these losses through future investments or participant growth, the

Board of Trustees voted, for any contract beginning after January 1, 2006, to give

participating employers the choice of increasing contribution rates by 10% (with no

benefit improvements), or cutting future benefit accruals for their employees by 25%. In

the wake of this action to force employers to raise contribution rates or cut benefit

accruals, approximately 20% of the Fund's participating employers withdrew from the

Fund. Then, in 2008, the Fund lost more than $500 million in assets, a net return of

-4.3% for the year.[7]

     On March 5, 2009, the Board of Trustees held a special meeting to discuss the

Plan's funding and the fact that the Fund would be certified to be in "critical" (also

referred to as "red zone") status by March 31, 2009. At this meeting, the Fund's actuary,

the Segal Company,[8] presented preliminary projections to the Board of Trustees which

---

[6] Ely's objection to the admissibility of the documents referenced in Paragraph 8 of C. Knight's Declaration, and attached thereto, (Dkt. 105-3), is overruled. The information concerning active and inactive participants, benefit payments, and employer contributions are set forth in the Fund's filed Form 5500s, which are publicly accessible at https://5500search.dol.gov/, constitute business records, and were timely produced, as discussed later in the Court's decision.

[7] Ely objected to the Trustee's characterization that the Fund's losses were solely due to the 2008 stock market crash. The cause of the Fund's decline is not material.

[8] The Segal Group, Inc. is the parent of The Segal Company, the Fund's actuarial firm. Virginia McGinley and Darrin Owens prepared a 2009 Actuarial Certification and Preliminary Projections for the Board of Board of Trustees meeting on March 5, 2009. (Dkt 109-3 at 2.) Virginia McGinley and Darrin Owens are two of Segal's senior vice presidents. Also, McGinley is an actuary, and Owens is a benefits consultant.

showed that, due to the significant 24.3% investment loss, the Fund had a projected

funding deficiency in 2013, and was projected to be insolvent in 2026. Segal's actuaries

presented data indicating that, for the Fund to emerge from critical status by the end of

the ten-year statutory rehabilitation period under the PPA, the Fund would need to raise

contribution rates sharply, such as through an immediate increase of 2.6 to 2.8 times the

collectively-bargained levels. Segal expected also that the Fund could emerge from

critical, or red zone, status in 2030 if the Board of Trustees increased contributions by

10% per year for the next 17 years. (Dkt. 109-3 at 21.)

  After discussion, the Board of Trustees voted to "freeze" the Fund's status in the

"green zone" for one plan year, as permitted by Section 204 of the Worker, Retiree, and

Employer Recovery Act of 2008 (WRERA).[9] This was one of the options set forth in

Segal's report presented to the Board of Trustees at the March 5, 2009 meeting.

  On March 31, 2009, Segal certified that the Fund was in "critical" status under the

PPA as of January 1, 2009, due to the fact that there was a projected funding deficiency

in the funding standard account during the plan year beginning January 1, 2013, which

was within five years of the measuring period. Darrin Owens, Segal's benefits consultant,

reported that the actuarial value of assets was approximately 73.5% of the total unit credit

accrued liability as of January 1, 2009. (Dkt. 105-3 at 129.)

---

[9] WRERA amended ERISA and allowed a plan sponsor to temporarily delay the designation of multiemployer plans as in endangered or critical status for one plan year. *See* 26 U.S.C. § 432; Pub. Law 110-458 (Dec. 23, 2008).

**MEMORANDUM DECISION AND ORDER - 7**

At the next regular meeting held May 5 – 7, 2009, Segal provided an additional presentation during which Segal illustrated the projected cost savings of each benefit cut permitted by law (known as "adjustable benefits"), and modeled the effects of several different possible designs for rehabilitation plans. Segal projected that, even if the Board of Trustees entirely eliminated the early retirement benefit and cut future benefit accruals in half, the Fund would still need ten annual contribution increases of 16% each to emerge from critical status within the ten-year statutory rehabilitation period.

On July 20 – 21, 2009, the Board of Trustees met again for a Special Funding meeting, at which Darrin Owens and Virginia McGinley of Segal presented live modeling of many different rehabilitation plan scenarios. (Dkt. 105-3 at 140.)  Based upon various modeling assumptions, Segal demonstrated that, if future benefit accruals were reduced by 50%, the Plan would require 20% annual contribution increases for ten consecutive years to emerge from critical status within the ten-year rehabilitation period under the PPA. *Id.*

The Board Meeting Minutes reflect that the Board of Trustees concluded contribution increases of that magnitude to avoid insolvency "will likely result in a mass withdrawal" of employers from the Plan. Segal modeled also that a mass withdrawal without any change in the assumed rate of early retirements resulted in a projected insolvency in 2026. Other modeling predicted that eliminating early retirement subsidies completely added only a few months to the projected date of insolvency, and the same was true of adding a 25 year cap on accruals. In other words, eliminating all subsidized

early retirement and freezing all future accruals would not change the year of projected insolvency, notwithstanding the statutory surcharges going into effect.

After asking Owens and McGinley several additional questions concerning proposed changes to the Plan, the Board of Trustees reached a tentative agreement on the terms of a rehabilitation plan, which was expected to be certified in 2010, and proposed the adoption and implementation of the rehabilitation plan at the earliest possible date. (Dkt. 105-3 at 141 - 42.) The proposed plan terms reduced accruals, reduced certain benefits, and imposed more modest contribution increases. *Id.;* Knight Decl. ¶ 16. (Dkt. 105-3 at 7.) The meeting minutes reflect the Board of Trustees proposed to implement the Plan "under the exhaustion provision" of the PPA,[10] and proposed hiring an economic consultant to assist the Board. (Dkt. 105-3 at 142.) (*See also* Dkt. 109-4 at 10. "The Board of Trustees have tentatively concluded that,…based on reasonable actuarial assumptions and upon exhaustion of all reasonable measures, the Fund cannot reasonably be expected to emerge from critical status by the end of the statutory rehabilitation period….").

At its November 2009 meeting, the Board reviewed in detail the 2009 actuarial valuation. Segal "discussed the concept of the funding standard account and minimum funding requirements," including the fact that the 2009 actuarial valuation projected that the Fund's credit balance would be depleted by 2013, and Segal reviewed with the Board of Trustees various scenarios for increasing contribution rates or decreasing adjustable

---

[10] *See* 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii).

**MEMORANDUM DECISION AND ORDER - 9**

benefits. The Board of Trustees reviewed its tentative Rehabilitation Plan and devised a revised tentative plan. The Board of Trustees also voted to retain an economic consultant "to review the Fund's contributing employers and the contribution increases and benefit reductions under consideration" for reasonableness.

The Board of Trustees retained economic consultant Stout Risius Ross ("SRR") to review whether the contribution increases and benefit reductions necessary to emerge from "red zone" status in the generally required time were "reasonable for the Fund." (Dkt. 105-3 at 150.) At the Board's May 4, 2010 meeting, the SRR consultant provided a detailed analysis of the paper industry and advised that certain large employers participating in the Plan could satisfy an increase in contribution rates of 24% annually, but other smaller companies could not. (Dkt. 109-4 at 33.) Data SRR collected suggested that, even though the large employers could absorb increased contribution obligations, such employers would more likely withdraw from the Fund if required to increase contribution rates by 24% annually.[11] *Id.*

Accordingly, SRR concluded that an annual contribution increase of 24% "will be excessively burdensome" on participating employers, and employers would choose to withdraw from the Fund if such an increase was imposed. *Id.* SRR noted that employers choosing withdrawal would pay withdrawal liability in the form of annual payments for up to 20 years at approximately the rate of their most recent annual contribution. *Id.* at

---

[11] SRR based its analysis on publicly available information. 75% of the Fund's participating employers are in the paper industry, so SRR focused on that industry and obtained information on the seven employers that made up 32% of the contributions to the Fund. (Dkt. 105-3 at 151.)

34. In other words, "all employers can withdraw and pay less in withdrawal liability than the contribution increases necessary to emerge from the red zone," and "it would not make sense for" them to pay large increased contributions. (Dkt. 105-3 at 151.)[12] SRR concluded that increased contribution rates of 24% annually "is not reasonable," and would result in too many employer withdrawals. *Id.* at 35.

SRR reviewed also the effect of a contribution rate increase of 10% the first year with an additional increase of between 5% and 10% in five years. (Dkt. 109-4 at 34.) SRR indicated to the Board of Trustees that this scenario "would likely result in fewer withdrawals than a 24% annual increase…." *Id.* Alternatively, contribution increases, together with the need for drastic benefit reductions, "would create a risk that there would be a withdrawal of all or substantially all of the employers from the Fund, which…would result in an earlier date of insolvency than the funding program under consideration by the Board of Trustees." *Id.* Accordingly, SRR concluded that it would not be unreasonable to impose "a 10% contribution increase in 2010 with an additional 5% or 10% increase five years thereafter…." (Dkt. 105-3 at 151; 109-4 at 35.)

The Board of Trustees again reviewed possibilities for the rehabilitation plan with the Segal actuaries; determined that there was no set of reasonable measures that would allow the Plan to emerge from critical status within the prescribed rehabilitation period; and approved the drafting of a rehabilitation plan as previously tentatively agreed to, with

---

[12] Ely objected to the characterization of SRR's report by Defendant in its statement of facts. The Court reviewed the Board's May 4, 2010 meeting minutes and the SRR report, (Dkt. 105-3 at 150, and Dkt. 109-4 at 4), and finds the Board of Trustee's characterization of the SRR report reflected in the meeting minutes is accurate.

certain changes. The proposed Rehabilitation Plan increased contribution rates by 10%

following the expiration of the employer's collective bargaining agreement, and by an

additional 5% effective January 1, 2016. It also cut adjustable benefits significantly.

In addition, due to the 2010 red zone certification, by operation of statute,

surcharges went into effect, which resulted in contribution increases of 5% effective at

the end of May of 2010, and 10% on January 1, 2011.

Following the adoption of the Rehabilitation Plan, employers continued to

withdraw from the Fund, with nine employers withdrawing during 2010; seven

employers withdrawing during 2011; and sixteen employers withdrawing during 2012,

including two large employers who each had contributed over 5% of the total

contributions to the Plan.

In each year from 2010 to 2013, the Fund's actuary certified that the Plan was in

critical status, and projected a deficiency in its funding standard account in 2013 or 2014,

and insolvency between 2026 and 2028.[13]

Each year, the Board reviewed the Rehabilitation Plan to determine whether to

update the contribution schedules or make other necessary changes. In each such year,

the Board of Trustees, with the advice of the Segal actuary, determined to update the

Rehabilitation Plan with revised projections but not to increase contribution rates beyond

---

[13] Ely contends the January 1, 2013 Actuarial Valuation projected insolvency in 2030, referring to
DEF_3879, found at Docket 135-5 at 55. This assertion is both misleading and incorrect. The January 1,
2013 Actuarial Valuation projected insolvency beginning in the Plan Year January 1, 2029. (DEF_3879,
Dkt. 135-5 at 55.) But, the Actuarial Certification of Plan Status as of January 1, 2013, prepared in March
of that year, is a different document which makes projections based upon the Actuarial Valuation dated
January 1, 2012. The 2013 Certification projected the Fund will be insolvent by October of 2028, nine
months later than what was reported in the January 1, 2012 Actuarial Valuation. (Dkt. 105-5 at 17.)

**MEMORANDUM DECISION AND ORDER - 12**

those set forth in the 2010 Rehabilitation Plan, or further cut future benefit accruals based on the Segal actuaries' analysis that the Fund was still on track to meet the Rehabilitation Plan's goal of forestalling insolvency.

In these annual reviews, and in other Board meetings, the Board of Trustees had many discussions about actions they could consider to forestall insolvency. H. Thielen Decl. ¶ 5, & Att. 4 (Segal 30(b)(6) Dep.) at 89:16-23. (Dkt. 105-9 at 2, Dkt. 109-5 at 4); S. Johnson Decl. ¶¶ 10-11. (Dkt. 105-13 at 3-4); J. Geenen Decl. ¶¶ 9- 10. (Dkt. 105-12 at 3-4.)[14] The Board also made periodic amendments to the Rehabilitation Plan.

In early 2012, the Fund's then-largest employer, Georgia-Pacific, approached the Board of Trustees to discuss withdrawing from the Fund. The Board of Trustees was aware that other large employers were also exploring avenues to withdraw from the Fund upon expiration of their collective bargaining agreements.

The Board of Trustees actively monitored employer withdrawals, receiving reports from the Fund Office at each meeting regarding employers that had withdrawn since the last meeting, and regarding which employers had adopted the Rehabilitation Plan. The

---

[14] Ely contests these facts, asserting the meeting minutes contain no record of such discussions. However, in board meeting minutes from November 2 – 4, 2011, the record reflects the Board of Trustees asked Segal to perform live modeling actuarial projections for its next meeting to evaluate the impact of investment performance, active participant contraction, and contribution rate changes on the solvency of the fund. (Dkt. 105-3 at 159.) Minutes from May 21 – 22, 2012, reflect the Board of Trustees requested Segal to study the impact on the Fund of withdrawals of certain employers and the impact of a change in withdrawal methodology or changes in the features of the Rehabilitation Plan. (Dkt. 105-4 at 3.) At that meeting, Segal presented its live modeling, and the Board of Trustees "reviewed various alternate scenarios" which illustrated the impact on the solvency of the Plan under each scenario. (Dkt 105-4 at 4.) Thus, while the exact content of the discussions is not documented in the minutes, there is a record in the meeting minutes reflecting the Board of Trustees discussed matters concerning the solvency of the Fund, and that various options affecting fund solvency were presented to the Board during these meetings. Ely's objection is therefore overruled.

**MEMORANDUM DECISION AND ORDER - 13**

Fund's actuaries also reported at least annually on declines in the active participant population.

At meetings in 2011 and 2012, the Board of Trustees repeatedly discussed the issues posed by contraction in the active employee population, withdrawal of large employers, and the effect these issues had on the Fund's insolvency date. The Board periodically asked Segal's actuaries to model various scenarios to illustrate the impact of employer withdrawals on the Fund's solvency. (Dkt. 105-3 at 159; 105-4 at 3.)[15]

At the Board's May 21 – 22, 2012, meeting, the Board of Trustees again had Segal actuaries conduct live modeling, based on updated Fund data, reviewing "various alternative scenarios such as increased contraction in the active employee population occurring in various years, various investment returns over time, additional employer contributions and a cessation of future benefit accruals." (Dkt. 105-4 at 4.) These projections indicated that, to avoid insolvency, the Fund would need to double contribution rates by 2018 while maintaining current participation.

At the November 15 – 16, 2012 Board meeting, the actuary presented the annual valuation which contained detailed reporting that, for the first ten months of 2012, active employee participation had dropped by more than 15% due to known withdrawn employers. (Dkt. 105-7 at 24.) The meeting minutes reflect that the Board of Trustees

---

[15] Ely denied this statement and objected on the grounds of relevance. The Court overrules Ely's objection. Ely raised the issue of the impact of employer withdrawals from the Fund. The meeting minutes reflect the Board of Trustees discussed the impact of withdrawing employers and withdrawal liability payments upon the Fund's solvency. Ely is correct that the Board of Trustees did not discuss the impact of the AFD Exit Fee at the meetings in 2011 and 2012, because the AFD Exit Fee was not discussed until 2013.

"discussed the potential withdrawals of several large contributing employers, and the resulting impact on the Fund going forward. The actuaries noted that depending on how the employers [paid] their withdrawal liability, and whether they [paid] the full amount owed, it could have either a positive or negative effect on the Fund's long term solvency." (Dkt. 105-4 at 11.)[16] The Board of Trustees discussed also the Fund's projected insolvency in 2028, and the dwindling size of the funding standard account, predicted by Segal to be depleted by 2013. (Dkt. 105-4 at 10; Segal Actuarial Valuation and Review as of January 1, 2012, Dkt. 105-7 at 2 – 64.) Segal noted that the "cash flow crisis has been addressed by the Board of Trustees with the adoption of the rehabilitation plan." (Dkt. 105-7 at 7.)

Also at the November 2012 meeting, the Fund's actuaries from Segal and the Fund's legal counsel made "a proposal to modify the Rehabilitation Plan to reflect an employer assessment of a pro rata share of any accumulated funding deficiency in the event an employer withdraws from the Fund." (Dkt. 105-4 at 12.)

Segal discussed with the Board of Trustees the potential benefits of the proposal, the theory for enforcing it, the calculation of the funding deficiency, and the PPA provisions regarding the funding standard account. After discussion, the Board directed its actuary and its legal counsel to "restate the Rehabilitation Plan to incorporate all amendments to date and to reflect the update as well as proposed language regarding

---

[16] Ely objected that the Board's characterization of the discussion is incorrect. However, the Court has quoted directly from the minutes of the November 15 – 16, 2009 Board of Trustees meeting minutes. The objection is overruled.

**MEMORANDUM DECISION AND ORDER - 15**

assessment of a pro rata share of any accumulated funding deficiency," and authorized the Board's Chair and Secretary to approve and execute the restated Plan between meetings. (Dkt. 105-4 at 12.)

The amendment added the following language, known as the AFD Exit Fee, to the Rehabilitation Plan's "Schedule of Reasonable Measures to Emerge From Critical Status. . . Or Forestall the Date of Insolvency":

> In addition, in the event an Employer withdraws during a Plan Year when the Fund has an accumulated funding deficiency, as determined under Section 304 of ERISA, the Employer shall be responsible for its pro rata share of such deficiency in addition to any withdrawal liability determined under Section 4211 of ERISA.

The March 29, 2013 Actuarial Certification of Plan Status as of January 1, 2013, prepared by the Segal Company, projected that the Fund was expected to be insolvent by October of 2028, nine months later than what was projected in the January 1, 2012 actuarial valuation. (Dkt. 105-5 at 17.) The certification indicates also that the Fund would have an accumulated funding deficiency of $14,129,179 at the end of 2013, and that the accumulated funding deficiency would grow to $772,342,809 by January 1, 2019. (Dkt. 105-5 at 17, 27.) The certification indicates that the projections were prepared "based on the Actuarial Valuation as of January 1, 2012 in accordance with generally accepted actuarial principles and practices and a current understanding of the law." (Dkt. 105-5 at 19.)

**MEMORANDUM DECISION AND ORDER - 16**

On April 26, 2013, the Fund sent to all bargaining parties (i.e., the participating employers and unions representing active employees) a copy of the amended Rehabilitation Plan with the new language regarding the AFD Exit Fee. At its next meeting on June 6, 2013, the Board of Trustees was informed of the actions taken by the Fund Office in follow-up to the November 2012 board meeting, which actions included revising and amending the Plan to include the AFD Exit Fee provision. (Dkt. 105-4 at 15-16.)

As projected, the Fund had a deficiency in its funding standard account at the end of 2013. As a result, the AFD Exit Fee went into effect for those employers that withdrew in plan year 2014. "Beginning with the 2014 withdrawals, the Fund office calculated and sent letters to these employers demanding payment of their allocated share of the accumulated funding deficiency pursuant to the Rehabilitation Plan. This is typically done after the employer's final payroll audit is resolved, the first demand letters being sent out in 2016." C. Knight Decl. ¶ 17. (Dkt. 105-3 at 7-8.)

The Board of Trustees has continued to monitor the employer withdrawals from the Fund, receiving updates at board meetings held between 2014 and 2017. (Dkt. 105-4 at 1 - 46.)

At its April 30, 2015 meeting, the Board of Trustees requested Segal "to review the top ten contributing employers to determine whether the current [active annual contributions] would be similar to the contributions required if the employers withdrew from the Plan." (Dkt. 105-4 at 30.) Segal later prepared the requested analysis for the top twelve employers, and concluded that none would pay less after withdrawal, and all but

one would instead pay more to the Fund, with increases ranging from .96% to 140.76%. (Dkt. 109-4 at 2.)[17]

The Fund office and Fund counsel reported on the allocations and payments of the AFD Exit Fee allocations at each Board meeting to allow the Board of Trustees and Fund actuary to monitor the effect of the AFD Exit Fee. The Segal representatives also reported to the Board of Trustees on any changes to the projected insolvency date three times throughout each year.

The Fund's actuary reported at the December 20, 2016 Board meeting that the actuarial valuation as of January 1, 2015, did not include any assumed withdrawal liability payments from Georgia-Pacific, which withdrew in 2015, but that if Georgia-Pacific made withdrawal "payments according to its estimated schedule, the insolvency date would be moved back 14 months to December 2029." (Dkt. 105-4 at 38.)

On December 13, 2017, Segal updated the Board of Trustees at its regular board meeting, and provided a report on its Actuarial Valuation as of January 1, 2017. (Dkt. 105-4 at 45.) According to Segal, once the Georgia Pacific withdrawal liability payments were factored, the projected insolvency date of the Fund was March 2031, 29 months later than the date projected in the actuarial valuation as of January 1, 2016, and the

---

[17] Ely "denies" the facts stated in the preceding paragraph and injects argument that the Board of Trustees did not ask for actuarial modeling or investigate the impact of the AFD Exit Fee. (Dkt. 135 ¶ 54(a).) However, the Court has examined Docket 105-4 at 30 and 109-4 at 2, and the documents are accurately quoted or represented by Defendant. Further, Ely admits the facts as stated in the next paragraph, in which the Board of Trustees represent that the Fund monitored the impact of the AFD Exit Fee, a direct contradiction of Ely's objection to the previous paragraph. Ely's objection is therefore overruled.

January 1, 2017 Actuarial Certification of Plan Status, or zone status certification. (Dkt. 105-4 at 45.)

The Actuarial Certification of Plan Status as of January 1, 2013, projected the Fund will be insolvent by October 2028. (Dkt. 105-5 at 17.) The Actuarial Certification of Plan Status as of January 1, 2019, projected the Fund will be insolvent by 2030. (Dkt. 105-6 at 10.)[18] The Actuarial Certification of Plan Status as of January 1, 2020, transmitted to the IRS in March of 2020, and based upon the Actuarial Valuation as of January 1, 2019, projects insolvency in Plan Year 2032. (Dkt. 149-2 at 32.)[19]

Through March 19, 2020, the Fund had collected over thirty million dollars in payments pursuant to the 2012 Amended Rehabilitation Plan's AFD Exit Fee, with an additional sum of approximately $6,000 that specific employees committed to pay on

[18] Ely disputes these facts, contending that the 2013 and 2019 actuarial valuations state the projected date of insolvency as 2030 and 2029, respectively. This is both misleading and incorrect. The Court cited to the Actuarial Certifications of Plan Status, or Zone Status certifications, submitted to the IRS in March of 2013, and in March of 2019. Zone Status certifications for each plan year are projections, based upon actuarial valuations as of January 1 for the year prior. *See, e.g.,* Docket 105-6 at 3 (indicating the status certification as of January 1, 2019, contains projections "prepared based on the actuarial valuation as of January 1, 2018.") There can therefore be no dispute that the Actuarial Certifications of Plan Status as of January 1, 2013, and January 1, 2019, reflect the projected insolvency dates of 2028 and 2030, respectively. Ely attempts to manufacture a conflict by citing to the Actuarial Valuation and Reviews, not the Zone Status certifications, Segal completed on January 1, 2013, and January 1, 2019, which would form the basis for the following years' zone status certifications. But, contrary to Ely's assertions, the 2013 and 2019 Actuarial Valuations project insolvency in the Plan Year beginning January 1, 2029, and the Plan Year beginning January 1, 2030, respectively, not the converse as Ely claims. (Dkt. 135-5 at 55, DEF_3879, Dkt. 135-7 at 49, SEGAL_ELY_01853.) The Actuarial Certification of Plan Status as of January 1, 2014, submitted to the IRS in March of 2014, and based upon the January 1, 2013 actuarial valuation, does, however, project insolvency in October of 2030. (Dkt. 105-5 at 33.)

[19] This document was recently disclosed pursuant to the Board of Trustees' ongoing duty to supplement discovery responses under Fed. R. Civ. P. 26, and is part of the record before the Court on the motions for summary judgment.

**MEMORANDUM DECISION AND ORDER - 19**

short-term payment plans. Collection efforts are ongoing with regard to other employers. C. Knight Decl. ¶ 19. (Dkt. 109-2 at 8.)[20]

PIUMPF continues to be in critical status (since 2015, "critical and declining" under the Multiemployer Pension Reform Act of 2014), and PIUMPF continues to comply with its Rehabilitation Plan.

In 2019, three small employers withdrew, and six withdrew in 2018.

Mr. Owens, of Segal, testified that, while there is no reason the Board of Trustees cannot remove the AFD Exit Fee, "that action would do the opposite of forestalling insolvency…it would make insolvency happen earlier." (Dkt. 109-5 at 17-18.) Ely contests this assertion, relying upon the opinions of expert James Naughton. Conversely, the Board of Trustees' expert, Joseph Hicks, contends that the Fund's solvency has been preserved for several more years due to the imposition of the AFD Exit Fee. Whether these expert opinions are admissible for the Court to consider is the subject of the parties' motions in limine, discussed next.

## ANALYSIS

### 1.     Motions in Limine

Before addressing the parties' motions for summary judgment, the Court must address the concurrently filed motions in limine, as each involves expert opinions that the Court may need to consider when analyzing the motions for summary judgment. The

---

[20] Ely "denies" this fact, and objects on the grounds that the statements are not relevant or material. However, he did not offer any facts in rebuttal. The Court overrules Ely's objection, finding that collections pursuant to the AFD Exit Fee are relevant.

Board of Trustees seeks to exclude the opinions expressed by Plaintiff's expert, James Naughton, DBA, in his report dated August 27, 2019. The Board of Trustees contends Naughton is not qualified to offer an expert opinion; his opinions are not relevant to any issue before the Court; and his opinions are unreliable, because they are based upon insufficient facts and data, and are not based upon a reliable methodology.

In turn, Ely seeks to exclude the opinions expressed by the Board of Trustees' expert, Joseph F. Hicks, Jr., contained in his report dated October of 2019. Ely raises much the same arguments raised by the Board of Trustees regarding Naughton, contending that Hicks' opinions are not relevant to any issue before the Court; and his opinions are based upon insufficient facts and data. Ely contends also that certain documents upon which Hicks relied to form his opinions should be excluded because they were not timely produced in discovery.

### A.    Legal Standards

Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Under Rule 403, however, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

> knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert*, the Court's inquiry into admissibility is a flexible one. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citing *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).

"[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id*. at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564 (citation omitted). The Court is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent–A–Car*, 738 F.3d at 969. Stated simply, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id*. at 969–70.

**MEMORANDUM DECISION AND ORDER - 22**

The test of reliability is flexible. *City of Pomona,* 750 F.3d at 1044 (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014)). The Court must assess the expert's reasoning or methodology, using as appropriate criteria measures such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *Id.*; *see also Primiano*, 598 F.3d at 564. But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted); *see also Barabin*, 740 F.3d at 463. The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. *City of Pomona*, 750 F.3d at 1044 (citing *Primiano*, 598 F.3d at 564–65). Challenges that go to the weight of the evidence are within the province of the fact finder. *Id.* The court should not make credibility determinations that are reserved for trial. *Id*.

While evidentiary hearings might help the Court to conduct an adequate *Daubert* analysis, the Court is not required to hold such hearings prior to trial in order to discharge its gatekeeping function. *See United States v. Alatorre*, 222 F.3d 1098, 1100-02 (9th Cir. 2000) ("The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether and when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable....") (quoting *Kumho Tire Co. v. Carmichael*, 526

**MEMORANDUM DECISION AND ORDER - 23**

U.S. 137 (1999)). What is required is that the Court allow counsel "to explore the relevance and reliability of the proposed testimony" prior to its admission. *Id.*

The Court determines that it has an adequate record before it to make its ruling on the motions in limine without holding an evidentiary hearing. The parties provided the experts' reports, deposition testimony, affidavits, and numerous other exhibits. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (finding no abuse of discretion for failure to hold an evidentiary hearing when district court had depositions and affidavits of plaintiffs' experts), *cited in In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1139 (9th Cir. 2002).

### B.    Naughton

James Naughton is an economist and actuary who currently teaches at Northwestern University's Kellogg School of Management. He has provided testimony before Congress concerning the multiemployer pension system. In his report dated August 27, 2019, he expresses the following opinions: (1) the AFD Exit Fee, at the time it was implemented, created incentives for employers to withdraw from the Fund and therefore accelerated the insolvency date; (2) the AFD Exit Fee was not based on actual modeling, and the Board of Trustees did not monitor the fee's impact upon the Fund's finances; (3) the Board of Trustees failed to exhaust all other reasonable measures before implementing the AFD Exit Fee; and, (4) the AFD Exit Fee adversely affects current Plan participants, while favoring retirees who are receiving full benefits. In his opinion, and according to his modeling, Naughton opines that the adoption of the AFD Exit Fee

shortened the time to PIUMPF's insolvency by approximately two years, and projected

PIUMPF's insolvency would occur in 2029. (Dkt. 90-1 at 69, 70.)

However, during his deposition, Naughton testified that, "when you look at the

growth in the [AFD allocation] at some point it does become prohibitive" for a

participating employer to withdraw from the Fund, and he did not evaluate what

incentives the AFD Exit Fee created for an employer that is participating in the Fund to

stay in the plan or withdraw. H. Thielen Decl. ¶ 6 & Att. 5 (J. Naughton Dep.) at 95:5-7;

96:9-16. (Dkt. 105-3 at 35-36.) He also testified that his analysis applied only to

employers considering withdrawing from the Fund, because, "[i]f an employer had no

plans to ever exit the plan, it doesn't have to take account of an exit fee." *Id.* at 86:9-10.

(Dkt. 105-9 at 34.)

The Board of Trustees' first objection is that Naughton lacks the requisite

qualifications to testify in the form of an opinion, because Naughton has never advised a

multiemployer pension plan. A witness who will offer expert opinion testimony must be

"qualified as an expert by knowledge, skill, experience, training, or education." Fed. R.

Evid. 702. This inquiry depends on whether the witness has "expertise and experience"

that "is relevant to the issues on which" the witness will opine. *Erhart v. B of I Holding,

Inc.*, 445 F. Supp. 3d 831, 843 (S.D. Cal. 2020) (citing *Pyramid Techs., Inc. v. Hartford

Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014)). The Court rejects the Board of

Trustees' qualification challenge, finding it affects the weight, but not the admissibility,

of Naughton's opinions. Given his experience and education as both an economist and

actuary, the Court finds Naughton is qualified to offer opinions concerning the Board of Trustees' implementation of the AFD Exit Fee.

The Board of Trustees next contends that Naughton's opinions are not relevant to the issue before the Court, because he renders opinions on the process by which the Board of Trustees arrived at the decision to impose the AFD Exit Fee, and he addresses shortcomings of the Rehabilitation Plan unrelated to whether the AFD Exit Fee actually forestalled insolvency. The Board contends Naughton's only relevant opinion is that the AFD Exit Fee caused participating employers to leave the Plan, which in turn accelerated the Plan's insolvency date by two years. As to his one relevant opinion, the Board argues it is nonetheless inadmissible because Naughton does not connect employer departures to the projected date of insolvency, and he does not rule out other alternative causes for employer withdrawals.

Ely contends the Board's arguments are without merit, because the statutory standard for measures designed to forestall insolvency is reasonableness. He argues Naughton's opinions address the reasonableness requirement imposed by the PPA upon any rehabilitation plan provision, such as the AFD Exit Fee, designed to forestall insolvency.

The Court finds that the Board of Trustees' challenge to the relevance of Naughton's opinions raise issues that are appropriately considered by the Court in connection with the parties' motions for summary judgment. The broader question of reasonableness is one the Court must determine in its interpretation of the PPA provision

at issue in this litigation. Accordingly, the Court finds Naughton's opinions meet the relevancy standard.

Finally, the Board of Trustees contends Naughton's opinions should be excluded because they are unreliable. The Board asserts Naughton fails to apply a reliable methodology to rule out alternative causes for employer withdrawals; fails to indicate an alternative to the analysis and modeling actually employed by the Board of Trustees when it considered the AFD Exit Fee; and that insufficient data and faulty methodologies undercut Naughton's opinions concerning exhaustion of other measures, Plan favoritism toward current retirees, and the incentive to withdraw from the Plan allegedly created by the AFD Exit Fee. In response, Ely argues Naughton's opinions address his arguments concerning whether the AFD Exit Fee constitutes a "reasonable measure" in the context of the PPA.

Having reviewed these opinions, the Court finds they largely concern the allegations underlying Ely's claims. Accordingly, the Court will consider these opinions in its discussion of the parties' motions for summary judgment.

### C.    Hicks

Hicks has expressed the opinion that Naughton's analysis is not reliable. He also opines that the AFD Exit Fee was a reasonable measure to forestall insolvency, because it had the effect of increasing revenue to the Plan during the time of a declining paper and pulp industry. According to Hicks, employer withdrawals during the 2013-2018 time frame had the effect of forestalling the Fund's insolvency date, by generating higher contributions through withdrawal liability and AFD Exit Fee payments than the

employers would have paid had they stayed in the Fund. J. Hicks Decl. Att. 1 at 33-36. (Dkt. 105-10 at 38-41; *see also* Dkt. 109-6 at 36-39.)

In Hicks' opinion, the AFD Exit Fee has forestalled insolvency and is likely to do so in the future, because "[g]iven PIUMPF's overall financial situation, including the important backdrop of the state of the industry, forestalling insolvency means bringing more money into the plan, and the AFD Rule does so." J. Hicks Decl., Att. 1 at 36-40. (Dkt. 109-6 at 39-43.) D. Owens Decl. ¶ 9. (Dkt. 105-11.) For a rehabilitation plan that seeks to forestall insolvency, Hicks considers cash flow to be the key component in the ability to remain solvent. J. Hicks Decl. Att. 1 at 31. (Dkt. 10-6 at 34.)

Ely first contends Hicks' opinions are not relevant to any issue before the Court and should be excluded, because Hicks does not address the various opinions Naughton expresses regarding the "reasonableness" of the AFD Exit Fee. As with Naughton, the Court finds these arguments are more appropriately considered in the context of the parties' motions for summary judgment, because the broader question of reasonableness is reserved for the Court to determine in its interpretation of the PPA provision at issue. Further, Hicks' opinions address the Board of Trustees' main premise that the AFD Exit Fee is a reasonable measure to forestall insolvency, because it had the effect of increasing revenue to the Plan. There is no need for Hicks to address every theory expounded by Naughton, and it is clear Hicks has a different opinion regarding the meaning of the reasonableness requirement imposed by the PPA. Accordingly, the Court finds Hicks' opinions meet the relevancy threshold in this case.

**MEMORANDUM DECISION AND ORDER - 28**

Next, Ely argues Hicks' opinions are unreliable, because he does not cite sufficient evidence in support of his assertions that the paper and pulp industry is in decline; he used an inappropriate comparison group; he failed to account for zone status; and he does not utilize reliable scientific principles. Ely's criticisms are directed primarily at the methodology used to support Hicks' conclusion. Upon review of Hicks' opinions, the Court finds the methodology Hicks employed is acceptable to meet Rule 702's threshold for admissibility. The purported flaws in Hicks' methodology go to the weight of the evidence, not its admissibility. *Schlesinger v. United States*, 898 F. Supp. 2d 489, 505 (E.D.N.Y. 2012). The Court finds that the methods underlying Hicks' conclusions are not so unreliable as to render his opinions inadmissible as "junk science" or mere conjecture. The Court will, therefore, deny Ely's request to exclude Hicks' opinions.

Last, Ely contends that eight documents produced with Hicks' report on October 15, 2019, and upon which Hicks relies, were not timely produced.[21] Ely seeks to exclude these documents, and presumably Hicks' opinions which rely upon them. Ely contends the Board of Trustees violated the applicable discovery rules governing disclosure and the Court's order regarding discovery deadlines.

The Court finds this argument without merit. The Court's amended scheduling order specified that fact discovery must be completed by October 15, 2019, and that the Board of Trustees must provide its expert's written report the same date. Ely was given

---

[21] These same eight documents are the subject of Ely's Motion to Supplement. (*See* Dkt. 153.) Ely contends that the Board of Trustees waited "until the last minute of the last day of discovery to produce over a thousand pages of documents." (Dkt. 153-1 at 2.)

**MEMORANDUM DECISION AND ORDER - 29**

until December 2, 2019, to disclose rebuttal witnesses and produce his expert's rebuttal report. Finally, the Court's order indicated that all discovery relevant to experts must be completed by January 15, 2020, and dispositive motions may be filed by February 14, 2020. (Dkt. 60.) According to the deadlines set forth in the Court's amended scheduling order, the documents provided with Hicks' report on October 15, 2019, were timely produced, and Ely had sufficient time within which to review them. Ely did not request an extension of time, or otherwise contend that the deadlines imposed by the Court were insufficient given the volume of documents produced on October 15, 2019.

The Court therefore denies both parties' motions in limine to exclude their adversary's expert reports, and now turns to the motions for summary judgment.

## 2.    Motions for Summary Judgment

Ely's first amended complaint seeks to enjoin the Board of Trustees from continuing to enforce the AFD Exit Fee, which was implemented as part of the 2012 Amended Rehabilitation Plan, and he asks for appointment of a receiver. (Dkt. 44, 163.)[22] Ely invokes the civil enforcement provision of 29 U.S.C. § 1132(a)(3)(A), ERISA § 502(a)(3)(A), which allows a participant or beneficiary to "enjoin any act or practice which violates any provision of this title or the terms of the plan…." ERISA § 502(a)(3)(B)(i) provides also that a participant may bring a civil action "to obtain appropriate equitable relief to redress such violations." Ely's contention is that the AFD

---

[22] In his motion, Ely asks the Court to "annul the Exit Fee." Pl. Mem. at 24. (Dkt. 84.)

Exit Fee violates the provisions of 29 U.S.C. § 1085(e)(3)(A)(ii), ERISA § 305(e)(3)(A)(ii),[23] because it was not a "reasonable measure" to forestall insolvency.[24]

The Board of Trustees raises the threshold issue of standing—both constitutional and statutory—in its cross-motion for summary judgment.[25] The Board of Trustees contends Ely has neither shown an injury in fact, nor that the relief sought would remedy any alleged injury. Because the Court finds the determination of standing dispositive, it does not reach Ely's arguments raised in support of his motion or the Board of Trustees' arguments in opposition.[26]

### A.      Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural

---

[23] ERISA § 502 is part of Title I of ERISA, which encompasses ERISA § 305.

[24] The Court allowed this claim to proceed. This is the sole claim remaining for consideration.

[25] Standing was not raised in the Board of Trustees' motion to dismiss. (*See* Dkt. 52, 58.) The Court notes that, at that time, it did not have the benefit of the parties' expert reports or the documents in the record produced during discovery. Based upon the allegations in the Complaint, the Court found Ely raised a plausible claim.

[26] Ely raises four arguments in support of his motion. He argues the Board of Trustees did not act reasonably because the Board of Trustees: (1) did not base the AFD Exit Fee upon reasonably anticipated experience and reasonable actuarial assumptions; (2) failed to exhaust all reasonable measures; (3) did not monitor the AFD Exit Fee's impact on PIUMPF's finances; and (4) did not question the AFD Exit Fee's flawed actuarial and legal origins. In opposition, the Board of Trustees asserts Ely has not created a genuine dispute of material fact, because the record contains no facts permitting the Court to conclude that the Exit Fee hastened insolvency. In addition, the Board of Trustees contends Ely's focus on the process by which the Board adopted the AFD Exit Fee is not material under ERISA. The Board of Trustees contends the AFD Exit Fee is a reasonable measure because it satisfies the language of ERISA § 305 by increasing plan revenue without increasing liabilities, thereby forestalling insolvency.

**MEMORANDUM DECISION AND ORDER - 31**

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts), but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a verdict in his or her favor. *Devereaux*, 263 F.3d at 1076. The non-moving party

must go beyond the pleadings and show "by…affidavits, or by the depositions, answers to interrogatories, or admissions on file," that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.[27]

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## B.    Standing

The Board of Trustees contends Ely lacks both Article III standing and statutory standing under ERISA. The Board asserts Ely has not presented evidence establishing that the relief he seeks would redress his claimed injury, or that it constitutes appropriate equitable relief under ERISA § 502(a)(3)(B). The Board further contends that annulment of the AFD Exit Fee would result in harm to the Fund's participants and

---

[27] Ely asserts the Board of Trustees bears the burden of proof as to whether the Board acted reasonably in adopting and implementing the AFD Exit Fee. But, in opposition to the Board of Trustees' motion for summary judgment, it is Ely's burden to demonstrate that a genuine dispute of material fact exists. The Court therefore does not address Ely's argument that the Board of Trustees did not satisfy its burden of proof. Pl. Mot. S.J. at 23-24. (Dkt. 84.) Further, the Court notes Ely evaluates the Board of Trustees' conduct in terms of ERISA's fiduciary duty obligations. However, the Court explained in its February 4, 2019 memorandum decision and order on the Board of Trustees' motion to dismiss that the Board, by virtue of the plain language of ERISA § 305, was not acting as a fiduciary, but rather as plan sponsor, when the Board of Trustees adopted the 2012 Amended Rehabilitation Plan.

beneficiaries, contrary to ERISA's statutory interests aimed at protecting pension benefits.[28]

Ely argues that annulment of the AFD Exit Fee will eliminate further employer withdrawals, and encourage new employers to join the Plan, thereby shoring up the Fund's finances with an infusion of cash based upon an increase in employee participants. Absent annulment of the AFD Exit Fee, Ely asserts he is likely to receive little to no pension benefits from PIUMPF, because the Fund will be insolvent and unable to pay benefits shortly after his planned retirement in May of 2026. In addition, Ely notes the federally funded Pension Benefit Guaranty Corporation (PBGC), which provides a safety net in the event a plan is insolvent, will itself become insolvent and be unable to pay more than a statutory minimum benefit. He seeks the appointment of an independent fiduciary to improve the Fund's solvency, which Ely argues will redress his injury – namely that he will be at less risk of receiving a reduced pension benefit from PIUMPF (or the PBGC) when he retires, because an independent fiduciary will be better able to improve the Fund's finances through investments.

### i.  Constitutional Standing

The concept of constitutional standing contains three elements. The plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of

---

[28] The Board of Trustees contend also that Ely has not shown that the AFD Exit Fee caused him an injury in fact, because Ely's entitlement to a monthly pension benefit from Clearwater's salaried pension plan is offset by the amount he will receive from PIUMPF. Ely responds that this argument is irrelevant, because he retains a legal right to enforce his claim to a pension benefit under ERISA. The Court agrees. ERISA grants beneficiaries and participants certain rights under ERISA § 502, and therefore the Court will not consider this argument further.

the defendant, and (3) that is likely to be redressed by a favorable judicial decision.

*Spokeo, Inc. v. Robins*, -- U.S. --, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016) (citing

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The party invoking federal

jurisdiction bears the burden of establishing these elements. *Lujan*, 504 U.S. at 560. At

the summary judgment stage, the plaintiff must set forth by affidavit or other evidence

specific facts, which for purposes of the summary judgment motion will be taken to be

true. *Id.*

The Board of Trustees focuses on the third factor in the standing analysis. To

establish standing, Ely must show a likelihood that the injury he has suffered will be

redressed by a favorable outcome to this litigation. *Glanton ex rel. ALCOA Prescription*

*Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006). Ely's proposed

remedy is for the Court to annul the AFD Exit Fee, and consider appointing an

independent fiduciary to administer the Fund. The Court concludes, as explained more

fully below, that Ely has not presented facts demonstrating that it is "likely,"

as opposed to merely "speculative," that any injury to him and the Plan's participants will

be "redressed by a favorable decision" on Ely's § 502(a)(3) claim. *See Lujan,* 504 U.S. at

560.

It is important to consider the limitations of the PPA to understand why the Court

finds that Ely has not presented facts showing his proposed remedy would redress his

claimed injury. The PPA expressly contemplates that some plans will not emerge from

critical status, and may become insolvent. *Board of Trustees of Local 138 Pension Trust*

*Fund v. F.W. Honerkamp Co., Inc.*, 669 F.3d 127, 135-36 (2nd Cir. 2012)

("implementation of a rehabilitation plan under the PPA may not restore a pension plan's solvency…the Board of Trustees here determined that the Fund was unlikely to emerge from critical status, and therefore designed the non-default schedules not to prevent but only to delay the point of insolvency."). Even Congress recognized the PPA "will postpone the possible collapse of some multiemployer plans, but it they [sic] will not cure it." 152 Cong. Rec. S8747-01, 152 Cong. Rec. S8747-01, S8749, 2006 WL 2224796.

Consequently, ERISA defines two types of rehabilitation plans in 29 U.S.C. § 1085(e)(3)(A), ERISA § 305(e)(3)(A). *WestRock RKT Co. v. Pace Industry Union-Management Pension Fund,* 856 F.3d 1320, 1324 (11th Cir. 2017). One enables a plan to cease to be in critical status by the end of the [ten-year] statutory rehabilitation period. 29 U.S.C. § 1085(e)(3)(A)(i); 29 U.S.C. § 1085(e)(4). Alternatively, Section 1085(e)(3)(A)(ii) provides that a rehabilitation plan can consist of "reasonable measures to emerge from critical status at a later time or to forestall possible insolvency (within the meaning of [ERISA] section 4245)." *See WestRock RKT Co.*, 856 F.3d at 1324 (noting the separation of 1085(e)(3)(A)(i) and (ii) with an "or"). A multiemployer plan is considered insolvent if "the plan's available resources are not sufficient to pay benefits under the plan when due for the plan year, or if the plan is determined to be insolvent under subsection (d)." 29 U.S.C. § 1426(b)(1), ERISA § 4245(b)(1).

For critical status plans that cannot emerge from critical status within the ten-year rehabilitation period, 29 U.S.C. § 1085(e)(3)(A)(ii) provides two alternative options—a plan to emerge from critical status at some later time beyond the statutory ten-year rehabilitation period, or a plan "to forestall possible insolvency," meaning there is a

possibility that a plan will not emerge from critical status, but that the rehabilitation plan will delay the date of insolvency. *See WestRock RKT Co.,* 856 F.3d at 1324-25; *F.W. Honerkamp Co., Inc*., 669 F.3d at 135-36 ("implementation of a rehabilitation plan under the PPA may not restore a pension plan's solvency….").

 The Board of Trustees here adopted a "forestall insolvency" rehabilitation plan. Such a plan may be implemented "if the plan sponsor determines that, based on reasonable actuarial assumptions and upon exhaustion of all reasonable measures, the plan can not reasonably be expected to emerge from critical status by the end of the [10-year] rehabilitation period…." 29 U.S.C. § 1085(e)(3)(A)(ii). In such a case, the rehabilitation plan is defined as a plan which consists of "reasonable measures…to forestall insolvency (within the meaning of section 1426 of this title)." *Id.* A forestall insolvency rehabilitation plan must provide:

> annual standards for meeting the requirements of such rehabilitation plan….if clause (ii) applies, [the plan] shall set forth the alternatives considered, explain why the plan is not reasonably expected to emerge from critical status by the end of the rehabilitation period, and specify when, <u>if ever</u>, the plan is expected to emerge from critical status in accordance with the rehabilitation plan.

29 U.S.C. § 1085(e)(3)(A) (emphasis added).

 Thus, for Ely to establish standing, he must show that his proposed remedy of annulment of the AFD Exit Fee and appointment of a receiver would eliminate the threat of insolvency, or at the very least, extend the insolvency date to allow Ely, who is eligible to retire in May of 2026, to receive his full pension benefits until his death.

Accepting Naughton's opinions for the purpose of resolving the motion before the Court, notably absent from Naughton's analysis is any suggestion or opinion that annulment of the AFD Exit Fee would either eliminate insolvency or prolong the time until insolvency, and thereby result in Ely receiving full pension benefits from PIUMPF. Under any scenario, the Plan will become insolvent— according to Naughton in 2029, or, according to the January 1, 2020 Certification, in 2032. Naughton's sole opinion concerning removal of the AFD Exit Fee is that it will halt employer withdrawals. Even assuming that came to fruition, Naughton offers no analysis concerning whether halting employer withdrawals would render the fund solvent, or stave off insolvency beyond 2029. Instead, Ely offers the speculative assertion that removing the AFD Exit Fee would, by design, encourage more employer participation. However, Ely offers little in the way of explaining how (or when) the Fund's solvency would be achieved.

Further, Naughton conceded that his analysis is retrospective, in that he looked only at the scenario before the Board of Trustees and participating employers in 2012 and 2013, when the AFD Exit Fee was implemented with the 2012 Amended Rehabilitation Plan. Naughton agreed that, at some point, the AFD Exit Fee would become prohibitive, such that participating employers would choose not to withdraw from the Fund. (Dkt. 105-9 at 35.) But again, he offered no alternatives and no opinion regarding the effect of annulment of the AFD Exit Fee, and its presumed

effect of preventing future employer withdrawals, upon the solvency of the Fund moving forward.

Other than his retrospective opinion, Naughton offers no prospective opinion concerning whether additional employers would withdraw because they no longer faced the prospect of paying the AFD Exit Fee. And finally, he offers no alternative solutions, such as reductions in future benefit accruals or increases in contributions, or projections as to how many employers must be retained and how many new employers (and participating employees) the Plan would need to enroll, for the Fund to become solvent.

Ely contends the recent decision of the Supreme Court of the United States in *Thole v. U.S. Bank, N.A.*, 590 U.S. ____, No. 17-1712 (June 1, 2020), (Dkt. 154), which addressed standing in an ERISA case, "requires this Court to enter judgment for him" on the question of standing. (Dkt. 156.) The Court disagrees. In that case, the majority opinion affirmed the judgment of the United States Court of Appeals for the Eighth Circuit, on the ground that the plaintiffs there lacked Article III standing.

The *Thole* plaintiffs were retirees and vested participants in U.S. Bank's defined benefit plan. The plaintiffs had been and were receiving 100% of their monthly pension benefits. The plaintiffs sued the plan, alleging the fiduciaries responsible for investing plan assets had mismanaged them, and had made poor investment decisions. The plaintiffs asked for injunctive relief, repayment of alleged investment losses, and replacement of the plan's fiduciaries.

The Supreme Court held that the plaintiffs, who had received all of their vested

pension benefits so far, and who would continue to do so, had no concrete stake in the

outcome in that litigation and therefore lacked Article III standing. *Slip Op.* at 8.

Importantly, the Court held that, simply because ERISA may grant an individual a

statutory right and purport to authorize that person to sue to vindicate that right, a

"concrete injury" for purposes of standing was not automatically established. *Slip Op.*

at 5-6.[29]

Ely seizes on dicta in the Supreme Court's decision that arguably distinguishes

the case before that Court from a case in which mismanagement of the plan was so

egregious that it substantially increased the risk that the plan and the employer would

fail and be unable to pay participants' future benefits. *Slip Op.* at 7. The Court did not

answer whether, in such case, an individual may have standing. Instead, the Court

noted that the plaintiffs did not assert that theory of standing and did not plausibly

claim that the alleged mismanagement of the plan substantially increased the risk of

plan failure, leaving the plan unable to pay future pension benefits. *Id.* The Supreme

Court noted also that, in the event of plan failure, the federal PBGC "acts as a

backstop" to cover vested pension benefits up to a certain amount and often in full,

and thus an increased risk of harm theory of standing may not be available for plan

---

[29] The Supreme Court was careful to note that its decision did not concern suits to obtain plan information, citing ERISA § 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A). *Slip Op.* at 6 n.1. In such cases, there may be no concrete injury. However, ERISA requires plan administrators to disseminate certain information to participants and beneficiaries.

participants whose benefits were guaranteed in full by the PBGC. *Id.* at 8 n.2. Again, however, the Court declined to make any holding, because the question was not squarely before it. *Id.*[30]

*Thole* is factually distinguishable from the case before this Court for three reasons. First, *Thole* involved alleged mismanagement of plan assets by its fiduciaries. Such is not the case here. Under ERISA, the Board of Trustees was acting in its role as plan sponsor when it adopted the 2012 Amended Rehabilitation Plan, not as fiduciaries, and Ely does not allege PIUMPF's assets were mismanaged. *See* ERISA § 305(e)(1).

Second, the U.S. Bank pension plan was not in critical status, as defined by the PPA, and there were no allegations that the Bank's pension plan was currently, or would become, insolvent. The Supreme Court was not looking at standing through that lens. Here, in contrast, PIUMPF is projected to become insolvent, a reality that the PPA expressly recognizes, because it defines one type of rehabilitation plan as a plan "which consists of…reasonable measures…to forestall possible insolvency…." ERISA § 305(e)(3)(A)(ii). *Thole* does not, therefore, compel any particular result on the question of standing here.

And third, the Supreme Court considered whether the plaintiffs had pled facts establishing an "injury-in-fact," the first element of Article III standing. Here, in

---

[30] In their dissent, Justices Sotomayor, Ginsburg, Breyer and Kagan noted that the PBGC is itself on the road to insolvency. *Slip Op.* at 21.

contrast, the Board of Trustees contests whether Ely's injury would be redressed by affording him the relief he seeks.[31] In other words, the Supreme Court did not reach the redressability question that is before this Court. Accordingly, *Thole* does not compel this Court to enter judgment for Ely on the Board of Trustees' affirmative defense of lack of Article III standing.[32]

Last, the Court finds Ely has not presented evidence demonstrating anything beyond mere speculation that his injury (insolvency of the Plan and its resulting inability to pay benefits) will be redressed by a favorable decision. Joseph Hicks, the Board of Trustees' retained expert, is of the opinion that the AFD Exit Fee has forestalled insolvency, and will in the future bring more money into the Plan. Solvency is a question of whether the Plan has sufficient available resources— namely, cash—to pay benefits under the plan when due for the plan year. ERISA § 4245(b)(1) (defining insolvency as the inability to pay benefits when due from "available resources"); ERISA § 4245(b)(3) (defining "available resources" as "cash,

---

[31] The Court rejects the Trustee's argument that Ely could not satisfy Article III's injury in fact requirement based upon the theory that Ely's receipt of pension benefits from Clearwater would make up any shortfall in benefits from PIUMPF.

[32] The question whether Ely satisfies the injury-in-fact requirement based upon an interpretation of the statutory text of ERISA § 502(a)(3) and § 305(e)(3)(A)(ii) is not before this Court, and was not raised upon the motion to dismiss. Injury is assumed here for purposes of Defendant's motion, as the Board of Trustees presented no argument regarding the first element of standing other than to assert Ely will suffer no financial harm because his Clearwater pension is offset by whatever he may receive from PIUMPF, which argument the Court rejected. Nonetheless, the Court notes the Supreme Court in *Thole* rejected the assertion that, simply because ERISA may afford beneficiaries and participants a general cause of action under ERISA § 502(a)(3) a plaintiff automatically satisfies the injury-in-fact requirement for purposes of standing in an ERISA case seeking equitable relief. *Id.* at 5 (citing *Spokeo*, 578 U.S. ___, __ (2016) (*slip op.* at 9)).

marketable assets, contributions, withdrawal liability payments, and earnings, less expenses). Darrel Owens, of Segal, testified that he believes removal of the AFD Exit Fee would make insolvency happen earlier. Faced with these opinions, Ely offers no facts, opinions, or other concrete evidence that PIUMPF would miraculously emerge from the brink of bankruptcy if the Court enjoined or annulled the AFD Exit Fee and appointed a receiver to invest the Plan's assets.

In short, Ely has not demonstrated that it is likely, and not merely speculative, that his injury, which is linked inexorably to PIUMPF's projected insolvency, would be redressed by a favorable outcome in this litigation.

### ii.    Statutory Standing

ERISA provides for two "catchall" remedies, providing "appropriate equitable relief" for "any" statutory violation. *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). "This structure suggests that these 'catchall' provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp.*, 516 U.S. at 512. The statute clearly authorizes "appropriate" equitable relief. In fashioning appropriate equitable relief, the Court must keep in mind the "special nature and purpose of employee benefit plans," and respect the "policy choices reflected in the inclusion of certain remedies and the exclusion of others." *Varity Corp*, 516 U.S. at 515.

Other principles the Court must keep in mind are the principles of statutory construction, especially in the context of ERISA. First, "in 'every case involving

construction of a statute,' the 'starting point ... is the language itself.'" *Thole v. U. S. Bank N.A*, ___ U.S. ___, 140 S. Ct. 1615, 1623, 207 L. Ed. 2d 85 (2020) (THOMAS, J., Concurring (citing *Varity*, 516 U.S. at 528, THOMAS, J., dissenting). And second, under ERISA, the Court's approach to statutory interpretation is "measured and restrained." *WestRock RKT Co. v. Pace Industry Union-Management Pension Fund*, 856 F.3d 1320, 1325 (11th Cir. 2017) (citing *Gulf Life Ins. Co. v. Arnold*, 809 F.2d 1520, 1524 (11th Cir. 1987) ("[C]ivil actions under ERISA are limited only to those parties and actions Congress specifically enumerated….")).

Ely has made clear in his most recent filing that, not only does he seek Court annulment of the AFD Exit Fee, but he also seeks appointment of a receiver to administer the Plan and manage its assets. (Dkt. 163.)[33] But, the authority Ely relies upon relates to the removal of fiduciaries who administer plan assets. ERISA has defined standards applicable to plan fiduciaries and the investments fiduciaries may make with plan assets. 29 U.S.C. §§ 1101 – 1113, ERISA §§ 404 - 413. Here, in contrast, the Board of Trustees was clearly acting in its role as plan sponsor. 29 U.S.C. § 1085(e)(1), ERISA § 305(e)(1) (requiring the plan sponsor to "adopt a rehabilitation plan….").

Ely has never disputed the fact that PIUMPF is in critical status, nor has he claimed that the Board of Trustees erred in making that determination. Once a plan is determined to be in critical status, the plan sponsor is required to adopt a rehabilitation

---

[33] The Board of Trustees filed a motion to strike Ely's motion to appoint a receiver.

plan and provide certain information to the bargaining parties participating in the plan, such as revised benefit structures or revised contribution structures which, if adopted, "may reasonably be expected to enable the [ ] plan to emerge from critical status in accordance with the rehabilitation plan." 29 U.S.C. § 1085(e)(1)(A), (B), ERISA § 305(e)(1)(A), (B). Yet, despite proposing annulment of the AFD Exit Fee, completely lacking in Ely's briefing and Naughton's analysis is any explanation how removal of the AFD Exit Fee and appointment of a receiver would comply with ERISA § 305(e)(1)(A) and (B).

Nor does Ely explain how his proposed remedy would meet ERISA's definition of a rehabilitation plan in § 305(e)(3)(A). The definition of a rehabilitation plan requires a showing that certain actions will either enable the plan to cease to be in critical status by the end of the ten-year rehabilitation period, or will allow it to emerge from critical status at a later time, as opposed to simply forestalling insolvency. But Ely offers no facts or evidence to support his contention that annulment of the AFD Exit Fee would meet the PPA's definition of a rehabilitation plan.

Ely contends that annulment of the AFD Exit Fee would "undo" the damage it has caused. But he offers no alternative, buttressed by reasonably anticipated experience and reasonable actuarial assumptions. As pointed out by the Board of Trustees, Ely has not offered concrete evidence of the impact such annulment would have upon him and other Plan participants and beneficiaries. Nor has Ely explained,

with factual support, how the proposed remedy would advance the statutory interest of allowing the Plan to emerge from critical status either within the ten-year statutory period or some later time, or would forestall PIUMPF's projected insolvency beyond 2032.

## CONCLUSION

In sum, the Court finds Ely has not presented facts, disputed or otherwise, that establish a likelihood that PIUMPF's projected insolvency would be redressed by annulment of the AFD Exit Fee and appointment of a receiver. Nor has Ely presented facts that establish the proposed remedy of annulment of the AFD Exit Fee and appointment of a receiver constitutes "appropriate equitable relief" to redress the alleged violation of ERISA § 305(e)(3)(A). Ely has therefore failed to establish either Article III standing or statutory standing under ERISA.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Motion for Summary Judgment (Dkt. 84) is **DENIED**.

2)      Defendant's Motion in Limine (Dkt. 89) is **DENIED**.

3)      Plaintiff's Motion in Limine (Dkt. 92) is **DENIED.**

4)      Defendant's Motion for Summary Judgment (Dkt. 105) is **GRANTED**.

**IT IS FURTHER ORDERED THAT:**

1)      Plaintiff's Motion to Appoint Receiver (Dkt. 163) is **DENIED as MOOT**.

2)      Defendant's Motion to Strike (Dkt. 165) is **DENIED as MOOT**.

The Court will enter a separate judgment in favor of Defendant.

DATED: November 30, 2020

Honorable Candy W. Dale
United States Magistrate Judge